22-2025, 22-2028, 22-2029, 22-2030, 22-2032, 22-2037

# United States Court of Appeals for the Federal Circuit

CELLSPIN SOFT, INC.,

Plaintiff-Appellant,

v.

FITBIT LLC; NIKE, INC.; UNDER ARMOUR, INC.; FOSSIL GROUP, INC.; NIKON AMERICAS, INC.; and GARMIN INTERNATIONAL, INC.,

Defendants-Appellees,

*Appeal from the United States District Court for the Northern District of California in case nos. 4:17-cv-05928, 4:17-cv-05931, 4:17-cv-05932, 4:17-cv-05933, 4:17-cv-05936, and 4:17-CV-05934*
*Judge Yvonne Gonzalez Rogers*

**[NON-CONFIDENTIAL] OPENING BRIEF OF PLAINTIFF-APPELLANT**

December 19, 2022

*/s/ M Scott Fuller*
Randall Garteiser
rgarteiser@ghiplaw.com
Christopher A. Honea
chonea@ghiplaw.com
M. Scott Fuller
sfuller@ghiplaw.com
**GARTEISER HONEA – IP TRIAL BOUTIQUE**
95 Third Street, 2nd Floor
San Francisco, California 94103
Telephone: (415) 785-3762
Facsimile: (415) 785-3805

*Attorneys for Plaintiff-Appellant*
CELLSPIN SOFT, INC.

# CERTIFICATE OF INTEREST

The undersigned counsel for the Plaintiff-Appellant certifies the following, pursuant to Federal Circuit Rule 47.4:

(i) The full name of every entity represented by me in this case is:

Cellspin Soft, Inc.

(ii) The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

N/A

(iii) All parent corporations and any publicly held companies that own 10 percent or more of the stock of the entity represented by me are:

N/A

(iv) The names of all law firms, partners, and associates that have not entered an appearance in the appeal, and (A) appeared for the entity in the lower tribunal; or (B) are expected to appear for the entity in this court, are:

**COLLINS EDMONDS & SCHLATHER, PLLC**
John J. Edmonds
Shea N. Palavan
Brandon G. Moore

(v) Other than the originating case number(s), the title and number of any cases known to counsel to be pending in this or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal.

None.

Date: December 19, 2022

*/s/ M. Scott Fuller*
M. Scott Fuller

# TABLE OF CONTENTS

STATEMENT OF REDACTION: This redacted Brief contains confidential information which was maintained as Confidential in the District Court. Generally, such information includes technical system diagrams and proprietary operational and functional specifications of certain Defendants. The redacted material appears on the following pages of this Brief: 11, 12, 44, 46, 47, 50, 76, 77, 78, 79, 81, and 82.


**CERTIFICATE OF INTEREST** ........ ii

**TABLE OF CONTENTS** ........ iii

**TABLE OF AUTHORITIES** ........ viii

**I. STATEMENT OF RELATED CASES** ........ 1

**II. STATEMENT OF JURISDICTION** ........ 2

**III. STATEMENT OF THE ISSUES** ........ 3

**IV. STATEMENT OF THE CASE AND FACTS** ........ 4

- **A. THE PRIOR APPEAL AND REMAND** ........ 4
- **B. THE ASSERTED CLAIMS AND ACCUSED INSTRUMENTALITIES** ........ 4
- **C. FACT AND EXPERT DISCOVERY IN THE DISTRICT COURT** ........ 5
- **D. THE EXPERT INFRINGEMENT REPORTS** ........ 6
- **E. THE NON-INFRINGEMENT SUMMARY JUDGMENT MOTIONS** ........ 12

**V. SUMMARY OF THE ARGUMENT** ........ 12

**VI. ARGUMENT** ........ 14

- **A. LEGAL PRINCIPLES AND STANDARD OF REVIEW** ........ 14

B. THE DISTRICT COURT ERRED IN FAILING TO CONSIDER THE EVIDENTIARY RECORD AS A WHOLE .......... 17

C. THE DISTRICT COURT ERRED IN FINDING THAT THE EXPERT OPINIONS OF CELLSPIN'S TECHNICAL EXPERT WERE CONCLUSORY .......... 20

D. DEFENDANT FITBIT .......... 24

1. TEMPORAL ORDER .......... 24

2. PERFORMED IN THE UNITED STATES .......... 29

3. INTERNAL TESTING BY FITBIT .......... 34

4. DIVIDED INFRINGEMENT .......... 35

a. FITBIT SOURCE CODE PERFORMS RECITED FUNCTION .......... 36

b. FITBIT "DIRECTS AND CONTROLS" INFRINGEMENT .......... 37

c. CELLSPIN ESTABLISHED INDIRECT INFRINGEMENT .......... 40

5. "USER IDENTIFIER" AND "USER INFORMATION" .......... 40

6. "CRYPTOGRAPHICALLY AUTHENTICATE" .......... 43

7. "PROCESSORS" .......... 46

a. CELLSPIN IDENTIFIED A "FIRST PROCESSOR" .......... 46

b. CELLSPIN IDENTIFIED REPRESENTATIVE PROCESSORS .......... 50

E. DEFENDANT GARMIN .......... 52

1. PROVIDING A SOFTWARE MODULE ..... 52

2. ESTABLISHING A SECURE PAIRED BLUETOOTH CONNECTION ..... 54

3. INTERNAL TESTING ..... 57

4. ASSEMBLY ..... 59

5. INDUCEMENT ..... 60

6. "DETECT" AND "DETERMIN[E]" "NEW DATA" ..... 60

7. TEMPORAL ORDER ..... 62

8. "ATTACHING" "USER IDENTIFIER" TO "NEW DATA" ..... 65

9. "FIRST PROCESSOR" ..... 65

10. "SECOND PROCESSOR" ..... 68

F. DEFENDANT FOSSIL ..... 70

1. THE "WEAR OS PRODUCTS" ..... 70

2. THE "FOSSIL HR HYBRID" PRODUCTS ..... 71

a. "CRYPTOGRAPHICALLY AUTHENTICATE" ..... 71

b. "USER IDENTIFIER" AND "USER INFORMATION" ..... 73

c. "SIGNALING NEW DATA FOR TRANSFER" AND "POLLING" ..... 73

G. DEFENDANT NIKON ..... 75

1. NIKON'S SO-CALLED "TWO-CONNECTION" PROCESS INFRINGES ..... 75

2. PERFORMANCE OUTSIDE THE UNITED STATES .....................79

3. "[RECEIVING/MAKING AVAILABLE] AT THE ONE OR MORE WEB SERVICES, THE NEW DATA" ................79

4. "ESTABLISH A SECURE PAIRED BLUETOOTH CONNECTION" ..................................................81

5. "CRYPTOGRAPHICALLY AUTHENTICATE" ............................82

H. DEFENDANT UNDER ARMOUR .........................................................85

1. THE HOVR 3 PRODUCTS ......................................................85

a. "ESTABLISHING" A "PAIRED BLUETOOTH CONNECTION" ........................................85

b. "SECURE PAIRED BLUETOOTH CONNECTION" AND "CRYPTOGRAPHIC ENCRYPTION KEY" .....................................................88

2. THE SAMSUNG GALAXY WATCH AND HOVR 3 PRODUCTS .............................................................89

a. "MAINTAINED ON A CONTINUOUS BASIS" ...................89

I. DEFENDANT NIKE ........................................................................92

1. THE APPLE WATCH NIKE PRODUCTS ..................................92

a. "ATTACHING" OR "APPLYING" USER IDENTIFICATION TO "NEW DATA" ..............................92

b. "FIRST PROCESSOR" ..................................................92

c. "SECOND PROCESSOR" ...............................................94

d. "INTERNAL TESTING" .................................................94

e. "ASSEMBLY" ..............................................................95

**f. DIVIDED INFRINGEMENT** ............................................ 95

**VII. CONCLUSION AND PRAYER FOR RELIEF** .................................................. 95

# TABLE OF AUTHORITIES

**CASES:**

*Akamai Techs., Inc. v. Limelight Networks, Inc.*,
797 F.3d 1020 (Fed. Cir. 2015) ........................................................ 36

*Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*,
761 F.3d 1329 (Fed. Cir. 2014) ........................................................ 33

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)............................................................... 14, 15

*Ariz. Dream Act Coalition v. Brewer*,
818 F.3d 901 (9th Cir. 2016) ........................................................... 14

*B-K Lighting, Inc. v. Fresno Valves & Castings, Inc.*,
375 Fed.Appx. 28 (Fed. Cir. 2010) .................................................... 15

*Bio-Rad Labs. v. 10X Genomics*,
967 F.3d 1353 (Fed. Cir. 2020) .................................. 15, 26, 47, 62, 63

*C.R. Bard Inc. v. AngioDynamics, Inc.*,
979 F.3d 1372 (Fed. Cir. 2020) ........................................................ 44

*Carmen v. San Francisco Unified School District*,
237 F.3d 1026 (9th Cir. 2001) ......................................................... 16

*Cellspin Soft, Inc. v. Fitbit, Inc.*,
927 F.3d 1306 (Fed. Cir. 2019) ..........................................................4

*Classen Immunotherapies, Inc. v. Elan Pharm., Inc.*,
786 F.3d 892 (Fed. Cir. 2015) .......................................................... 14

*Edwards Sys. Tech. v. Digital Control Sys.*,
99 Fed.Appx. 911 (Fed. Cir. 2004) ............................... 15, 37, 39, 76, 87

*EMI Group N.A., Inc. v. Cypress Semiconductor Corp.*,
268 F.3d 1342 (Fed. Cir. 2001) ........................................................ 33

*Finjan v. Blue Coat,*
2015 WL 3640694 (N.D. Cal. 2015) ........................................................ 43

*Finjan, Inc. v. Qualys Inc.,*
2021 WL 1253651 (N.D. Cal. 2021) ........................................................ 43

*Fujifilm Corp. v. Motorola Mobility*,
182 F.Supp.3d 1014 (N.D. Cal. 2016) ........................................ 26, 62, 63

*Genentech, Inc. v. Apotex Inc.,*
2014 WL 12646045 (N.D. Cal. 2014) ...................................................... 19

*Hinton v. Pacific Enters.*,
5 F.3d 391 (9th Cir. 1993) ....................................................................... 41

*i4i Ltd. Partnership v. Microsoft Corp.,*
598 F.3d 831 (Fed. Cir. 2010) ................................................................. 33

*In Re: Copaxone Consolidated Cases,*
906 F.3d 1013 (Fed. Cir. 2018) ............................................................... 44

*Intel Corp. v. Tela Innovations, Inc.,*
2021 WL 516529 (N.D. Cal. 2021) .......................................................... 16

*Invitrogen Corp. v. Clontech Labs., Inc.,*
429 F.3d 1052, 1080 (Fed. Cir. 2005) ..................................................... 20

*Irise v. Axure Software Soln's,*
2009 WL 3615075 (C.D. Cal. 2009) ........................................................ 93

*Joy Techs., Inc. v. Flakt, Inc.,*
6 F.3d 770 (Fed. Cir. 1993) ............................................................... 30, 52

*Koninklijke Philips v. Google LLC,*
948 F.3d 1330 (Fed. Cir. 2020) ............................................................... 44

*Koninklijke Philips v. Zoll Medical,*
656 Fed. Appx. 504 (Fed. Cir. 2016) ...................................................... 32

*Lemelson v. TRW, Inc.*,
760 F.2d 1254 (Fed. Cir. 1985) ............................................................... 14

*Liquid Dynamics Corp. v. Vaughan Co.*,
449 F.3d 1209 (Fed. Cir. 2006) .......... 15

*Masson v. New Yorker Magazine*,
501 US 496 (1991).......... 15

*MasterObjects, Inc. v. Meta Platforms, inc.*,
2022 WL 4856269 (N.D. Cal. Oct. 3, 2022) .......... 42

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
475 U.S. 574 (1986).......... 15, 17

*Muniauction, Inc. v. Thomson Corp.*,
532 F.3d 1318 (Fed. Cir. 2008) .......... 56

*Ormco Corp. v. Align Tech., Inc.*,
463 F.3d 1299 (Fed. Cir. 2006) .......... 30, 52

*Orthopaedic Hospital v. Encore Medical*,
2022 WL 254956 (S.D. Cal. Jan. 27, 2022) .......... 40

*Phillips Petroleum Co. v. Huntsman Polymers Corp.*,
157 F.3d 866 (Fed. Cir. 1998) .......... 20

*Semiconductor Energy Lab. Co. Ltd. v. Chi Mei Optoelectronics Corp.*,
485 F.Supp.2d 1089 (N.D. Cal. 2007).......... 21

*SiRF Tech. v. Int'l Trade Comm'n*,
601 F.3d 1319 (Fed. Cir. 2010) .......... 30, 54, 55, 56

*Silicon Labs., Inc. v. Cresta Tech. Corp.*,
2016 WL 836679 (N.D. Cal. 2016).......... 15, 37, 87

*Spigen Korea Co., Ltd. v. Ultraproof, Inc.*,
955 F.3d 1379 (Fed. Cir. 2020) .......... 14

*Tinnus Enterprises, LLC v. Telebrands Corp.*,
846 F.3d 1190 (Fed. Cir. 2017) .......... 45

*Traxcell Techs., LLC v. Sprint Commc'ns. Co. LP*,
15 F.4th 1121 (Fed. Cir. 2021) .................................................. 17, 18, 24

*Ultratec, Inc. v. Sorenson Communications, Inc.*,
733 Fed.Appx. 535 (Fed. Cir. 2018) ..................................................... 45

*Warner Lambert Co. v. Teva Pharm.*,
418 F.3d 1326 (Fed. Cir. 2005) ............................................................ 16

**STATUTES AND RULES:**

28 U.S.C. §1295(a)(1) .........................................................................2

28 U.S.C. §1331 ..................................................................................2

28 U.S.C. §1338(a) .............................................................................2

28 U.S.C. §1400(b) .............................................................................2

28 U.S.C. §2107 ..................................................................................2

Fed.Cir.R. 4 .........................................................................................2

Fed.R.App.P. 4(a) ................................................................................2

Fed.R.App.P. 4(a)(4)(B)(i) ....................................................................2

Fed.R.Civ.P. 56(c)(1)(a) .......................................................................16

## I. STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5(a), counsel for Plaintiff-Appellant, Cellspin Soft, Inc. ("Cellspin"), hereby states that the civil cases underlying these consolidated appeals were previously appealed to this Court, as follows:

(i) The title and number of the earlier appeals were: *Cellspin Soft, Inc. v. Fitbit, Inc.; Moov, Inc. d/b/a Moov Fitness, Inc.; Nike, Inc.; Fossil Group, Inc.; Misfit, Inc.; Garmin International, Inc.; Garmin USA, Inc.; Canon USA, Inc.; GoPro, Inc.; Panasonic Corporation of North America; and JK Imaging Ltd.*, Appeals Nos. 2018-1817, 2018-1819, 2018-1820, 2018-1821, 2018-1822, 2018-1823, 2018-1824, 2018-1825, and 2018-1826.

(ii) The date of the earlier decision was: June 25, 2019.

(iii) The composition of the earlier panel was: Lourie, O'Malley, and Taranto.

(iv) The citation of the earlier opinion in the Federal Reporter is: 927 F.3d 1306 (Fed. Cir. 2019).

Pursuant to Federal Circuit Rule 47.5(b), counsel for Cellspin further states that it is not aware of any case pending in this or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal.

## II. STATEMENT OF JURISDICTION

Cellspin brings these consolidated Appeals from the District Court, including in accordance with 28 U.S.C. §1295(a)(1). Fed.R.App.P. 4(a)(4)(B)(i). Each of the consolidated, pending actions arose under the United States Patent Laws and jurisdiction, including in accordance with, and pursuant to, 28 U.S.C. §§1331, 1338(a) and 1400(b).

Cellspin takes each of these appeals from the final judgments[1] entered in the respective cases by the District Court, based upon the Court's clearly erroneous grant of the Motions for Summary Judgment in favor of each of the Defendant-Appellees, which amounted to clear error.[2]

These orders are final because appealable orders amounting to final judgment were entered on June 15, 2022. Cellspin timely filed Notices of Appeal[3] within thirty days of entry of final judgment in accordance with 28 U.S.C. §2107, Fed.R.App.P. 4(a), and Fed.Cir.R. 4.

---

[1] *See, e.g.,* June 15, 2022 Judgment as entered in Case No. 22-2025 (Fitbit) (Appx0114), which is identical in material respects to the Judgments entered in each of the respective cases by the District Court. Appx0115-0120.

[2] June 7, 2022 Order Granting Motions for Summary Judgment (Appx0031-0113), which was entered in each of the respective cases by the District Court.

[3] Notices of Appeal, *see* Appx0462-Appx0473.

## III. Statement of the Issues

1. Whether the District Court erred in granting each of Defendant-Appellees' individual motions for summary judgment of non-infringement.

2. Whether the District Court erred in finding that the expert opinions of Cellspin's technical expert were conclusory.

3. Whether the District Court erred in failing to consider the record as a whole on summary judgment.

4. Whether the District Court erred by weighing evidence and failing to view all evidence in a light most favorable to Cellspin as the non-moving summary judgment party.

5. Whether the District Court erred in rendering credibility judgments on summary judgment.

6. Whether the District Court erred in failing to credit circumstantial evidence of infringement.

# IV. Statement of the Case and Facts

## A. The Prior Appeal and Remand

These consolidated matters were previously appealed to this Court following the District Court's earlier erroneous Orders invalidating all Asserted Claims under 35 U.S.C § 101. This Court reversed and remanded the District Court's Orders at *Cellspin Soft, Inc. v. Fitbit, Inc.,* 927 F.3d 1306 (Fed. Cir. 2019). Upon remand and fact discovery, the District Court denied Defendants' Motion for Summary Judgment again seeking to invalidate the Asserted Claims under 35 U.S.C. § 101, and construed the claims as a matter of law. The parties then proceeded through full discovery.

## B. The Asserted Claims and Accused Instrumentalities

Given the Court's prior familiarity with these Asserted Patents from the prior appeal, Cellspin here provides only a brief overview. The Asserted Patents each relate to systems or methods for efficiently transferring data from a Bluetooth-enabled data capture device (such as, for example, a wearable fitness tracker) to a remote Internet server via a physically-separate Bluetooth-enabled mobile device which is equipped with a mobile application. Here, Cellspin asserts the following claims: Claims 1, 2, and 3 of United States Patent No. 9,749,847; Claims 1, 2, 4, 5, 12, 13, and 14 of United States Patent No. 8,892,752; and Claims 1, 2, 3, 4, 7, 9, 16, 17, 18, 20, and 21 of United States Patent No. 8,738,794.

The Defendants in these matters each manufacture and sell infringing wearable devices in the form of either fitness trackers, watches, or shoes. Uniquely, Defendant Nikon manufactures and sells infringing data capture devices in the form of digital cameras. Defendants further provide infringing mobile applications for use with their respective infringing products. A representative Accused Product and Mobile Application of Defendant Fitbit are illustrated below:




## C. FACT AND EXPERT DISCOVERY IN THE DISTRICT COURT

As noted, the parties each engaged in full fact and expert discovery. In the process, the technical experts for Cellspin conducted in-person evaluations and inspections of the pertinent Source Code as provided by each Defendant. The parties collectively prepared and served a total of 29 expert reports concerning damages, infringement, and validity. The infringement reports prepared on behalf of Cellspin

were authored by its qualified technical expert, Rahul Vijh (hereafter "Vijh").[4]

### D. THE EXPERT INFRINGEMENT REPORTS

As noted, a separate Cellspin Expert Infringement Report authored by Rahul Vijh was served to each individual defendant. The Vijh Reports each include, *inter alia*, discussions of the legal framework, claim construction, the Asserted Patents, the Accused Products and Accused Mobile Applications, and a claim-by claim and element-by-element discussion and infringement analysis.

The Vijh Reports identify each individual claim element using a numbering paradigm which corresponds to the numbering used in the Claim Charts accompanying each Report as Vijh Exhibits E, which each concern an individual representative Accused Instrumentality. Within each individual paragraph of the Vijh Report and for each individual claim element, Vijh discusses his opinions and identifies certain relevant Source Code supporting such opinions as applicable. Each paragraph further specifically cites and incorporates the discussion and evidence as cited in the corresponding section of the Claim Charts at each accompanying Vijh Exhibit E.

Each Vijh Exhibit E provides detailed discussions concerning the

[4] The original expert reports were authored by Dr. Ryan Garlick on behalf of Plaintiff Cellspin. Due to unexpected circumstances, Cellspin subsequently moved the Court for leave to substitute Mr. Vijh for Dr. Garlick, which the District Court granted. As such, the Cellspin Expert Reports are deemed authored by Rahul Vijh, who has adopted all of the opinions as set forth in the Written Report and all Exhibits thereto.

technologies of the Asserted Claims, including citations and explanations of the Bluetooth Standard and typical computer architectures as pertinent to each individual claim element. Further, each Vijh Exhibit E provides numerous screenshots as prepared by Vijh illustrating his testing and personal usage of the charted devices and the respective infringing functionalities and features. Among the tests conducted by Vijh are "sniffing" tests, which variously evidence and confirm data transmissions among devices, and such are reported in the form of "sniffing logs" provided in the Vijh Exhibits E. Still further, each Vijh Exhibit E provides citations to the pertinent evidence of record for each individual element, including citations to Source Code, Technical Documents, and Witness Testimony.

As for each individual Defendant and each representative Accused Instrumentality, Vijh purchased and personally tested such devices, including the related Accused Mobile Application(s), and carried out the steps of the Asserted Claims. In the process, Vijh performed Bluetooth packet sniffing and Internet data transfer packet sniffing and reported those results in the Vijh Exhibits E. Of course, Vijh captured a number of screenshots of the Accused Instrumentalities in actual use as a means of illustrating and evidencing the infringing functionalities and performance of the infringing methods.

By way of illustration and for reference, the flow chart below reflects the organizational structure of the Vijh Reports, as described immediately *supra:*



By way of example, and with respect to Element 1.I.c of Claim 1 of the '847 Patent, the Written Report authored by Vijh provides his opinion concerning infringement, including the following:

> I was able to locate evidence of "pairing" in accordance with the Court's construction. Moreover, testing of the Accused Instrumentalities and Accused Mobile Applications confirmed they respectively operate in accordance with the Asserted Claim. For example, FB-SC000311 details parameters specific to the Bluetooth pairing process on the device. *See* Vijh Exhibit E at: '847 Exhibits 1-2 at Element 1.I.c. In my opinion, this element is met by the Accused Instrumentalities.

*See* Appx0503-04 at ¶ 88 (citing Fitbit Source Code at Appx1150 and "Vijh Exhibit E" at Appx2007-21 and Appx2696-710). As cited by Vijh, his opinions continue and include the information and evidence in Vijh Exhibits E, which comprise, *inter alia*, discussions of the technology and screenshot evidence of the infringing functionality (in this case, "establishing a paired Bluetooth connection"), as illustrated below:




Further, the Vijh Exhibits E include additional specific citations to the record in support of his opinions and conclusions. Generally, such citations include Source Code, technical documents, and witness testimony. For example:

**REDACTED**

*See, e.g.*, Android Bluetooth Settings

In addition, as to this Element and as to this Asserted Claim, the following evidence is cited in support of the opinions of Dr. Ryan Garlick:

Source Code: FB-SC-000667

Defendant's Documents: [redacted]

Page **28 | 137** **U.S. Patent No. 9,749,847**

Fitbit '847 EXHIBIT 1 – Fitbit Versa 2 PIC Chart

| **Infringement Contention** |
|---|
| REDACTED<br>DESCRIPTIVE TEXT FROM ORIGINAL<br>[redacted]<br>Deposition Testimony (see Exhibit F to Garlick Written Report): Boccon-Gibod at 16-18 (all are Bluetooth devices), 43 (all use BTLE), 51-52 (use BTLE secure pairing - JustWorks), 54-55 (authentication), 58-60 (app runs in background), 70-71 (pairing and key exchange), 72-74 (all day sync every 15 minutes), 158-159 (pairing) |

Page **29 | 137** **U.S. Patent No. 9,749,847**

As highlighted for reference, each citation to a document or transcript includes a brief and specific quote of the pertinent disclosure or testimony. As readily appreciated, such citations are not merely block references to "swaths of documents" and do not require the Court to "scour the record in search of facts." Rather, Vijh

REDACTED

has endeavored to provide very specific citations and quotes of the directly relevant text from the documents themselves. By way of example, Vijh (in the excerpt above) cites specifically to page FB30941 [Appx1731] which includes a disclosure of how the "[redacted]" and further discloses the fact that "[redacted]." This same detailed approach is used by Vijh throughout all of his Reports.

### E. The Non-Infringement Summary Judgment Motions

At the close of discovery, each Defendant filed a motion for summary judgment of non-infringement. In opposition, Cellspin directed the District Court to the expert testimony and evidence of record which raise genuine issues of fact precluding summary judgment. The District Court granted virtually every issue in every motion in favor of Defendants, based largely on the District Court's failure to properly consider the evidence on the whole and its failure to appreciate the totality of evidence and opinion as provided by Vijh.

## V. Summary of the Argument

The District Court's omnibus Order granting each of Defendant-Appellees' Motions for Summary Judgment is erroneous and should be reversed. In its briefing to the District Court, Cellspin presented specific and substantial evidence in support of its infringement case against each of the Defendants. That evidence comprised, *inter alia*, qualified expert testimony, corporate technical witness testimony,

technical documents and user manuals, source code, expert test data, and observable functionalities of the Accused Instrumentalities. At bare minimum, Cellspin presented sufficient specific record evidence to raise genuine issues of material fact as to infringement in each and every instance.

The District Court erred in several respects. First, the District Court failed to apply a proper summary judgment standard, by: (i) improperly weighing evidence; (ii) failing to view all evidence and draw all inferences in a light most favorable to Cellspin as the non-moving party; and (iii) failing to consider the evidentiary record as a whole. Second, the District Court erroneously and consistently found the opinions offered by Cellspin's technical expert to be "merely conclusory," notwithstanding the fact that every statement in the Vijh Expert Reports is backed by specific citations to the record. Meanwhile, the District Court consistently credited the opinions of Defendants' experts. Third, the District Court held Cellspin's technical Expert Report to an improper testimonial standard, as reflected by the fact that the District Court rejected opinions it did not understand from its own lay perspective. Fourth, the District Court failed to properly consider the specific evidence as cited by Cellspin; rather, the District Court characterized the volume of evidence as mere citations to "swaths" of documents without attributing the actual disclosures of such evidence to the benefit of Cellspin.

As in the prior appeals in these cases, the errors committed by the District

Court resulted in the improper and incorrect grant of summary judgment of non-infringement in favor of each of the Defendant-Appellees. Those erroneous Orders should be reversed.

## VI. ARGUMENT

### A. LEGAL PRINCIPLES AND STANDARD OF REVIEW

This Court applies the law of the regional circuit when reviewing a district court's grant of summary judgment. *Classen Immunotherapies, Inc. v. Elan Pharm., Inc.*, 786 F.3d 892, 896 (Fed. Cir. 2015). The Ninth Circuit reviews a grant of summary judgment de novo. *Ariz. Dream Act Coalition v. Brewer*, 818 F.3d 901, 908 (9th Cir. 2016).

At the summary judgment stage, "the judge's function is not … to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Fact-finding at such time "is an inappropriate exercise, at either the appellate or the district court level." *Lemelson v. TRW, Inc.*, 760 F.2d 1254, 1260 (Fed. Cir. 1985). Thus, if a reasonable factfinder "could find in favor of the non-moving party, a trial court must stay its hand and deny summary judgment." *Spigen Korea Co., Ltd. v. Ultraproof, Inc.*, 955 F.3d 1379, 1384 (Fed. Cir. 2020). On summary judgment, all evidence must be viewed in the light most favorable to the non-moving party, and all justifiable inferences are to be drawn in the non-moving party's favor; this

includes the resolution of questions of credibility and weight. *Anderson,* 477 US at 255; *Masson v. New Yorker Magazine,* 501 US 496, 520 (1991).

Summary judgment is inappropriate in a classic "battle of the experts" scenario. *Edwards Sys. Tech. v. Digital Control Sys.,* 99 Fed.Appx. 911, 921 (Fed. Cir. 2004); *B-K Lighting, Inc. v. Fresno Valves & Castings, Inc.,* 375 Fed.Appx. 28, 32 (Fed. Cir. 2010) (vacating summary judgment order in view of competing expert opinions); *Silicon Labs., Inc. v. Cresta Tech. Corp.,* 2016 WL 836679 at *5 (N.D. Cal. 2016). Expert testimony supported by testing and data flow analysis can be sufficient for the jury to find infringement. *Bio-Rad Labs. v. 10X Genomics*, 967 F.3d 1353, 1369 (Fed. Cir. 2020) (testing as sufficient evidence of infringement). Moreover, a patentee may prove direct infringement or inducement of infringement by either direct or circumstantial evidence; there is no requirement that direct evidence be introduced, nor is a jury's preference for circumstantial evidence over direct evidence unreasonable *per se. Liquid Dynamics Corp. v. Vaughan Co.,* 449 F.3d 1209, 1219 (Fed. Cir. 2006).

In reviewing summary judgment evidence, the task of the Court is to discern whether "the record *taken as a whole* could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986) (emphasis added). In this regard, the Federal Rules of Civil Procedure require that, in order to defeat summary judgment, the non-moving party

must "cit[e] to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed.R.Civ.P. 56(c)(1)(a). In the regional circuit, courts rely on the non-moving party to identify "with reasonable particularity the evidence that precludes summary judgment." *Intel Corp. v. Tela Innovations, Inc.,* 2021 WL 516529 at *2 (N.D. Cal. 2021). This requires the non-moving party to provide the Court with "adequate references" to the record such that the evidence can be "conveniently found." *Carmen v. San Francisco Unified School District,* 237 F.3d 1026, 1031 (9th Cir. 2001).

Finally, the burden of proof with respect to infringement is a preponderance of the evidence, which simply means that infringement is more likely than not. *Warner Lambert Co. v. Teva Pharm.,* 418 F.3d 1326, 1341, n.15 (Fed. Cir. 2005).

Other legal principles applicable to the District Court's erroneous grant of summary judgment are noted below, as applicable.

### B. THE DISTRICT COURT ERRED IN FAILING TO CONSIDER THE EVIDENTIARY RECORD AS A WHOLE

Throughout its Order Granting Summary Judgment [Appx0031-0113, hereafter as the "Order"], the District Court repeatedly and consistently failed to consider the evidence as cited by Cellspin as a whole. *Matsushita,* 475 U.S. at 587 (genuine issue must be viewed in light of record taken as a whole). This is not an isolated error, but rather permeates the entirety of the Order such that the Order should be reversed. The fundamental failure on the part of the District Court to appreciate and credit the totality of the evidence and opinions of Cellspin's technical expert is the root of this error.

In its briefing to the District Court, Cellspin fully complied with its summary judgment rebuttal requirement by providing the Court with specific citations to the voluminous evidence in support of infringement. The fact that there is substantial record evidence in support of infringement, and thus a large number of individual citations, does not in any sense mean Cellspin simply "cited to swaths of documents" without elaboration (as argued repeatedly by the District Court). To the contrary, Cellspin made specific and direct citations to pages and lines in the record which support its theories and the infringement opinions of its technical expert. Notwithstanding such specific citations, the District Court repeatedly cited to *Traxcell Techs., LLC v. Sprint Commc'ns. Co. LP,* 15 F.4th 1121, 1133 (Fed. Cir.

2021) in support of its judgment that Cellspin is guilty of "citing to swaths of documents without explanation." *See, e.g.,* Appx0035 at 5:15-18. The instant facts, however, bear no resemblance to those in *Traxell,* where the party simply "slammed" its briefing "full of volumes upon volumes of evidence." *Traxell,* 15 F.4th at 1133. As discussed at length herein *infra*, and as is readily apparent from a review of the Vijh Report (Appx0474-586) and its accompanying Claim Charts (*e.g.,* Appx1237-1471), the analysis and discussion as to each and every limitation is narrowly tailored and supported by specific citations to specific evidence of record. Further, there is no such "citation to swaths of documents" by Cellspin. To the extent Cellspin cites to materials in the record, such citations are made to specific pages, and commonly include a quotation of the exact pertinent language from the cited document. The District Court thus erred in failing to consider the record as a whole on summary judgment, and its repeated reliance on *Traxcell* is misplaced and erroneous.

By way of specific example, Defendant Fitbit argued that Cellspin failed to establish direct infringement via Fitbit's extensive internal product testing activities. Appx0042 at 12:5-7. In response, Cellspin first pointed to the substantial evidence "that the Accused Instrumentalities follow the recited temporal order when used in their normal and intended manner." Appx0445-46 at 10:27-11:2. These facts underlie the arguments as to testing, given that the testing carried out by Fitbit included "the full pattern of infringing use (data capture with transmission to mobile

application and web server)." Appx0445-46 at 10:26-11:15. Again, Cellspin directed the District Court to specific element-by-element evidence establishing the fact of infringement when the Accused Instrumentalities are used in their normal and intended manner. Appx0446 at 11:1-5 (citing to: Appx0437-43 at § III.A.1-2 (temporal order); Vijh (Appx0535-36 at ¶ 134; Appx0549-51 at ¶ 160; Appx0561-63 at ¶ 185; Appx0573-75 at ¶ 215 (summarizing opinions); Appx0443-45 at § III.A.3 (direct infringement of system claims); and Vijh (Appx0501-18) at ¶¶ 84-108 (opining with respect to infringement of system claims)). Indeed, the evidence of infringement includes the direct testing carried out on the Accused Instrumentalities by Vijh, and as reflected in the screenshots of the Accused Instrumentalities in use at Appx1253-68, as well as in the Bluetooth Sniffing Traffic Logs for the Accused Instrumentalities as reported and discussed, for example, at Appx1307-08. *Genentech, Inc. v. Apotex Inc.,* 2014 WL 12646045 at *2 (N.D. Cal. 2014) (Test results produce a question of fact).

These exemplary arguments and expert opinions are, as noted, fully supported with specific citations to the evidence of record. Indeed, this approach is employed throughout the Vijh Report (Appx0474-586), wherein the technical expert first discusses each individual claim limitation and cites to the specific evidence on which his opinions are based. Each individual claim limitation is discussed in detail, and includes the extensive evidence and discussion as provided in the supplemented

Infringement Contentions (*e.g.,* Appx1237-1471). Again, the District Court erred in failing to appreciate the totality of the evidence as cited, and by failing to credit the opinions and facts as cited by Vijh in his Written Report and its accompanying Exhibits E.

### C. THE DISTRICT COURT ERRED IN FINDING THAT THE EXPERT OPINIONS OF CELLSPIN'S TECHNICAL EXPERT WERE CONCLUSORY

Throughout its Order, the District Court repeatedly and consistently deemed the qualified expert opinions offered by Cellspin as merely conclusory. *See, e.g.,* Summary Judgment Order (Appx0032 at 2:14-16; Appx0053 at 23:1-3; Appx0058 at 28:21-23; Appx0062 at 32:6-7; Appx0071 at 41:11-14; Appx0076 at 46:8-13; Appx0097 at 67:25-26; Appx0101 at 71:5-7). Expert opinions, however, are "conclusory" only when they are "devoid of facts upon which the affiant's conclusions, as experts, were reached." *Phillips Petroleum Co. v. Huntsman Polymers Corp.,* 157 F.3d 866, 876 (Fed. Cir. 1998); *Invitrogen Corp. v. Clontech Labs., Inc.,* 429 F.3d 1052, 1080 (Fed. Cir. 2005) (expert raises genuine issue when there is a basis cited for his opinion). Indeed, in the Ninth Circuit, expert opinions which are based upon a personal examination of the accused instrumentalities performed by the expert are non-conclusory and should be challenged (if at all) at trial. *Semiconductor Energy Lab. Co. Ltd. v. Chi Mei Optoelectronics Corp.,* 485 F.Supp.2d 1089, 1100 (N.D. Cal. 2007).

As discussed above, the expert opinions of Vijh are provided on a claim-by-claim and element-by-element basis in his Written Reports as to each individual Defendant. *See, e.g.,* Appx0475-586 (Vijh Fitbit). Indeed, Vijh fully explained his methodology as used throughout his written reports. Appx0499-500 at ¶ 81; Appx0612 at ¶ 80; Appx0724 at ¶ 81; Appx0836-37 at ¶ 84; Appx0947-48 at ¶ 81; Appx1057-58 at ¶ 82. As explained, and to reiterate what the District Court failed to appreciate: Vijh's opinions are not limited to the statements and materials discussed and cited in the body of his Written Reports; rather, they further include (by express adoption) and are based upon the claim charts appended to each individual Report as Vijh Exhibits E [*e.g.,* Appx1237-1471], together with the discussions, technical explanations, screenshots, testing, and evidence of record as cited therein.

In each Report, Vijh explains, on an element-by-element basis, his opinions concerning infringement. In each instance, Vijh specifically cites to the evidentiary support he relied upon in forming his opinions as written. By way of example, and in reference to Defendant Fitbit (which is representative of the approach used for each Defendant), the Vijh Report [Appx0519-37] breaks out and discusses Claim 1 of the '752 Patent in a series of twenty-six consecutive numbered paragraphs (¶¶ 109-134). Those paragraphs follow the analytical framework as discussed *supra* at § IV.D.

By way of further illustration, Vijh begins his discussion and analysis of Claim 1 of the '752 Patent by explaining the basis for his reasoning and opinion that the Accused Fitbit Instrumentalities do, in fact, practice a method as set forth in the preamble. Appx0519 at ¶ 109, including Appx1237-1471 and Appx1472-1699 each by reference, and citing Fitbit Source Code at Appx1150; and at Appx1704-08.

Next, Vijh discusses Element 1.I of Claim 1, and provides a full explanation of the basis for his reasoning and opinion that the Accused Fitbit Instrumentalities do, in fact, perform the recited elements at the capture device. Appx0519-20 at ¶ 110, including Appx1237-1471 and Appx1472-1699 each by reference, and citing Fitbit Source Code at Appx1150.

Next, Vijh discusses Element 1.I.a of Claim 1, and again explains the basis for his reasoning and opinion that the Accused Fitbit Instrumentalities do, in fact, establish infringing secure paired Bluetooth connections at the data capture device. Appx0520-21 at ¶ 111, including Appx1237-1471 and Appx1472-1699 each by reference, and citing Fitbit Source Code at Appx1150 (explaining again [at Appx 0503-04 at ¶ 88] that such Code "details parameters specific to the Bluetooth pairing process on the device"). As explained by Vijh, the capture device establishes a secure Bluetooth connection when facilitated by the Accused Mobile Application. Appx1251-52. This process is illustrated and confirmed by Vijh via firsthand use and testing of the Accused Fitbit Instrumentalities, as recorded in Appx1253-59.

Likewise, the process is evidenced by the multitude of Fitbit technical documents [*see, e.g.,* Appx1268-69], including *inter alia* Appx1731. Of course, Vijh further supports his opinions by citing to specific lines of testimony from Fitbit's own witnesses, including Appx1788-89; Appx1789-91; Appx1800-01; and Appx1804-05.

For purposes of brevity, Cellspin will not here trace the support for each and every element of each and every claim, as such is evident from the Vijh Report and its accompanying Claim Charts. *See, e.g.,* Appx0475-586 (Vijh Fitbit), as discussed *supra*. For each element, the analytical pattern is consistent across all Reports and across all Defendants. That is, Vijh identifies the element, discusses the technical infringing functionality, and fully cites to the evidence of record supporting the ultimate conclusion. In the process, Vijh explains the relevance of the evidence such that a reasonable fact-finder could (and, in fact, should) find in favor of Cellspin as to the issue of infringement. Because the Vijh Report is non-conclusory, the District Court fundamentally erred in granting summary judgment of non-infringement for all Defendants.

## D. DEFENDANT FITBIT

### 1. TEMPORAL ORDER[5]

The Court's Claim Construction Order requires that, *for a given bit of data*, the claimed "event notifications" be enabled after the step of "acquiring new data in the Bluetooth enabled data capture device" and before the step of "determining existence of the new data for transfer." Order [Appx0034 at 4:9-10]. Because Cellspin presented substantial evidence from which a reasonable fact-finder could (and, in fact, should) find in favor of Cellspin as to this issue, the Order is erroneous and should be reversed.

The District Court first addressed Cellspin's reliance upon its technical expert, Vijh, and specifically his opinions as recorded at Appx0535-36 ¶ 134. Per the District Court, the opinions in the referenced paragraph are merely "conclusory" and do not explain how the cited sniffing logs and lines of Fitbit Source Code indicate performance of the claimed steps in the requisite temporal order. Appx0035 at 5:5-18 (citing *Traxcell,* 15 F.4th at 1133). These findings of the District Court are erroneous because they fail to properly and fully consider the substantial evidence cited by Cellspin in its briefing, including the evidence cited by Vijh in support of his opinions. Appx0437-38 at 2:24-3:16. As Cellspin explained to the District Court, the single summary paragraph identified and discussed by the Court in its

[5] This error impacts the Asserted Claims of the '792 and '794 Patents.

Order (namely, Appx0535-36 ¶ 134) was plainly *not* the sum total of Vijh's discussion on this specific issue. To the contrary, and as expressly pointed out to the District Court by Cellspin:

> Defendant [and, ultimately, the District Court in its Order] ignores the wealth of discussion leading up to, and providing evidentiary support for, such ultimate opinions. For example, Vijh explains that the processors of the Accused Devices are necessarily designed such that they "persistently acquire new data using the data capture circuitry" in order to perform as observed. Appx0522-23 at ¶ 114. Further, Vijh cites to Fitbit's own Source Code to establish how the Accused Products implement event notifications for new data. Appx0524-25 at ¶ 116; Appx1950-52. This functionality is further evidenced by the sniffing logs generated by Vijh as part of his analysis, where Vijh explains that the event notifications in the Accused Devices correspond to, and exist because of, the new data. *See* Appx0524-25 at ¶ 116; *see also* Appx1318-19. Still further, Vijh cites to a number of Fitbit's own technical documents in support of his conclusions, including Appx1953-55 and Appx1956, which he summarizes as disclosing how the Fitbit Live Data and Activity Services use characteristics and notifications, and the relative temporal timing of such use. Appx1320. Yet still further, Vijh has cited to, and relies upon, the testimony of Fitbit's own technical witness, who explained the flow of data using characteristic notifications. Appx1320 (citing Appx1820-22). Finally, Vijh discusses how the "callback" functionality in both Android and iOS is temporally triggered. *See* Appx0535-36; Appx0549-51; Appx0557-58 at ¶¶ 134, 160, 176; *see also* Appx1964 at 104:7-22 (explaining "callback"). In view of the foregoing, Defendant's assertion that there is purportedly "no evidence" of the temporal order relating to "event notifications" in the Accused Devices is demonstrably false.

*See* Appx0437-38 at 2:24-3:16.

Here, the "temporal order" of the Asserted Claims *is observable* and aspects can also be tested by various methods. Cellspin's expert preformed detailed rigorous

live testing of the representative Accused Devices with the Accused Mobile Applications. As discussed *supra*, and for each step, Vijh documented the actual performance of the claimed methods by the Accused Instrumentalities. Likewise, Vijh captured screenshots of the testing "sniffing logs" of the Bluetooth data and message flows between the capture device and the mobile device. Such testing screenshots are presented in the Vijh Exhibit E (at, *e.g.,* Appx1308; Appx1313; Appx1319; Appx1333; Appx1395). The District Court erred by failing to appreciate and credit the testing performed by Vijh and, in essence, sought to independently evaluate the technical merits of the testing evidence. *Bio-Rad Labs. v. 10X Genomics*, 967 F.3d 1353, 1369 (Fed. Cir. 2020) (testing as sufficient evidence of infringement); *Fujifilm Corp. v. Motorola Mobility*, 182 F.Supp.3d 1014, 1036 (N.D. Cal. 2016) (expert testimony, supported by testing and analysis of data flow, sufficient evidence for jury to find infringement).

Even beyond these citations, Cellspin further explained how the "persistent acquisition of new data" in the Accused Fitbit Devices is a supported fact in the record. Appx0438-39 at 3:22-4:3. Indeed, one of the principal paragraphs cited from the Vijh Report (namely, Appx0522-23 at ¶ 114) relating to this issue is not even *mentioned* by the District Court in its erroneous Order. Appx0438 at 3:1 and 3:25-27 (citing Appx0522-23 ¶ 114). Nevertheless, it is the persistent acquisition of data which largely informs and evidences the temporal aspect of the claimed event

notifications. Appx0522-23 at ¶ 114. The persistent acquisition of data is illustrated by the screenshots of the Accused Instrumentalities in actual use, as provided by Vijh in (for example) Appx1295-98. This evidence was specifically cited and discussed by Cellspin in its briefing to the District Court (Appx0438-39 at 3:27-4:1).

Still further, Cellspin pointed out to the District Court the fact that the specific temporal order of actions in the Accused Instrumentalities "is not accidental or infrequent; rather, it is the precise manner in which the Accused Devices are programmed to work, and the precise manner in which users are instructed to use them." Appx0439 at 4:5-7. From there, Cellspin identified specific evidence of record supporting infringement with respect to the claimed temporal order, as follows:

> Again, as summarized by Vijh, for a given bit of data, the progression and order of steps in the Accused Devices precisely meets the Asserted Claims. *See* Appx0535-36; Appx0549-51; Appx561-63; Appx573-75 at ¶¶ 134, 160, 185, 215 (summarizing opinions). The first step is the establishment of a paired Bluetooth connection. *See, e.g.,* Appx0520-21 at ¶ 111; Appx0540-41 at ¶ 143; Appx0553-54 at ¶ 168; Appx0567 at ¶ 199; Appx1251-59; Appx1263-64; Appx1266-69; Appx1731; Appx1759 and Appx1785-86). The next step is the acquisition of new data. *See, e.g.,* Appx0522-23 at ¶ 114; Appx0543-44 at ¶ 148; Appx0554 at ¶ 170; Appx0568 at ¶ 201; Appx1282 and Appx1296-98. As discussed at length *supra*, "event notifications" are then enabled. [Referencing discussion in Appx0437-38 at 2:14-3:16 and evidence as cited therein]. The new data is then transferred. *See, e.g.,* Appx0491-92 at ¶ 59; Appx0508 at ¶ 94; Appx0511-12 at ¶ 99; Appx0529 at ¶ 123; Appx0545-46 at ¶ 151; Appx0557-58 at ¶ 176; Appx0570 at ¶ 206; Appx1351-60; Appx2816. Finally, the new data is transmitted via HTTP to the Fitbit server. *See, e.g.,* Appx0515-16

> at ¶ 102; Appx0534-35 at ¶ 131; Appx0548-49 at ¶ 157; Appx0559 at ¶ 180; Appx0571-72 at ¶ 210; Appx1415-17 and Appx1420-23; Appx2818-21; Appx1817-18.

Appx0439 at 4:7-19. The fact that Cellspin cited to separate evidence in support of the performance of each of the individual steps in the claimed method is clearly not the same as citing to "swaths of documents" as alleged by the District Court.

Indeed, the District Court ignored virtually *all* of this evidence, and only mentioned seven paragraphs of the Vijh Report it in its erroneous Order. As to those paragraphs, the District Court broadly characterized them as failing to show the "practice of the asserted claims in order." Appx0035 at 5:21-22. But the cited paragraphs, as pointed out specifically by Cellspin in its briefing, concerned only the *final step* of transmitting new data via HTTP to the Fitbit servers – not the totality of the flow of data through the infringing Accused Instrumentalities. In sum, the District Court entirely missed the element-by-element discussion provided by Vijh (and cited by Cellspin) wherein the sequence of operations for a given bit of data is explained and evidenced in the record.

Specifically with respect to the enabling of "event notifications" *after* the step of "acquiring new data" and *before* the step of "determining existence of the new data," Cellspin provided the District Court with ample evidence from which a reasonable juror could find in favor of Cellspin as to infringement on the part of Fitbit. Appx0437-38 at 2:26-3:17 (citing Appx0522-23 at ¶ 114; Appx0535-36 at ¶

134; Appx549-51 at ¶ 160; Appx0557-58 at ¶ 176; Appx1950-52; Appx1318; Appx1953-55; Appx1956; Appx1820-22; and Appx1964 at 104:7-22). Notwithstanding the fact that Cellspin directed the District Court to all of these specific evidentiary sources, and despite the fact that Vijh explained the temporal timing with respect to each and every limitation individually (*see, e.g.,* Appx0525-26 at ¶ 118 (as referenced by Appx0535-36 at ¶ 134) (citing, *inter alia*, Fitbit Source Code at Appx1950-52 and the Bluetooth "sniffing logs" prepared by Vijh as reported and discussed at Appx1318-19), the District Court failed to consider all of these facts of record in its erroneous Order. Instead, and as noted, the District Court simply characterized the single summary paragraph [Appx0535-36 at ¶ 134] found in the Vijh Report as "conclusory," and erroneously failed to give the totality of Vijh's well-supported expert opinion any weight. Appx0035 at 5:5-18.

### 2. PERFORMED IN THE UNITED STATES[6]

The District Court erred in finding that Cellspin failed to offer sufficient evidence from which a reasonable juror can conclude that the performance of the "providing a software module on the Bluetooth enabled data capture device" takes place in the United States. As noted by the District Court, infringement here centers on an application of the plain and ordinary meaning of the term "providing." Appx0037 at 7:3.

[6] This error impacts Asserted Method Claims 1 and 16 of the '794 Patent.

The threshold issue raised in the District Court by Cellspin, which was altogether ignored by the Court in its Order, is premised on the well-established principle that a method claim is not, and cannot be, directly infringed by the mere manufacture, importation, and/or sale of the infringing apparatus; rather, infringement occurs upon *use* of the patented method. *Ormco Corp. v. Align Tech., Inc.,* 463 F.3d 1299, 1311 (Fed. Cir. 2006); *Joy Techs., Inc. v. Flakt, Inc.,* 6 F.3d 770, 773 (Fed. Cir. 1993); Appx0440 at 5:1-6. As such, the place of original manufacture is not dispositive. As argued by Cellspin, *at the time of use* of the Accused Instrumentalities (and, hence, the infringing performance of the claimed methods), the jury could reasonably find that the software module is "provided" by Fitbit either: (i) at the time of original sale; or (ii) by virtue of software updates. Appx0440 at 5:10-21. In its argument, Cellspin favorably compared the facts here to those in *SiRF Tech. v. Int'l Trade Comm'n,* 601 F.3d 1319, 1329-30 (Fed. Cir. 2010) and *Convolve, Inc. v. Dell, Inc.,* 2015 WL 574458 at *3 (E.D. Tex. 2015) (Appx0440-41 at 5:24-6:4), where the defendant was held accountable for direct infringement when its software performed the infringing steps. Again, the District Court failed to even address these arguments in its discussion of Fitbit. Rather, the District Court determined (by improperly weighing evidence and credibility) that software cannot "provide" itself. Appx0038 at 8:4-6. As noted, this is *not* what Cellspin argued. Rather, Cellspin argued that the infringing act of "providing" in

this context is satisfied by Fitbit directly when it makes the original sale or, alternatively, when Fitbit (via Fitbit software) provides software updates to the Accused Devices in the United States. These arguments do not contradict the testimony of Vijh, given that he opined how software is "provided" on multiple occasions: (i) when they are manufactured; and (ii) when they are shipped to consumers. Appx0552-53 at ¶ 166. As argued by Cellspin, software modules can be "provided" on multiple instances during the lifetime of a device. Even assuming *arguendo* that Cellspin did assert that Fitbit's software itself "provid[es] a software module," the District Court is incorrect in its technical assessment that such interpretation is purportedly "counter-intuitive." Appx0038 at 8:6. It is not at all counter-intuitive, for example today it is a common experience that the software on a phone checks and updates itself to a newer version.

Still further in the alternative, the fact that the Fitbit Devices themselves perform software updates is well-established in the record. Appx0440 at 5:15-21 (citing: Appx1958 at 88:16-24; Appx1779-80; Appx1853; Appx2837; Appx3447; Appx3461; Appx2140. The citation on the part of Cellspin to the sales spreadsheets in this context (Appx0440 at 5:16-17) was for the purpose of establishing the sheer volume of devices in the United States, and the corresponding volume of software update instances.

In the alternative, Cellspin argued in the District Court that the infringing *use*

of the claimed methods occurs when users of Fitbit's devices in the United States actually assemble and use the Accused Instrumentalities as instructed by Fitbit. Appx0441 at 6:4-7. Cellspin pointed out how Vijh had explained that the infringing *use* of the claimed methods was attributable to the user of the Fitbit products. Appx0441 at 6:11-13 (citing Appx1976 at 188:3-10; Appx1977 at 195:8-14; Appx1977-78 at 195:18-196:4; Appx1980-81 at 198:16-199:4). As such, the user "provides" a software module on the data capture device: (i) upon initial purchase and assembly; and/or (ii) via installing software updates. Appx0441 at 6:15-16. Again, Cellspin cited substantial evidence of record in support of this theory, and from which a reasonable juror could find indirect infringement by inducement. Appx0441-42 at 6:16-7:15. The point of Cellspin's alternative arguments is that (under *Koninklijke Philips v. Zoll Medical,* 656 Fed. Appx. 504, 521 (Fed. Cir. 2016)) the infringing *use* of the infringing methods is performed by the end user. Appx0441 at 6:4-10. The District Court, however, simply avoided this argument by declaring Cellspin cannot argue contradictory alternative theories and by "finding" (in purely conclusory fashion and without elaboration) that "the plain language of the asserted patent claims does not support Cellspin's" theory. Appx0039 at 9:5-7. As pointed out by Cellspin to the District Court, the determination of which specific party performs the recited step of "providing a software module" (and where) is a question of fact for which there is a genuine dispute, thus precluding summary

judgment. Appx0442 at 7:9-15. In any event, it is not improper for Cellspin to offer alternative theories of infringement. *i4i Ltd. Partnership v. Microsoft Corp.,* 598 F.3d 831, 849-50 (Fed. Cir. 2010) (jury verdicts shall be upheld as long as there is sufficient evidence to support any alternative theory); *EMI Group N.A., Inc. v. Cypress Semiconductor Corp.,* 268 F.3d 1342, 1348 (Fed. Cir. 2001). As noted, it is Cellspin's primary contention that the software on the Accused Devices performs each step, including "providing" by way of software update. The District Court erred, and its Order should be reversed. *See, e.g., Amdocs (Israel) Ltd. v. Openet Telecom, Inc.,* 761 F.3d 1329, 1341-43 (Fed. Cir. 2014) (reversing "no evidence" summary judgment order when district court failed to properly attribute evidence in favor of plaintiff and resolved factual disputes in favor of defendant; genuine issues of material fact existed even without expert testimony).

Still further, Cellspin argued that Defendant Fitbit exercises sufficient direction and control over the act of infringement such that the act is attributable solely to Fitbit. Appx0442-43 at 7:16-8:8 (citing substantial evidence of record in support). Cellspin further argued that the facts here are analogous to those previously found sufficient to overcome summary judgment elsewhere in the Ninth Circuit. Appx0443 at 8:5-8. The District Court completely ignored this argument in its erroneous Order.

### 3. INTERNAL TESTING BY FITBIT[7]

In its briefing to the District Court, Cellspin identified specific evidence in support of its contention that the Accused Instrumentalities directly infringe all claims. Appx0445-46 at 10:26-11:5. Nevertheless, in its Order, the District Court focused exclusively on that portion of Cellspin's cited evidence establishing the fact that Fitbit conducts extensive internal testing. Appx0042 at 12:7-15. According to the District Court, the purported "string cite of evidence … does not provide sufficient evidence that Fitbit's accused products constitute a system performing all of the recited acts." Appx0042 at 12:7-15. The District Court, however, missed the point entirely.

Plainly, the evidence specific to the testing program at Fitbit was not the sum total of the factual foundation of infringement. Rather, as explained clearly by Cellspin, a reasonable fact-finder could find infringement in view of a *combination* of evidence, as follows: (i) the referenced evidence establishing how the Accused Instrumentalities directly infringe when used in their ordinary manner; and (ii) the evidence establishing that Fitbit fully tested the Accused Instrumentalities for the full scope of intended and ordinary use. Appx0445-46 at 10:24-11:15. Among the evidence relating to testing, Cellspin relies upon: (i) deposition testimony confirming the fact that Fitbit tests data flow from capture device to mobile

[7] This error impacts all Asserted Claims.

application to server [Appx1860-613]; (ii) deposition testimony confirming the fact that Fitbit continually conducts regression tests [Appx1867-68]; (iii) deposition testimony confirming the fact that Fitbit conducts "use-case" testing [Appx1919-21]; (iv) Fitbit document reflecting an exemplary use-case test report [Appx2822-29]; and (v) Fitbit test spreadsheet indicating a wide range of pertinent tests [Appx2830]. As argued to the District Court by Cellspin, the evidence of record is more than sufficient for a reasonable juror to find direct infringement on the part of Fitbit by virtue of its testing activities. Because the District Court erred in failing to consider the evidence as a whole, the erroneous Order should be reversed.

#### 4. DIVIDED INFRINGEMENT[8]

The District Court erred in finding that Cellspin failed to offer sufficient evidence from which a reasonable juror could find Fitbit liable for direct infringement under Cellspin's alternative divided infringement theory. To be clear: Cellspin contends that the code on the Accused Instrumentalities carries out the step of "establishing a paired Bluetooth connection" directly. This is the focus of Cellspin's briefing to the District Court, as reflected at Appx0446-48 at 11:24-13:14. Thus, divided infringement under *Akamai Techs., Inc. v. Limelight Networks, Inc.,* 797 F.3d 1020, 1022 (Fed. Cir. 2015) is not even a proper or necessary consideration. In any event, and assuming *arguendo* that it is the user who performs the recited

[8] This error impacts all Asserted Claims of the '794 and '752 Patents.

step, the District Court erred in weighing the evidence of "direction and control" against Cellspin on summary judgment.

### a. FITBIT SOURCE CODE PERFORMS RECITED FUNCTION

As a threshold matter, Cellspin contends that the code on the Accused Instrumentalities carries out the step of "establishing a paired Bluetooth connection" directly. The District Court erred by rejecting the qualified opinions of Vijh on this point and by concluding that Vijh "does not explain what 'evidence of pairing' he locates; nor does he explain what 'testing' he performed to confirm infringement." Appx0044 at 14:18-19. Again, the District Court fails to see the record as a whole. As cited by Cellspin, the opinions of Vijh (at Appx0503-04, Appx0520-21 at ¶¶ 88 and 111) are supported and explained in the evidentiary record. With respect to "evidence of pairing," Vijh identifies Fitbit Source Code at Appx1150 as detailing parameters *specific to the Bluetooth pairing process on the device*. Appx0503-04 at ¶ 88. Plainly, Fitbit Source Code detailing parameters specific to pairing on the device is "evidence of pairing." Likewise, the testing conducted by Vijh is well-documented and explained in the charts accompanying his Report. Appx2014-20 (as cited and incorporated at Appx0503-04 at ¶ 88).

In view of the foregoing, the District Court erred by stating that: "Vijh's unsupported conclusion on the ultimate issue of infringement is insufficient to raise a genuine issue of material fact." Appx0044 at 14:20-21. The opinions of Vijh are

*not* conclusory, and they *do* raise genuine issues. Nevertheless, here, as elsewhere throughout the Order, the District Court erred by recognizing the conflicting opinions as between Cellspin's technical expert and Defendants' experts (here, Mr. Bims on behalf of Fitbit), yet proceeding to weigh the evidence and make credibility judgments. Summary judgment is inappropriate in such "battle of the experts" scenarios. *Silicon*, 2016 WL 836679 at *5; *Edwards*, 99 Fed.Appx. at 921. The District Court erred in weighing both evidence and credibility.

#### b. FITBIT "DIRECTS AND CONTROLS" INFRINGEMENT

In the alternative, and assuming *arguendo* that it is the user who performs the recited step of "establishing a secure connection," and as shown by Cellspin in its briefing to the District Court, there is sufficient evidence upon which a reasonable juror can find it more likely than not that Fitbit does in fact direct and control the actions of consumer users in the performance of the infringing steps. The District Court, however, improperly weighed the evidence and made findings of fact in favor of Fitbit.

By way of example, the District Court erroneously determined that certain of the benefits identified by Cellspin were not actually conditioned upon the performance of the claimed step; but this is a fact question to be resolved by the jury. Appx0045 at 15:24-25. Further, the District Court erroneously determined that there was no evidence in the record to support the "Live Tracking" benefit identified by

Cellspin. Appx0045-46 at 15:27-16:1. The District Court was incorrect: as pointed out by Cellspin in its briefing, the "Live Tracking" aspect of Fitbit's infringing system, as well as the requirement of pairing, is discussed in detail, with full citation to the record. Appx0455 at 20:8-12; Appx0504 at ¶ 89 (citing Fitbit Source Code at Appx1990-91); Appx2027 (citing Fitbit Source Code at Appx1711-12).

Still further, the District Court erroneously determined that Vijh's testimony was immaterial because he did not "examine the operation of Fitbit's accused products without Bluetooth." Appx0046 at 16:5-6. Even if true, this fact has nothing to do with the questions at hand: Does Fitbit condition participation in an activity upon performance of a step, and does Fitbit establish the manner and timing of such performance? The testimony of Vijh goes directly to these questions, inasmuch as he opined as to the specific benefits of the invention (which is practiced by Fitbit), and he explains how Fitbit instructs users to infringe by, *inter alia*, requiring user Bluetooth set-up and pairing. Appx0449 at 14:8-18 (citing Appx0487 at ¶ 51; Appx0577-79 at ¶¶ 225-229; Appx1252; Appx1253-58; and Appx1960-63 at 94:18-97:2; Appx1971-73 at 147:23-149:18; Appx1974 at 186:8-23). Again, the evidence of record, including the testimony of Vijh, raises sufficient questions of fact precluding summary judgment. The District Court erred by pointing to the difference of opinion as between Cellspin's technical expert (Vijh) and Fitbit's technical expert (Bims), yet proceeding to weigh the evidence and make credibility

judgments. Summary judgment is inappropriate in such "battle of the experts" scenarios. *Edwards*, 99 F.Appx. at 921.

Finally, the District Court erred by failing to credit the evidence cited by Cellspin in support of the fact that Fitbit requires Bluetooth pairing in order to enjoy the full benefits of the Accused Instrumentalities. Appx0046 at 16:14-25. Indeed, Cellspin's factual assertion that "the only way a consumer user can enjoy the full benefits of the Fitbit Devices (namely: effortlessly transfer personal fitness data between: (i) a data capture device; (ii) an intermediary mobile device; and (iii) the Internet) is to pair them with a Fitbit Mobile Application and sync their data with their online account" is *not* a conclusory allegation. Appx0449 at 14:22-25. Rather, it is clearly supported by the discussion and evidence as presented to the District Court in Cellspin's responsive brief. Appx0449 at 14:25 (specifically referencing the discussion at III.A.2 (*i.e.,* Appx0442-43 at 7:23-8:8)). As argued by Cellspin:

> Fitbit conditions participation in an activity (namely, effortlessly transfer personal fitness data between: (i) a data capture device; (ii) an intermediary mobile device; and (iii) the Internet) or receipt of a benefit (same) upon performance of a step or steps (namely, the steps as recited in the Asserted Method Claims) and establishes the manner and timing of such performance (namely, by requiring the performance of the recited steps in order to realize and receive the benefit). *See* Appx0487-89 at ¶ 51 and 53; Appx0577-79 at ¶¶ 225-229; *see also* Appx2837; Appx2839; Appx2845; Appx1779-83; Appx1821; Appx1852-53; Appx1252-58; Appx1960-63 at 94:18-97:2; Appx1971-73 at 147:23-149:18; Appx1974 at 186:8-23; Appx3012-13; Appx3014. In sum, the evidence establishes that a user is required to set up and pair their Accused Device with an

> Accused Mobile Application in order to enjoy the benefit of effortlessly transferring their data to the Internet. *See Orthopaedic Hospital v. Encore Medical,* 2022 WL 254956 at *27-28 (S.D. Cal. Jan. 27, 2022) (denying summary judgment on similar facts).

Appx0442-43 at 7:23-8:8.

The evidence as cited must be credited to Cellspin at summary judgment, and (at bare minimum) sufficiently raises a question of fact for the jury.

#### c. CELLSPIN ESTABLISHED INDIRECT INFRINGEMENT

In its erroneous Order, the District Court concluded that Cellspin was precluded from establishing indirect infringement. This finding was based on the District Court's erroneous determination that Cellspin failed to produce sufficient evidence of direct infringement. Appx0046-47 at 16:28-17:5.

### 5. "USER IDENTIFIER" OR "USER INFORMATION"[9]

With respect to the claimed "user identifier" and "user information" limitations, the District Court erred in finding that Cellspin offered "a different infringement theory" involving "OAuth" tokens, which it found to be a so-called "improper new theory" in violation of Local Patent Rule 3-1(c). Appx0047-49 at 17:7-19:3]. Because the District Court's error amounted to an abuse of discretion, the Order should be reversed. *Hinton v. Pacific Enters.*, 5 F.3d 391, 395 (9th Cir. 1993).

[9] This error impacts all Asserted Claims of the '794 and '752 Patents.

Here, the District Court abused its discretion by, *inter alia*, making the technological fact-finding (in purely conclusory fashion) that an "OAuth Token" is an "undisclosed theory" in view of Cellspin's express disclosure of a "username or email address, or information based off of a user or the user's associated wearable device." Appx0048 at 18:17-20. Of course, in full compliance with the Court's Local Rules, Cellspin prepared and served Infringement Contentions to each Defendant, including Fitbit. *See, e.g.,* Appx3016-17. There, Cellspin stated that the claimed "user identifier" limitation is satisfied in the Accused Instrumentalities by a "username or email address, *or information based off of a user or the user's associated wearable device*." *See, e.g.,* Appx3114 (emphasis added). Similarly, Cellspin stated that the claimed "user information" limitation is satisfied in the Accused Instrumentalities by "a username [or] email address, and/or a code identifying the user or the Fitbit [Accused Device]." *See, e.g.,* Appx3375. Further, in its Contentions, Cellspin specifically identified the pertinent limitations as being performed in Fitbit's proprietary software, which required investigation by experts to confirm implementation details. Appx3268 at 2:16-22. The specific use of OAuth Tokens on the part of Fitbit was only confirmed *after* expert review of Fitbit's Source Code, and such Code was promptly and fully cited by Vijh in his Report. *See, e.g.,* Appx0515-18 at ¶¶ 102 and 106 (citing Fitbit Source Code for the fact that "user-specific OAuth credentials" are used). The term "OAuth" is short for "Open

Authorization," and is one of any number of interchangeable mechanisms (*e.g.,* OpenID Connect, Auth0, JSON Web Token, Keycloak, SAML, SSO) allowing for the sharing of information about user accounts with mobile applications. Only by reviewing the specific implementation from Source Code was Cellspin able to identify the use of OAuth by Defendant.

The plain and obvious fact that the Contentions do not expressly use the phrase "OAuth Token" does not thereby render such Tokens a "new theory" of infringement. Quite the contrary; as cited to the District Court, Vijh explained precisely how an "OAuth Token" is mapped from a unique user identifier and log-in credentials. Appx0452 at 17:12-14 (citing Appx1982 at 223:1-14). Cellspin did not know the *name* of the infringing user identifier until it was able to review the Source Code as was made available by Fitbit at the end of discovery, yet Cellspin correctly asserted from the inception of the case that it would be information based off of a user or the user's associated wearable device. Again, simply identifying the OAuth Token from Source Code does not render it a "new theory." Because OAuth Tokens reasonably fall within the *theory* of infringement set forth in Cellspin's original Contentions as served, the District Court abused its discretion in precluding Cellspin from arguing infringement. *MasterObjects, Inc. v. Meta Platforms, inc.,* 2022 WL 4856269 at *1 (N.D. Cal. Oct. 3, 2022).

The pertinent inquiry is whether "the expert permissibly specified the

application of a disclosed theory" or "impermissibly substituted a new theory altogether." *Finjan, Inc. v. Qualys Inc.,* 2021 WL 1253651 at *2 (N.D. Cal. 2021). In identifying OAuth Tokens as the specific embodiment as implemented by Fitbit, Vijh did no more than provide specificity and elaboration with respect to the manner by which Fitbit derives its infringing "user identifier" from user credentials. The identification of OAuth is an application of a disclosed theory, is entirely appropriate, and the District Court abused its discretion in rejecting it. *Finjan v. Blue Coat,* 2015 WL 3640694 at *3 (N.D. Cal. 2015) (permitting elaboration of disclosed theory by identifying specific infringing implementation).

### 6. "CRYPTOGRAPHICALLY AUTHENTICATE"[10]

The District Court erroneously deemed Cellspin's arguments as mere "attorney argument" and as otherwise "conclusory." Appx0049 at 19:14-15 and 19:21-22. First, the unremarkable statement that decryption must necessarily follow encryption is not simple conclusory attorney argument. Rather, it is supported in the form of expert testimony and evidence of record. Specifically, Vijh has explained how Bluetooth authentication includes the use of cryptographic keys on both sides, and that the observable fact that data is presented to the user evidences the fact of decryption. Appx0454-55 at 19:24-20:1 and 20:14-15 (citing Appx0490 at ¶ 56 and Appx0531 at ¶ 126). There was and is substantial evidence of record in support of

[10] This error impacts Claim 1 of the '847 Patent.

**REDACTED**

the contention that encryption and decryption are both performed by each of the Accused Instrumentalities. *See, e.g.,* Appx2027-28 (emphasis added):

Source Code: FB-SC-000362,FB-SC-000253, FB-SC-0000667

Page **35 | 137** **U.S. Patent No. 9,749,847**

Fitbit '847 EXHIBIT 1 – Fitbit Versa 2 PIC Chart

| **Infringement Contention** |
| --- |
| Defendant's Documents: FB04471[redacted] |

REDACTED

DESCRIPTIVE TEXT FROM ORIGINAL

Such is the very nature of encryption process: a sender encrypts data, and a receiver decrypts the data for use. In any event, experts are permitted to opine based upon their unique knowledge, not to mention common sense. *Koninklijke Philips N.V. v. Google LLC,* 948 F.3d 1330, 1338 (Fed. Cir. 2020); *In Re: Copaxone Consolidated Cases,* 906 F.3d 1013, 1029 (Fed. Cir. 2018). Likewise, reliance on circumstantial evidence (here, the fact that encrypted data is eventually presented to the user in decrypted form) to establish the simple fact of decryption is more than

sufficient to raise a genuine issue for trial. *C.R. Bard Inc. v. AngioDynamics, Inc.,* 979 F.3d 1372, 1379 (Fed. Cir. 2020); *Ultratec, Inc. v. Sorenson Communications, Inc.,* 733 Fed.Appx. 535, 541 (Fed. Cir. 2018); *Tinnus Enterprises, LLC v. Telebrands Corp.,* 846 F.3d 1190, 1204 (Fed. Cir. 2017).

Finally, the District Court erroneously weighed evidence and made fact findings with respect to the Source Code cited by Cellspin. In the process, the District Court failed to consider all of the evidence of record. More specifically, the Court erroneously found in its Order that certain "presumptions have no foundation in the record." Appx0050 at 20:19-21 (in reference to Cellspin's reliance on Appx1990-91). The referenced Source Code at Appx1990-91, which is identified by Vijh as evidence of authentication among the Accused Instrumentalities, necessarily indicates the facts of both encryption and decryption in view of the established authentication protocol in the Bluetooth Standard; specifically, Appx2021-28 (authentication follows encryption key generation and exchange). Still further, the so-called "presumption" that "authentication is performed at the tracker" [Appx0050 at 20:22] is no presumption at all; rather, the Source Code cited by Vijh at Appx1711-12 (which is not addressed by the District Court) is clearly Code *from the Fitbit tracker*. Appx1711-12; Appx0501-02 at ¶ 85; Appx0504-05 at ¶ 90; Appx0539-40 at ¶ 142 (stating that the Source Code of Appx1711-12 is from the data capture device (*i.e.,* the "tracker")).

**REDACTED**

### 7. "PROCESSORS"[11]

#### a. CELLSPIN IDENTIFIED A "FIRST PROCESSOR"

The Asserted System Claims of the '847 Patent each recite a "first processor" which is "configured to" perform three steps: (i) acquire new-data, (ii) store the acquired new-data, and (iii) send an event notification. The District Court was not asked to, and did not, construe the term "configured to;" as such, the plain and ordinary meaning applies.

According to the District Court, Cellspin's evidence of infringement relies upon two purportedly untenable presumptions: (i) Fitbit's software defines the functions of acquiring, storing, and sending new data; and (ii) Fitbit's hardware contains one "first processor" configured to perform all three claimed functions. Appx0051-52 at 21:22-22:1. The District Court erred in both instances.

First, the fact that Fitbit's software defines the performance of the recited functions is established in the record. With respect to "acquiring new data," the software plainly controls the acquisition of data, as evidenced by the Fitbit Source Code and explained by Vijh. Appx0506-07 at ¶ 92 (citing Fitbit Source Code at Appx1990-91; Appx0507-08 at ¶ 93 (citing Appx0502 at ¶ 86, which cites and describes the Fitbit Source Code at Appx3409-11 as "[redacted]") (emphasis added)). Further,

[11] This error impacts the Asserted Claims of the '847 Patent.

**REDACTED**

Vijh tested the Accused Instrumentalities and confirmed the respective actions of acquiring and sending captured data. Appx2040-42. Still further, the observable fact that the devices capture new data is conclusive evidence that the devices are necessarily "configured" to do so by the software. Appx0505-06 at ¶ 91; *Bio-Rad*, 967 F.3d at 1369.

Second, with respect to "storing" the acquired new data, Vijh again identifies Fitbit Source Code which evidences software control. Appx0507-08 at ¶ 93 (citing Appx0502 at ¶ 86, which cites and describes the Fitbit Source Code at Appx3409-11 as "[redacted]") (emphasis added)).

Third, with respect to "sending" event notifications, Vijh again identifies Fitbit Source Code which evidences software control. Appx0508 at ¶ 94 (identifying Fitbit Source Code at Appx3414 as including [redacted]). Further, Vijh confirmed the functionality through testing, as reported and discussed at Appx2061-63.

In sum, the District Court erred in its conclusion that there is no evidence of record establishing the fact that Fitbit's software defines the functions of acquiring, storing, and sending new data.

With respect to the second purported "presumption" the District Court identified, there is indeed evidence of record establishing the fact that Fitbit's

hardware contains one "first processor" configured to perform all three claimed functions. Here, as elsewhere in the thoroughly erroneous Order, the District Court failed to consider (or even recognize) the substantial evidence as cited by Vijh in both his Written Report and the accompanying Exhibits (*i.e.,* the individual Claim Charts at, *e.g.*, Appx1237-1471 (the Vijh Exhibits E)). The simple and obvious fact that the District Court failed to consider all such evidence is admitted by the Court in its Order at Appx0052-53 at 22:25-23:3. Again, and as explained in detail *supra*, the opinions of Vijh are consistently presented on an element-by-element basis, with summary and conclusion paragraphs at the end of each section relating to a specific Asserted Claim. Critically, each individual paragraph of the Vijh Written Report [Appx0475-586] makes specific reference to the specific supporting evidence as contained in the accompanying Vijh Exhibit(s) E. The fact that the District Court consistently failed to even consider the explanations and evidence presented in the Exhibits E is a primary driver of its erroneous Order, and is fundamental to virtually every error now on appeal. In any event, Vijh certainly did cite to evidence in support of the fact that standard computer architecture and device tear-down data was relied upon in forming his opinions. More specifically, Appx0502-03 at ¶ 87 includes the opinion of Vijh concerning the "first processor" in the Accused Instrumentalities. There, Vijh explains the elementary fact that software code requires a processor to work, and cites exemplary Fitbit Source Code which is

written in C language, and thus requires a processor for execution. Thereafter, Vijh cites to supporting evidence recorded at Element 1.I.b at Appx2003-07 and Appx2691-96. At Element 1.I.b at Appx2003-07 is an abundance of evidence and explanation concerning both standard computer architecture and tear-down images from an exemplary Fitbit device. Appx2003-07 (exemplary images reproduced below):





**REDACTED**

As noted, the District Court did not consider any of this evidence in its erroneous Order, even though it was expressly cited by Vijh and identified by Cellspin in its briefing. Appx0456 at 21:6 and 21:16; Appx0502-03 at ¶ 87.

Notwithstanding the foregoing, Cellspin did identify a "first processor" in the form of a single Toshiba ARM Cortex M4 processor for the accused Fitbit Versa 2 devices. Appx2007 and Appx2053 (citing Appx3417); Appx3437; Appx3438; Appx3443-46 (all evidencing use of ARM Cortex processors in Accused Devices). The "multi-processor" counter-narrative offered by Fitbit is belied by the fact that Appx3417 (at 28707; as cited and relied upon by Vijh at Appx2053) illustrates a *single* Toshiba processor in the Accused Versa 2:

**REDACTED**

**ELECTRONIC DIAGRAM**

Again, the District Court erred by failing to consider the evidence as a whole,

by weighing evidence against Cellspin, and by crediting the testimony offered by Fitbit concerning the "multi-processor" architecture.

#### b. CELLSPIN IDENTIFIED REPRESENTATIVE PROCESSORS

First, the District Court rejected the testimony and opinions of Vijh that the "teardown-analyzed Cortex M3 processor" is functionally similar to the processor in the Accused Devices. Appx0053 at 23:25-26. The Asserted Claims of the '847 Patent, however, do not recite a specific processor; rather, they merely recite a "first processor" which is "configured to" perform certain enumerated functions. Appx0427-28 at Claims 1, 2, and 3. Again, Vijh relied upon standard computer architecture and exemplary chipsets to illustrate the fact that each Accused Device necessarily comprises a "first processor." The specific model is not relevant to the fact to be determined, and Vijh expressed his opinions based on exemplary hardware and the fact that Source Code must be processed. Further, Vijh cited to specific evidence (as discussed above) establishing the fact that the code controls the processor such that it is "configured to" perform the recited functions, as well as testing of the Accused Devices.

Second, the District Court erred by rejecting the evidence cited by Cellspin because it believed such evidence was "mere attorney argument" and lacked any explanation. Appx0053-54 at 23:27-24:1. This error by the District Court results, again, from its misunderstanding of the evidence as cited. To the extent Cellspin

cited to its Contentions (*e.g.,* Appx1992-2129), it consistently did so with an accompanying explanation. Appx0457 at 22:8 (citing Appx2004); Appx0457 at 22:20 (citing Appx2003-07 and Appx2034-63); Appx0457 at 22:15 (citing Appx2003-07); Appx0460 at 25:18 (citing Appx2002).

In sum, the District Court erred by improperly rejecting evidence and by weighing evidence against Cellspin on summary judgment. The erroneous Order should be reversed.

## E. DEFENDANT GARMIN

### 1. PROVIDING A SOFTWARE MODULE[12]

Here, the District Court offered much of the same erroneous analysis relating to Garmin as it did in the portion of its Order relating to Fitbit. As such, Cellspin hereby adopts and incorporates by reference all arguments made *supra* concerning Fitbit. *See supra* at § VI.D.2.

Again, and as discussed at length *supra*, a method claim is not, and cannot be, directly infringed by the mere manufacture, importation, and/or sale of the infringing apparatus; rather, infringement occurs upon *use* of the patented method. *Ormco,* 463 F.3d at 1311; *Joy Techs.,* 6 F.3d at 773; Appx3477-78 at 7:27-8:5. As such, the place of original manufacture is not dispositive. Again, *at the time of use* of the Accused Instrumentalities (and, hence, the infringing performance of the claimed

[12] This error impacts the Asserted Method Claims of the '794 Patent.

methods), the jury could reasonably apply a plain and ordinary meaning to find that the software module is "provided" by Garmin either: (i) at the time of original sale; or (ii) by virtue of software updates. Appx3478 at 8:12-16.

Rather than address these arguments, the District Court instead weighed evidence and decided that Cellspin's arguments are "counter-intuitive" and contradicted by Vijh's testimony. Appx0091-92 at 61:24-62:3. Again, and as explained in detail *supra* at § VI.D.2, the assertion that "the software provides itself" is *not* what Cellspin argued. Rather, Cellspin argued that the infringing act of "providing" in this context is satisfied by Garmin directly when it makes the original sale or, alternatively, when Garmin (via Garmin software) provides software updates to the Accused Devices in the United States. Further, these arguments do not contradict the testimony of Vijh, given that he opined how software is "provided" on multiple occasions: (i) when they are manufactured; and (ii) when they are shipped to consumers. Appx1113 at ¶ 166. As argued by Cellspin, software modules can be "provided" on multiple instances during the lifetime of a device.

The District Court erred again in failing to consider the evidence cited by Cellspin as a whole. More specifically, the District Court characterized Cellspin's evidence as "baldly cited" and untenable in view of the District Court's interpretation of one line of Vijh's testimony. Appx0091 at 61:5-9. First, Cellspin did not in any sense merely "baldly cite" evidence in its briefing to the District Court.

In fact, Cellspin made specific citations to the record establishing a basis to conclude that Garmin "provides" the modules at the point of sale or otherwise via software updates. Appx3478 at 8:12-20 (citing Appx3511; Appx3818; Appx3821; Appx3961; Appx4035).

Finally, the District Court erred in applying an improper construction of the Asserted Claim. Specifically, the District Court found that "elements of the '794 Patent recite the manufacturing and shipment of software to consumers." Appx0092 at 62:13-14 (citing Appx1113 at ¶ 166 for this proposition). Plainly, *none* of the Asserted Claims of the '794 Patent recite any such limitation. Rather, they simply recite "providing a software module." Appx0396-97 at Claims 1 and 16. In any event, the District Court's erroneous statement actually bolsters Cellspin's point: the claimed "software module" can be "provided" by shipping it to customers (*e.g.,* via software update).

### 2. ESTABLISHING A SECURE PAIRED BLUETOOTH CONNECTION[13]

The entirety of the District Court's "analysis" on this point is faulty and erroneous. Fundamentally, the District Court's discussion and application of *SiRF,* 601 F.3d at 1329-30 misses the mark. The District Court argues that, because it viewed the "establishing" step as being necessarily performed by a user, then *SiRF* is inapposite. Notably, the District Court did *not* base its decision on the actual

[13] This error impacts the Asserted Method Claims of the '752 Patent.

language of the Asserted Claims (which say *nothing* about a user and do *not* recite anything resembling a user or specific user action); rather, the District Court cited a generic and non-controversial statement of counsel from oral argument which simply confirmed what Cellspin had already stated numerous times in its briefing. Appx0093 at 63:14-17 (counsel confirming that user action is required to activate device functionality). In any event, the District Court ignored and otherwise failed to credit the *remainder* of counsel's statements during oral argument, which unequivocally affirm (again) that it is the *software* – not the *user* – which actually *performs* the recited function. Appx4092 at 39:13-16; Appx4093 at 40:2-4. Again, Cellspin argued that, while a user must be present in order to activate the Accused Instrumentalities, the actual *performance* of the recited functionality lies with the Accused Instrumentalities themselves – not with a user. Cellspin has consistently argued that the "establishing" step is performed exclusively by the Accused Instrumentalities. This fact is well-documented and fully supported in the record. *See, e.g.,* Appx3479 at 9:2-19 (citing Appx1079-80 at ¶111; Appx1100-01 at ¶ 143; Appx3530 (as cited at Appx1079-80 at ¶ 111)).

Still further, the District Court misapprehends and misapplies *SiRF.* The claims at issue in *SiRF* were comparable to the Asserted Claims here in the sense that they recited elements that were physically controlled by human users; as such, the defendant argued that "the claims are only infringed when actions are taken by

[defendant's] customers and by the end users of the [accused] devices." *SiRF,* 601 F.3d at 1329. Nevertheless, this Honorable Court found direct infringement because of the fact that the claims did not expressly recite a "user action" and because the actual performance of the infringing function was carried out by the accused software. *Id.* (holding: "[W]e do not read the relevant claims as requiring that any of the specified actions be taken by [defendant's] customers or by the end users of the [accused] devices. This is not a situation where a method claim specifies performance of a step by a third party, or in which a third party actually performs some of the designated steps"). In the process, this Honorable Court cited *Muniauction, Inc. v. Thomson Corp.,* 532 F.3d 1318, 1329 (Fed. Cir. 2008) as an example of claims for which an actual user action was recited. The claims in *Muniauction* recited an express user action, as follows: "*inputting* data associated with at least one bid for at least one fixed income financial instrument into said bidder's computer via said input device." *Id.* at 1328-29, at FN. 9. Further, the parties in *Muniauction* did not dispute the fact that a user action was recited in the claim, and that a showing of joint infringement was necessarily required. *Id.* at 1328. The District Court thus erred in its application of the law and in its unilateral fact-finding with respect to the plain and ordinary meaning of "establishing." The Asserted Claims here do *not* recite a user action (such as "inputting"), but rather recite an action ("establishing") performed by the devices themselves and, more

particularly, by the code on such devices. Because the District Court clearly erred, and because it failed to consider the substantial evidence cited by Cellspin, its erroneous Order should be reversed.

### 3. INTERNAL TESTING[14]

In the same manner in which the District Court erred with respect to its rulings relating to Defendant Fitbit, the District Court erred in finding that Cellspin failed to offer sufficient evidence from which a reasonable juror could find that the extensive internal testing conducted by Garmin resulted in acts of direct infringement. As such, Cellspin hereby adopts and incorporates by reference all arguments made *supra* concerning Fitbit. *See supra* at §§ VI.B and VI.D.3.

In its briefing, Cellspin identified specific evidence in support of its contention that the Accused Garmin Instrumentalities directly infringe all claims. Appx3475-77 at 5:22-7:5. Nevertheless, in its Order, the District Court focused exclusively on that portion of Cellspin's cited evidence establishing the fact that Garmin conducts extensive internal testing. Appx0092-94 at 63:23-64:3. According to the District Court, the purported "string cite of evidence … [do not] raise a genuine dispute of material fact that the recited claims are performed, much less in the order required by the Court's construction." Appx0092-94 at 63:26-64:10. The District Court, however, missed the point entirely.

[14] This error impacts the Asserted Claims of the '794 and '752 Patents.

Plainly, the evidence specific to the testing program at Garmin was not the sum total of the factual foundation of infringement. Rather, as explained by Cellspin, a reasonable fact-finder could find infringement in view of a *combination* of evidence (both direct and circumstantial), which collectively establishes liability. Appx3475-77 at 5:22-7:5. Among the evidence relating to testing, Cellspin relies upon: (i) deposition testimony confirming the fact that Garmin consistently tests data flow to ensure seamlessness from capture device to mobile application to server [Appx4238-40 at 67:11-69:7]; (ii) deposition testimony confirming the fact that Garmin tests all functions, including automatic updating, in the United States [Appx4355-56 and Appx4357-59129]; (iii) Garmin technical document evidencing the Garmin Test Protocol, which includes device registration and sync with Garmin Connect and Garmin Web, including Workout Data and Heart Rate Data [Appx4290-93]; (iv) Garmin technical document reflecting Bluetooth testing protocol [Appx4294; Appx4309-10]; (v) Garmin technical document confirming that the testing methodology includes Bluetooth pairing [Appx4311; Appx4331; Appx4342]; (vi) Garmin technical document evidencing the fact that Garmin device testing includes pairing and sync with Garmin Connect [Appx4350]; (vii) Garmin technical document evidencing testing of pertinent claimed functions [Appx4360-634]. As argued by Cellspin, the evidence of record is more than sufficient for a reasonable juror to find direct infringement on the part of Garmin by virtue of its

testing activities.

#### 4. ASSEMBLY[15]

The District Court's erroneous Order somehow arrived at the conclusion that Cellspin failed to present sufficient evidence that the Accused Garmin Instrumentalities infringe the system claims, concluding in summary fashion that Cellspin offers "no explanation how any element of the asserted claims is met." Appx0096 at 66:6-7. According to the District Court, *none* of the testimony of Vijh "mentions" the fact that an assembly of the Accused Instrumentalities comprises an infringing system. Appx0096 at 66:5. The District Court erred.

As cited by Cellspin, Vijh provides extensive discussions and explanations with respect to each element of each claim of the '847 Patent. Indeed, the very point of his opinions was to identify and explain the fact that the Accused Instrumentalities comprise an infringing system. Appx3481 at 11:15-22 (citing Appx1051-57 at ¶¶ 66-80 and Appx1059-77 at ¶¶ 85-108). Among other things, the District Court again failed to appreciate the fact that Vijh's Written Report, in virtually every paragraph, cites and incorporates the appended Vijh Exhibits E (the Claim Charts). Here, for the Asserted System Claims of the '847 Patent, Vijh specifically states that: "The Garmin Fenix 6 Accused Instrumentalities *comprise a system* comprising a Garmin Fenix 6 Wearable and Garmin Mobile Application in (*i.e.,* installed on) a Bluetooth

[15] This error impacts the Asserted System Claims of the '847 Patent.

enabled cellular phone." *See, e.g.,* Appx4366 (as cited at Appx1059-60 at ¶ 85). Likewise, Vijh explains how the Accused Instrumentalities comprise an assembly. Appx4403 (as cited at Appx1061-62 at ¶ 89 (also stating: "the Garmin Fenix 6 Wearable establishes a secure Bluetooth wireless connection with the Bluetooth enabled cellular phone, including as facilitated by the Garmin Mobile Application") (at Appx4407); *see also* Appx4474 (as cited at Appx1065-67 at ¶ 94). As if the entirety of Vijh's discussions and analysis was not abundantly clear, he states unequivocally that: "The Garmin Fenix 6 Accused Instrumentalities comprise the system of claim 1." *See, e.g.,* Appx4531; *see also* Appx1059-60 at ¶ 85 (similar).

#### 5. INDUCEMENT[16]

The District Court's erroneous findings with respect to direct infringement, as discussed *supra*, yield a clearly erroneous finding of a failure of proof on the issue of inducement. Appx0097 at 67:8-12. Because the findings relating to direct infringement should be reversed, the District Court's erroneous conclusion that Cellspin failed to establish inducement must also be reversed.

#### 6. "DETECT" AND "DETERMIN[E]" "NEW DATA"[17]

At the outset, the District Court improperly weighed evidence, inasmuch as it made the determination that the so-called "pushing" of data from the capture device

[16] This error impacts all Asserted Claims.
[17] This error impacts the Asserted Claims of the '794 and '752 Patents.

cannot possibly meet the "detect" or "determine" steps. A reasonable juror could certainly find that, in order for the capture device to "push" data, such data must necessarily first be "detected." In any event, the District Court's decision that a reasonable juror could not decide, based on "22 paragraphs of Vijh's expert report," that the Accused Instrumentalities actually perform the recited functions is clearly erroneous.

As noted, Cellspin provided the District Court with substantial evidence of the "detecting" and "determining" steps. First, Vijh *did* explain how and why the cited Garmin Source Code evidences the fact of "detecting." More specifically, Vijh explained that the Garmin Code [Appx4550] "includes a function on the data capture device for subscribing to notifications of real-time updates to data such as heart rate and accelerometer values and the sending of real-time data to a subscriber." Appx1082-83 at ¶ 115 (citing Appx4550). The District Court, apparently, was not able to understand the technical implication of such a statement, and erroneously found an absence of explanation and evidence. Nevertheless, the established fact that "real-time data" can be "updated" and delivered to the subscriber because it has changed *is* evidence that such new data is necessarily "detected." This technical fact is fully explained by Vijh. Appx3595 (as cited at Appx1082-83 at ¶ 115).

Moreover, Vijh expressly states that the testing he performed on the Accused Instrumentalities establishes the fact that notifications for the newly-detected data

are sent. Appx1082-83 at ¶ 115 (citing, *e.g.,* Appx3604); *see also, e.g., Bio-Rad,* 967 F.3d at 1369; *Fujifilm*, 182 F.Supp.3d at 1036. Finally, the Garmin Source Code establishes the fact that the Garmin Mobile Application is configured to receive such event notifications. Appx1084 at ¶ 117 (citing Appx4551-55).

#### 7. TEMPORAL ORDER[18]

In the same manner in which the District Court erred with respect to its rulings relating to Defendant Fitbit, the District Court again erred in finding that Cellspin failed to offer sufficient evidence from which a reasonable juror can conclude that Garmin's Accused Instrumentalities perform the claimed method steps in the required temporal order. As such, Cellspin hereby adopts and incorporates by reference all arguments made *supra* concerning Fitbit. *See supra* at § VI.D.1.

The District Court first recognized that Vijh had expressly opined concerning the temporal order and its satisfaction by the Accused Garmin Instrumentalities, yet the District Court nevertheless failed to credit such testimony. Appx0099 at 69:6-12.

First, there is no burden on Cellspin to explain *why* an infringing device performs actions in a particular sequence. As such, the District Court's first objection does not justify a grant of summary judgment against Cellspin. Second, the District Court was incorrect in its assessment of Vijh's testimony and the

[18] This error impacts the Asserted Method Claims of the '794 and '752 Patents.

supporting evidence. As Cellspin explained to the District Court, and just as was true with respect to Fitbit (as discussed *supra*), the single summary paragraph identified and discussed by the Court in its Order (namely, Appx1095-96 at ¶ 134) was plainly *not* the sum total of Vijh's discussion on this specific issue. To the contrary, and as expressly pointed out to the District Court by Cellspin, the final conclusions drawn by Vijh are based upon the totality of his Written Report and the accompanying Vijh Exhibits E, which includes *direct testing* of the Accused Devices in operation and the data sniffing logs. Appx3485 at 15:20-28; *see also, e.g., Bio-Rad,* 967 F.3d at 1369; *Fujifilm*, 182 F.Supp.3d at 1036.

Specifically with respect to the timing of the infringing "event notifications," the evidence of record is sufficient to form the basis of a reasonable jury verdict of infringement. Cellspin explained in its briefing how the "persistent acquisition of new data" in the Accused Garmin Devices is a supported fact in the record. *See* Appx3486 at 16:1-7. Indeed, one of the principal paragraphs cited from the Vijh Report (Appx1081-82 at ¶ 114) relating to this issue is not even *mentioned* by the District Court in its erroneous Order. Nevertheless, it is the persistent acquisition of data which largely informs and evidences the temporal aspect of the claimed event notifications. Appx1081-82 at ¶ 114 (explaining how the persistent acquisition of data is readily ascertained from observation of the Accused Instrumentalities, together with the timing of the pairing process, which collectively evidence

satisfaction of the temporal limitations of the claims). The persistent acquisition of data is illustrated by the screenshots of the Accused Garmin Instrumentalities in actual use, as provided by Vijh in (for example) Appx3588-94. This evidence was specifically cited and discussed by Cellspin in its briefing to the District Court (Appx3486 at 16:5-6).

Further, and specifically with respect to the temporal order of enabling "event notifications," Cellspin provided the District Court with ample evidence from which a reasonable juror could find in favor of Cellspin as to infringement on the part of Garmin. Appx3486 at 16:7-14 (citing Appx1083-84 at ¶ 116; Appx4551-55 (Garmin Source Code); Appx3604 and Appx3614-15 (sniffing logs); Appx4574-75 at 76:25-79:22 (Vijh explaining sequence of steps in sniffing log creation and personal knowledge of Garmin Device operation); Appx4586 at 123:10-124:14. Notwithstanding the fact that Cellspin directed the District Court to all of these specific evidentiary sources, and despite the fact that Vijh explained the temporal timing with respect to each and every limitation individually (*see, e.g.,* Appx1084-85 at ¶ 118 (as referenced by Appx1095-96 at ¶ 134) (citing Garmin Source Code at Appx4550 and discussions at Appx3604 and Appx3614-15)), the District Court failed to consider all of these facts of record in its erroneous Order. Instead, and as noted, the District Court simply characterized the single summary paragraph [Appx1095-96 at ¶ 134] found in the Vijh Report as "conclusory," and erroneously

failed to give Vijh's well-supported expert opinion any weight.

#### 8. "ATTACHING" "USER IDENTIFIER" TO "NEW DATA"[19]

In the same manner in which the District Court erred with respect to its rulings relating to Defendant Fitbit, the District Court also necessarily erred in finding that Cellspin offered "a different infringement theory" involving OAuth tokens in its case against Garmin. Appx0099-0100 at 69:15-70:7. As such, Cellspin hereby adopts and incorporates by reference all arguments made *supra* concerning Fitbit. *See supra* at § VI.D.5.

#### 9. "FIRST PROCESSOR"[20]

As noted *supra,* the Asserted System Claims of the '847 Patent each recite a "first processor" which is "configured to" perform three steps: (i) acquire new-data, (ii) store the acquired new-data, and (iii) send an event notification. The District Court was not asked to, and did not, construe the term "configured to;" as such, the plain and ordinary meaning applies.

According to the District Court, Cellspin and its technical expert fail to identify any specific "first processors" and fail to identify any supporting evidence, and further that the Source Code cited by Vijh does not support the existence of any such "first processor" in the Accused Garmin Devices. Appx0100-0101 at 70:15-

[19] This error impacts the Asserted Method Claims of the '794 and '752 Patents.
[20] This error impacts the Asserted System Claims of the '847 Patent.

71:18. The District Court erred in each instance.

First, Vijh certainly did cite to evidence in support of the fact that standard computer architecture and device tear-down data was relied upon in forming his opinions. More specifically, Appx1061 at ¶ 88 includes the opinion of Vijh concerning the "first processor" in the Accused Garmin Instrumentalities. There, Vijh explains the elementary fact that software code requires a processor to work, and cites exemplary Garmin Source Code which requires a processor for execution. Thereafter, Vijh cites to supporting evidence recorded in Appx4397-403. As cited, Appx4397-403 sets forth an abundance of evidence and explanation concerning both standard computer architecture and tear-down images from an exemplary Garmin device. Appx4389-92; Appx4398; and Appx4402 (exemplary images reproduced below):






As noted, the District Court did not consider any of this evidence in its erroneous Order, even though it was expressly cited by Vijh and identified by Cellspin in its briefing. Appx3488 at 18:1-9; Appx1061 at ¶ 88.

Notwithstanding the foregoing, Cellspin did identify a "first processor" in the form of a single Maxim MAX32630 with an ARM Cortex M4 Core processor for the Accused Garmin Devices. Appx3488 at 18:1-3; Appx4389; Appx4565 at 38:1-8; Appx4571 at 63:15-64:9; Appx4626; Appx4627-28; Appx4629-30; Appx4631-33; Appx4634; Appx4635; Appx4636; (all evidencing use of Cortex M4 processors in Accused Garmin Devices).

Still further, the District Court clearly erred in finding an absence of evidence establishing the fact that the identified processors perform the recited functions. First, the fact that Garmin's software defines the performance of the recited functions is established in the record. With respect to "acquiring new data," the

software does control the acquisition of data, as evidenced by the Garmin Source Code and explained by Vijh. Appx1063-64 at ¶ 92 (citing Garmin Source Code at Appx4637-39. Further, Vijh tested the Accused Instrumentalities and confirmed the respective actions of acquiring and sending captured data. *See, e.g.,* Appx4464-70. Still further, the observable fact that the devices capture new data is conclusive evidence that the devices are necessarily "configured" to do so by the software. Appx1063-64 at ¶ 92.

Second, with respect to "storing" the acquired new data, Vijh again identifies Garmin Source Code which evidences software control. Appx1065-67 at ¶ 94 (citing Appx1060 at ¶ 87, which further cites and describes Garmin Source Code at Appx4640-41).

Third, with respect to "sending" event notifications, Vijh again identifies Garmin Source Code which evidences software control. Appx1065-67 at ¶ 94 (identifying and discussing Garmin Source Code at Appx4550). Further, Vijh confirmed the functionality through testing, as reported and discussed at Appx4482-84.

#### 10. "SECOND PROCESSOR"[21]

As pointed out by Cellspin, the Asserted System Claims of the '847 Patent do in fact recite a "second processor," but such processor is merely "controlled by"

[21] This error impacts Asserted Claim 1 of the '847 Patent.

Garmin's infringing Mobile Application. *See* Appx3488 at 18:23-24 (citing Appx0427 at Claim 1). There is no affirmative recitation of a "second processor" as part of an infringing system; as such, the evidence of record establishing the *capability to control* such a processor by Garmin's Mobile Applications is sufficient to establish the fact of infringement, without an express identification of the specific processors used in each mobile phone sold in the United States over the past six years. Appx3488-89 at 18:25-19:1. Thus, to establish infringement, Cellspin need only show by a preponderance of evidence that the accused mobile applications include executable code which, when executed, results in the control of a processor to perform the recited functions. The District Court did not even address this argument in its erroneous Order. In any event, because Cellspin more than satisfied this threshold of proof, and because the District Court erred by "reading in" limitations to the Asserted Claims, the erroneous Order must be reversed.

Further, the District Court erred by failing to credit the substantial evidence offered by Cellspin supporting the fact that the Accused Garmin Mobile Applications comprise code which enables and controls a second processor to perform the recited functions. As argued to the District Court, Vijh has explained how the Java, Kotlin, and Swift programming code used in the Source Code for the Accused Garmin Mobile Applications necessarily controls the processor on which it is installed in order to execute. Appx3489 at 19:6-15 (citing Appx1067 at ¶ 95). In

addition, Vijh has explained, including with citations to Garmin's Source Code, how the code is executed by the processor to perform the specific recited functions. Appx3489 at 19:8-15; Appx1067-71 at ¶¶ 95-97 and 99; Appx1072-75 at ¶¶ 101-103; Appx4551-55 (Garmin Source Code describing the listener to be called in the event of a change in a Bluetooth characteristic) (*see* Appx1070-71 at ¶ 97); Appx4642-43 (Garmin Source Code indicating how notifications are received) (*see* Appx1070-71 at ¶ 99); Appx4644-46 (Garmin Source Code indicating storage of data) (*see* Appx1072-73 at ¶ 101); Appx4647 (same); Appx4648 (Garmin Source Code indicating use of HTTP transmission protocol) (*see* Appx1074 at ¶ 102); Appx4649 (same); Appx4650-51 (Garmin Source Code controlling GUI) (*see* Appx1075 at ¶ 103); Appx4652 (Garmin Source Code indicating mobile application code controlling processor for listening and receiving real time data and notifications) (*see* Appx4488); Appx4588 at 132:1-10; Appx4589 at 133:16-134:6; Appx4484-97; Appx4501-508; and Appx4516-26.

## F. DEFENDANT FOSSIL

### 1. THE "WEAR OS PRODUCTS"

Cellspin does not appeal those portions of the Order concerning the Accused "Wear OS Products" of Defendant Fossil.

### 2. THE "FOSSIL HR HYBRID" PRODUCTS

#### a. "CRYPTOGRAPHICALLY AUTHENTICATE"[22]

The District Court repeatedly rejects the evidence cited by Cellspin and resorts to its own technical assessment which contradicts the testimony of Cellspin's technical expert. First, the District Court credited Fossil's argument that the "Just Works" Bluetooth pairing method does not perform authentication. Appx0084-85 at 54:19-55:10. Conversely, the District Court rejected the testimony and opinions offered by Vijh that the Accused Fossil HR Hybrid Devices nevertheless perform authentication because both LE Legacy and LE Secure pairing use "cryptographic keys for authentication." Appx0085 at 55:11-27. In the process, the District Court made the determination that Cellspin purportedly failed to explain how the cited source code: (i) indicates the use of link keys; and (ii) performs cryptographic authentication. Appx0085 at 55:19-26. The District Court was incorrect on both points.

With respect to the "explanation how the Fossil Source Code indicates the use of link keys," Cellspin specifically cited to Appx0858-59 at ¶ 115 [*see* Appx4672 at 13:15], which explains how the exchange of link keys is performed in *all* Bluetooth pairing models (including Legacy) using cryptographic encryption keys, and further explains how the cited Fossil Source Code at Appx4683 and Appx8108 both

[22] This error impacts Claim 1 of the '847 Patent.

describe the encryption of data. Further, Appx8109-11 [as cited at Appx5111] is Fossil Source Code which shows encryption key exchange using secret keys.

With respect to the "explanation how the Fossil Source Code performs cryptographic authentication," Cellspin specifically cited to Appx0840-41 at ¶ 91 [*see* Appx4672 at 13:15], which explains how the cited Fossil Source Code at Appx8101-03 and Appx8104-07 describe both pairing and authentication during pairing, including use of encryption keys for authentication. Further, Appx8109-11 [as cited at Appx5111] is Fossil Source Code which shows use of device authentication as well as encryption key exchange using secret keys.

Second, the District Court argued that the opinions of Vijh depend upon a number of purported "unfounded assumptions" as follows: (i) the Accused Instrumentalities use either LE Legacy or LE Secure Bluetooth connections; (ii) both LE Legacy or LE Secure Bluetooth connections necessarily use link or cryptographic keys; and (iii) use of cryptographic keys means that a product performs the recited "verify as legitimate by use of encryption and decryption involving an algorithm." Appx0085-86 at 55:27-56:8. As Cellspin established, none of these "presumptions" are "unfounded." First, it is established in the record that all Accused Instrumentalities use Bluetooth LE. *See, e.g.,* Appx7308 (citing Fossil Witness Testimony [Appx4738; Appx4779-82; Appx4799-800] confirming the fact that all Fossil devices have Bluetooth 4.1 or 4.2 functionality; confirming all

Accused Devices comply with Bluetooth 5.0 LE or 4.2 LE). Second, it is established in the record that both LE Legacy or LE Secure Bluetooth connections necessarily use link or cryptographic keys. *See, e.g.,* Appx7335-40. Third, it is established in the record that use of cryptographic keys means that a product performs the recited "verify as legitimate by use of encryption and decryption involving an algorithm." *See, e.g.,* Appx0841-42 at ¶ 92 (citing Fossil Source Code at Appx8104-07); Appx7335-40; Appx7342 (citing Appx4691).

#### b. "User Identifier" and "User Information"[23]

In the same manner in which the District Court erred with respect to its rulings relating to Defendant Fitbit, the District Court also necessarily erred in finding that Cellspin offered "a different infringement theory" involving OAuth tokens in its case against Fossil. Appx0086-87 at 56:17-57:20. As such, Cellspin hereby adopts and incorporates by reference all arguments made *supra* concerning Fitbit. *See supra* at § VI.D.5.

#### c. "Signaling New Data for Transfer" and "Polling"[24]

First, while the option of "manually syncing" data as described by Fossil and admitted by Cellspin may exist, the fact remains that the Accused Instrumentalities nevertheless satisfy the "polling" limitations as construed. As explained by Vijh,

[23] This error impacts the Asserted Method Claims of the '752 and '794 Patents.
[24] This error impacts all Asserted Claims.

"polling" in this context "is the act of the mobile device synchronizing data with the capture device. This is typically accomplished by reading the values of characteristics on the capture device at regular time intervals or upon set events such as resumption of activity or user request." Appx0906 at ¶ 206. While the District Court took the view that Vijh was stating a position contrary to the Court's Construction, it failed to appreciate the entirety of its own Construction, which provides that "predetermined" refers to: "programming that sets the frequency of the status checks (*e.g.,* at set intervals, dynamic intervals, randomly, etc.)." Appx8007 at 20:6-8. The opinions of Vijh include the provision that the action of a user performing a manual sync satisfies the construction, inasmuch as such functionality occurs at "dynamic intervals" and/or "randomly."

Second, and more to the point, the District Court erred by weighing evidence against Cellspin at summary judgment, including the weighing of expert testimony and credibility as between Cellspin's expert (Vijh) and Fossil's expert (Rysavy). More specifically, the District Court failed to properly credit the infringing functionality evidenced by the Fossil Source Code as cited and explained by Vijh. Appx0906 at ¶ 206 (citing Fossil Source Code at Appx8112-14 and Appx8115-18). In its erroneous Order, the District Court did not appreciate the importance and clear disclosures of the cited evidence, which collectively illustrate the fact that the Accused Instrumentalities comprise programming which sets the frequency of status

checks at a period of 60 seconds, with a corresponding programming setting a sync data read. *See ids.* Such evidence satisfies the "polling" limitation as construed, and raises a genuine issue of fact precluding summary judgment. To the extent the District Court characterized Vijh as unable to explain how the cited Fossil Source Code constituted evidence of "polling," it is incorrect. Appx0089-90 at 59:21-60:3 (discussing testimony at Appx8040 at 115:12-14, 116:8-22). In fact, Vijh fully explained how the questions asked were ambiguous with respect to the meaning of the term "polling interval" [Appx8042 at 123:6-125:9], and repeatedly informed counsel for Fossil that a full response could be offered if he were permitted to review the Source Code in question [Appx8041 at 118:21-24 and 120:4-24]. In any event, Vijh explained unequivocally that: "[I]t would be incorrect for me and imprudent for me to say that the device *always* syncs at 60 seconds. What I'm saying here is *there are parameters in the source code that put a particular regular time interval*." Appx8040 at 115:6-11 (emphasis added).

## G. DEFENDANT NIKON

### 1. NIKON'S SO-CALLED "TWO-CONNECTION" PROCESS INFRINGES[25]

Notwithstanding Nikon's reliance on its so-called "two-connection" process, the evidence of record establishes infringement by the Accused Nikon Instrumentalities. Again, the District Court erred in granting summary judgment on

[25] This error impacts all Asserted Claims.

**REDACTED**

the basis of the "two-connection" argument offered by Nikon's expert. To the extent opposing experts offer conflicting opinions with respect to what the evidence and the Source Code establish from a technical perspective, it is not the purview of the District Court to resolve such conflicting opinions on summary judgment. *Edwards,* 99 F.Appx. at 921

The District Court's failure to appreciate the impact of the construed term "paired" resulted in an erroneous ruling on summary judgment. More specifically, and again as construed, an infringing "paired" connection is one which persists "in the condition of having an exchanged link key (either before connection establishment was requested or during connection phase)." Appx8005 at 18:5-6. Accordingly, as long as the Accused Nikon Instrumentalities continue to have exchanged link keys, they are "paired" in accordance with the Asserted Claims. As shown by Cellspin, there is substantial evidence from which a reasonable juror could (and should) conclude that the Accused Nikon Instrumentalities do, in fact: (i) establish a paired Bluetooth connection by the exchange of link keys; (ii) maintain the exchanged keys; and (iii) acquire "new data" after the exchange of link keys. As such, Nikon's so-called "two-connection" argument put forward by Nikon's expert in the Haas expert Report fails.

First, the District Court incorrectly states that: "Cellspin does not contest that Nikon's accused products operate through the [redacted] of the [redacted]

REDACTED

and the [redacted] of the [redacted] for [redacted]." Appx0105 at 75:26-27. In fact, Cellspin expressly argued to the contrary. Appx8209 at 6:19-22. Moreover, the fact that a single set of link keys is exchanged, and hence a single "paired connection" exists, is established by the evidence of record and the qualified expert testimony of Vijh. Appx8210 at 7:19-21 (citing Appx0957-58 at ¶ 88 (citing and discussing Nikon Source Code at Appx8216-17); (further citing Appx8243-48; Appx8249 (citing Appx8350 (deliberate unpairing is required and connection is always maintained))). Indeed, Nikon and its expert have never contested the fact that there is a *single exchange of link keys* in its so-called "two-connection" configuration.

Second, the District Court inexplicably found that the above-referenced testimony of Vijh concerning the existence of a single "paired" connection (because of the single exchange of link keys) in the Accused Nikon Instrumentalities was "conclusory." Appx0106 at 76:6-15. As noted, the opinions offered by Vijh are not conclusory; rather, they are backed up by Nikon's own Source Code, which Vijh identified as illustrating the fact that the Accused Devices use Bluetooth authentication as part of the pairing process. Appx0838-39 at ¶ 88. Further, Vijh cited and relied upon Nikon's own technical documents, which evidence the fact that deliberate unpairing is required and that the connection is always maintained. Appx8249 (citing Appx8350). Of course, Vijh also explained in detail the manner

**REDACTED**

in which authentication and pairing in Bluetooth includes the exchanging of link keys. *See, e.g.,* Appx0938 at ¶ 56; Appx0952-53 at ¶ 89; Appx8249-54.

Third, the District Court's conclusion that "Cellspin's efforts fail because it never addresses the element of the Court's construction requiring a connection 'maintained on a continuous basis'" is clearly erroneous. Appx0106 at 76:13-15. Indeed, Cellspin specifically argued that there is a single set of link keys exchanged between the Nikon Instrumentalities, and that such keys are "used to *maintain the Bluetooth connection* between the camera and the mobile application." Appx8210 at 7:14-21 (emphasis added) (citing Appx0957-58 at ¶ 88; Appx0968-69 at ¶ 111; Appx0988-89 at ¶ 143; Appx1001-02 at ¶ 168; and Appx1015 at ¶ 199, as well as the Nikon Source Code as cited therein). Moreover, Cellspin pointed out that "the exact same link keys are maintained and reused for subsequent communication about the existence of new data for transfer even after the [redacted] communication has ended." Appx8210 at 7:18-19. Further, Cellspin cited the opinions of Vijh, which detail how every limitation of the Asserted Claims are satisfied by the Accused Nikon Instrumentalities, including specifically those limitations "which require only that a secure paired connection (having an exchanged link key) is established and maintained among the Nikon camera and the Nikon Mobile application." Appx8213-14 at 10:23-11:7 (citing Appx0951-52 at ¶ 88; Appx0968-71 at ¶¶ 111, 112, and 114, as well as the Nikon Source Code as cited

**REDACTED**

therein). Still further, Vijh has explained how and why the exchange of link keys persists between the devices such that they necessarily maintain their paired connection on a continuous basis. Appx0943-44 at ¶ 69. Still further, Vijh cited and relied upon Nikon's own technical documents, which evidence the fact that deliberate unpairing is required and that the connection is always maintained. Appx8249 (citing Appx8350).

Fourth, the District Court failed to address Cellspin's argument that the evidence of record establishes the fact that the Bluetooth Specifications do not disallow a single connection that may use both radio technologies (*i.e.,* Bluetooth Classic and Bluetooth LE) for communicating [redacted] types of [redacted]. Appx8206-07 at 3:28-4:23.

### 2. PERFORMANCE OUTSIDE THE UNITED STATES[26]

Again, the District Court offered the same erroneous analysis relating to Nikon as it did in the portions of its Order relating to Fitbit and Garmin. As such, Cellspin hereby adopts and incorporates by reference all arguments made *supra* concerning Fitbit and Garmin. *See supra* at §§ VI.D.2 and VI.E.1.

### 3. "[RECEIVING/MAKING AVAILABLE] AT THE ONE OR MORE WEB SERVICES, THE NEW DATA"[27]

The District Court erroneously relies upon the Nikon "Terms of Use" to

[26] This error impacts the Asserted Method Claims of the '794 Patent.
[27] This error impacts the Asserted Method Claims of the '794 Patent.

support the conclusion that *all* data falling within the scope of the Asserted Claims is located exclusively on servers located in Japan. Appx0107-108 at 77:17-78:23. This conclusion is unwarranted and subject to conflicting evidence, which raises genuine issues of fact.

First, the Nikon "Terms of Use" *do not state* that *all* data is stored and processed *only* on servers located in Japan. Appx8213 at 10 (emphasis added):

> 1. Use of the NIKON IMAGE SPACE requires that the customer agree to:
>
> a. all of these Terms of Use.
>
> b. Customers who for any reason find themselves unable to agree to the Terms of Use shall be prohibited from using NIKON IMAGE SPACE. NIKON IMAGE SPACE is operated in Japan by Nikon, a Japanese company, and when using this service customers store and process image data on servers located in Japan. Customers should note that locations of the servers on which other data are stored or processed varies by membership type as shown below.
>
> i. Japan, in the case of Members who are not "Nikon product owners plan" Members, or
>
> ii. Japan, the United Kingdom, the Republic of Ireland, or the United States of America in the case of Members who are "Nikon product owners plan" Members.

Rather, the Terms make it clear that "other data" (*i.e.,* non-image data) is stored or processed on servers located in the United States. The District Court erred by limiting the infringing scope of the Asserted Claims to *only* image data, notwithstanding the fact that the scope of the claimed "new data" is far broader, and includes (at minimum) "audio data, video data, image data, text data, or digital data." Appx0397 at Claim 7. Indeed, Nikon's Terms of Use confirm the fact that other "new data" including: (i) text; (ii) other writings; (iii) data; (iv) music; (v) audio; (vi) videos; and (vii) information, may all be uploaded to NIKON IMAGE SPACE. *See* Appx8354-56 (at VI.1; VI.4.k; and XII.3):

**REDACTED**

VI.Member Responsibilities

1. The user is responsible for all content, including text and other writings, images, data, software, music and other audio, drawings, and videos, posted or otherwise published (below, "post", "posts", "posting", "posted") using NIKON IMAGE SPACE or via the Internet (including but not restricted to images uploaded to NIKON IMAGE SPACE and shared with others, referred to below as "Posted Works").

As accused by Cellspin, the infringing "new data" comprises more than simply "image data." In fact, Cellspin expressly defined Nikon's accused "image data" as "data associated with digital images and/or video." *See, e.g.,* Appx8360. Likewise, Cellspin expressly defined the accused "new data" as "image and/or video data." Appx8369.

### 4. "Establish a Secure Paired Bluetooth Connection"[28]

First, the District Court erroneously states that Cellspin failed to directly address Nikon's argument that the Accused Products purportedly "operate at a [redacted]" which does not [redacted] or [redacted]. Appx0109 at 79:5-15. Indeed, Cellspin cites to Nikon's Source Code as direct evidence of the fact that the Accused Instrumentalities *do* in fact use the same context objects throughout the communication, regardless of the communication method being used (*i.e.,* [redacted]). Appx8213 at 10:17-25. The use of the same context objects confirms the fact that link keys have been exchanged.

In any event, the District Court's conclusion that Vijh is engaging in pure conjecture is plainly erroneous. As discussed at length *supra* [at § VI.G.1.b], there

[28] This error impacts the Asserted Method Claims of the '752 Patent.

REDACTED

is substantial evidence of record establishing the fact that the Accused Nikon Instrumentalities establish and maintain "paired Bluetooth connections" which use "cryptographic encryption keys." For example, the fact that a single set of link keys is exchanged, and hence a single "paired connection" exists, is established by the evidence of record and the qualified expert testimony of Vijh. *See* Appx8210 at 7:19-21 (citing Appx0951-52 at ¶ 88 (citing Nikon Source Code at Appx8216-17 and citing Appx8243-48); Appx8249 (citing Appx8350)). Of course, Vijh also explained in detail the manner in which authentication and pairing in Bluetooth includes the exchanging of link keys. *See, e.g.,* Appx0938 at ¶ 56; Appx0952-53 at ¶ 89; Appx8249-54. The foregoing raise genuine issues precluding summary judgment.

### 5. "CRYPTOGRAPHICALLY AUTHENTICATE"[29]

First, the District Court failed to properly consider the evidence and arguments presented by Cellspin establishing the fact that the purported "[redacted]" operation of the Accused Instrumentalities is merely a starting point in the connection process, which continues to include pairing and authentication. This issue is discussed at length *supra* [at § VI.G.1.b], and there is substantial evidence of record establishing the fact that the Accused Nikon Instrumentalities establish and maintain "paired Bluetooth connections" which use

[29] This error impacts the Asserted System Claims of the '847 Patent.

"cryptographic encryption keys." The fact that the Accused Instrumentalities pair with authentication is established by the evidence of record and the expert testimony of Vijh. *See* Appx8210 at 7:19-21 (citing Appx0951-52 at ¶ 88 (citing Nikon Source Code at Appx8216-17; and citing Appx8243-48)); Appx8249 (citing Appx8350). Of course, Vijh also explained the manner in which authentication and pairing in Bluetooth includes the exchanging of link keys. *See, e.g.,* Appx0938 at ¶ 56; Appx0952-53 at ¶ 89; Appx8249-54. As such, the District Court wrongly states that Cellspin relies upon the mere possibility of a so-called "upgrade" to authentication. Appx0110 at 80:22. Rather, as established, Cellspin has presented expert testimony and evidence of record from which a reasonable juror could conclude that the Accused Instrumentalities do, in fact, perform authentication.

Second, the District Court rejected Cellspin's cited Nikon Source Code because it failed to understand the argument and basis for infringement. Appx0110-111 at 80:25-81:5. Here, the District Court ignored Cellspin's cited evidence, which defeats the District Court's position that there is "an absence of explanation" relating to infringement. In its briefing, Cellspin expressly directed the District Court to the cumulative opinions of Vijh on this issue; namely: Appx0938 at ¶ 56; Appx0944 at ¶ 70; Appx0952-53 at ¶ 89 (citing Nikon Source Code at Appx8485-87); Appx8249-56 (citing, *inter alia,* Nikon Source Code at Appx8488; Appx8489-90; and Appx8491). *See* Appx8214 at 11:16-20. Despite these citations to the evidence of

record, the District Court simply reviewed the single background paragraph contained in Vijh's Written Report (*i.e.,* Appx0938 at ¶ 56) and erroneously ignored the remainder. *See* Appx0110-111 at 80:25-81:4. The evidence cited by Cellspin establishes the fact that the Accused Nikon Instrumentalities perform authentication. Among the evidence is the expert testimony of Vijh concerning the facts that authentication is used in Bluetooth LE Legacy and Bluetooth LE Secure Pairing, and both use cryptographic keys for authentication. Appx0938 at ¶ 56. This is not an opinion, but a statement of fact based upon Vijh's knowledge in the field and the Bluetooth Specification as cited at Appx8249-54. The evidence further includes the discussion provided by Vijh in his Written Report in which he identifies Nikon Source Code [Appx8485-87] evidencing "the Bluetooth authentication, pairing, bonding and encryption of the wireless link." Appx0952-53 at ¶ 89. The evidence further includes the citations provided by Vijh to Nikon Source Code, including: (i) Appx8488 (evidencing encryption in the pairing process and cryptographic key generation) (*see also* Appx0969-70 at ¶ 112); and (ii) Appx8489-90 (evidencing bonding) (*see also* Appx0979 at ¶ 126). Still further, the evidence of record includes Nikon Technical Documents as identified by Vijh which evidence both authentication and encryption in the Accused Devices. *See* Appx8256.

## H. DEFENDANT UNDER ARMOUR

### 1. THE HOVR 3 PRODUCTS

#### a. "ESTABLISHING" A "PAIRED BLUETOOTH CONNECTION"[30]

First, with respect to the UA Source Code establishing the fact that the Accused Instrumentalities implement authentication, the District Court erroneously stated that Cellspin "does not cite to where in Vijh's report he identifies this source code." Appx0069 at 39:5-6. This statement is incorrect, as the *very first citation* in Cellspin's brief to the District Court was to this very evidence. *See* Appx8501 at 4:3-7 (citing Appx0727-28 at ¶ 88; Appx0744-45 at ¶ 111) (Vijh identifying UA Source Code at Appx8510-11, Appx8512, and Appx8513). Further, Cellspin cited specifically to Appx8529-50 [*see* Appx8501 at 4:10-11], which sets out a detailed explanation of the manner by which the HOVR 3 Products establish a secure paired Bluetooth connection, including screenshot images of UA instructions on how to perform pairing and images of the actual HOVR 3 Products pairing with the UA Mobile Application. Further, the evidence of record as cited at Appx8549-50 includes UA documents establishing at least the following facts: (i) the HOVR 3 shoe remains paired even when out of Bluetooth range [Appx8736-40 and Appx8741-47]; (ii) use of Bluetooth SoC with Key Generation and AES-128 Hardware Encryption in the Accused Products [Appx8748-49] [*see also* Appx8752;

[30] This error impacts all Asserted Claims.

Appx8759-61; and Appx8763]. Specifically with respect to the aforementioned evidence establishing the fact that the HOVR 3 Products remain paired even when out of Bluetooth range, Vijh has explained that such functionality is evidence that link keys have, in fact, been exchanged and pairing between the devices is maintained. Appx8501-02 at 4:22-5:10; Appx0720 at ¶ 69.

Second, the District Court credited the testimony of UA's expert while rejecting the opinions expressed by Vijh. One fact the District Court focused upon was the purported lack of invocation of the Security Manager Protocol in the Accused Products. Appx0070 at 40:8-9 (citing Sharony). This "fact" is not dispositive, given that the Bluetooth connection can be secure and paired *without* invoking the Security Manager Protocol and Sharony makes no showing otherwise. Such issues are properly subject to cross examination and the weighing of credibility, which is the purview of the jury. In any event, following the District Court's summation of its view of the evidence, it erroneously concluded that Vijh based his opinions on the fact that "a device with a certain Bluetooth connection might 'typically' have certain characteristics." Appx0070 at 40:21-23. This view of the evidence is incorrect, inasmuch as Vijh based his opinions on far more than mere conjecture and generalizations. Specifically, Vijh confirmed the fact that the Accused Products "exchange link keys" by citing to UA Source Code and his personal testing of the Accused Products in use. Appx8501 at 4:3-21 (citing, *inter*

*alia*, Appx0727-28 at ¶ 88, which is discussed in detail *supra*). Again, and as repeatedly discussed, Vijh [at ¶ 88] noted specifically within UA's Source Code the evidence which confirms the use of Bluetooth authentication configuration function as part of the pairing process. To the extent UA's expert has a different opinion with respect to what the Source Code shows, it is not the purview of the District Court to resolve such conflicting opinions on summary judgment. *Silicon,* 2016 WL 836679 at *5; *Edwards,* 99 F.Appx. at 921.

Third, the District Court weighed evidence against Cellspin, including the documents of record as cited and relied upon by Vijh in support of the fact that the Accused Products perform Bluetooth pairing with key exchange. Appx0071 at 41:17-26. The documentary evidence, however, should be weighed in Cellspin's favor, and supports the opinions rendered by Vijh. For example, Appx8736-40 and Appx8741-47 each establish the fact that the HOVR 3 shoe remains paired even when out of Bluetooth range (*i.e.,* "maintained on a continuous basis" and having exchanged link keys). The pertinence of this fact in regards to pairing and key exchange is explained by Vijh, at Appx8501-02 at 4:22-5:10 and Appx0720 at ¶ 69. Further, and as discussed *supra*, the documents of record establish the use of Bluetooth SoC with Key Generation and AES-128 Hardware Encryption in the Accused Products. Appx8748-49; Appx8752; Appx8759-61; and Appx8763. It was clear error for the District Court to weigh such evidence and testimony.

Fourth, the District Court incorrectly stated that Vijh failed to present the results of his testing. Appx0072 at 42:1-9. Again, the District Court failed to consider and appreciate the evidence of record on the whole. In its briefing, Cellspin specifically cited to the portions of Vijh's Report (which includes and incorporates the Vijh Exhibits E) wherein he presented his findings. Specifically, Cellspin directed the District Court to Appx8529-50 [*see* Appx8591 at 4:10-11], which sets out a detailed explanation of the manner by which the HOVR 3 Products establish a secure paired Bluetooth connection, including screenshot images of UA instructions on how to perform pairing and screenshot images of the actual HOVR 3 Products pairing with the UA Mobile Application.

### b. "SECURE PAIRED BLUETOOTH CONNECTION" AND "CRYPTOGRAPHIC ENCRYPTION KEY"[31]

The District Court erred in granting summary judgment on the basis of the "secure paired Bluetooth connections" argument offered by UA's expert. In the process, the District Court relied upon its own erroneous ruling (as discussed *supra*) that the HOVR 3 Products do not perform authentication.

Again, and as discussed *supra*, the evidence establishes the fact that the HOVR 3 Products establish secure paired Bluetooth connections, including via the exchange of link keys, with authentication. Per the District Court, a finding of

[31] This error impacts the Asserted System Claims of the '847 Patent.

infringement would require an "improper assumption that the HOVR 3 uses link keys." Appx0073 at 43:5-10. Of course, as established by Cellspin, there is no need to "assume" anything relating to the exchange of keys, given that Vijh has identified specifically within UA's Source Code evidence of authentication. *See* Appx8501 at 4:3-7 (citing Appx0727-28 at ¶ 88 and Appx0744-45 at ¶ 111) (Vijh identifying UA Source Code at Appx8510-11, Appx8512, and Appx8513). Still further, the evidence of record as cited at Appx8549-50 includes UA documents establishing at least the following facts: (i) the HOVR 3 shoe remains paired even when out of Bluetooth range [Appx8736-40 and Appx8741-47]; and (ii) use of Bluetooth SoC with Key Generation and AES-128 Hardware Encryption in the Accused Products [Appx8748-49] [*see also* Appx8752; Appx8759-61; and Appx8763]. With respect to the aforementioned evidence establishing the fact that the HOVR 3 Products remain paired even when out of Bluetooth range, Vijh explained that such functionality is evidence that link keys have, in fact, been exchanged and pairing between the devices is maintained. Appx8501-02 at 4:22-5:10; Appx0720 at ¶ 69.

### 2. The Samsung Galaxy Watch and HOVR 3 Products

#### a. "Maintained on a Continuous Basis"[32]

The District Court erred in granting summary judgment on the basis of the "maintained on a continuous basis" argument offered by UA's expert.

[32] This error impacts all Asserted Claims.

First, the District Court introduces an argument that the Asserted Claims distinguish between the "concepts" of "paired devices" and "connected" devices. Appx0073 at 43:22-27. There is no such "distinction" in the Asserted Claims, which each recite: "establishing a secure paired Bluetooth connection between the … devices" and "acquiring new data …, wherein new data is data acquired after the secure paired Bluetooth connection is established." *See, e.g.,* Appx0411 ('752 Patent) at Claim 1. There is only a *single* limitation and a *single* "concept" – "a secure paired Bluetooth connection" – not a "paired" connection and a separate conceptual "connection which is maintained on a continuous basis." Stated differently, the "connection" is "paired," and the "paired connection" is "maintained on a continuous basis." Per the District Court's construction, the "connection" is "paired" as long as it is "in the condition of having an exchanged link key."

Given the Court's Claim Construction and the plain language of the Asserted Claims, devices infringe as long as they "pair" by "exchanging link keys" and as long as the "new data" is acquired after such "pairing" is maintained continuously. The technical implications of this construction are explained by Vijh, including the fact that the persistency of the paired connection is a benefit of having the exchanged link keys, and allows for ease of use. Appx0720 at ¶ 69. Indeed, such "ease of use" is appreciated when the "paired" devices are able to immediately communicate with each other when they are brought into Bluetooth signal range and there is no "re-

pairing" required. Appx8501-02 at 4:22-5:10.

The evidence raises genuine issues of material fact with respect to the question of whether the UA Instrumentalities acquire "new data" during the time following pairing and during which such "paired Bluetooth connection" is "maintained on a continuous basis." For example, the UA Instrumentalities remain "paired" [because they have exchanged link keys] even when out of Bluetooth range, as evidenced by the fact that they reconnect as soon as brought into Bluetooth signal range. Appx8736-40 and Appx8741-47. Further, UA Source Code evidences the fact that events are read *after* pairing is established and maintained. Appx0730-31 at ¶ 92 (citing Appx8767-68). Such technical evidentiary citations are well-understood to those of ordinary skill, and form the foundation for the opinions offered by Vijh.

Even taking the District Court's "findings" as accurate, which they are not, the fact that a given set of devices may pair and re-pair does not eliminate the infringement which occurs during each respective "paired" state. The District Court's erroneous Order should be reversed.

### I. DEFENDANT NIKE

Cellspin does not appeal those portions of the Order concerning the Accused Nike FuelBand Products.

#### 1. THE APPLE WATCH NIKE PRODUCTS

##### a. "ATTACHING" OR "APPLYING" USER IDENTIFICATION TO "NEW DATA"[33]

Notwithstanding Nike's arguments, the evidence establishes infringing functionality *at the mobile application*. Nike's witness testimony establishes the following: (i) the phone attaches the user identification because the account is attributed to the account as "logged in on the phone at the time" and (ii) the unique user ID is assigned at the mobile device because the user must sign-in to their account. Appx0061 at 31:16-21; Appx9415 at 61:3-11. Further, the infringing user identifier is a unique set of credentials assigned so that the data can be properly attributed to the individual user, and the evidence establishes that such credentials are applied at the mobile device. Appx0630 at ¶¶ 105 (citing Nike Source Code at Appx9430-31, which shows a "userId" derived from a token during an API authorization event *on the mobile device*).

##### b. "FIRST PROCESSOR"[34]

First, the District Court held Cellspin at fault for not proving the absence of

[33] This error impacts the Asserted Method Claims of the '794 and '752 Patents.
[34] This error impacts the Asserted System Claims of the '847 Patent.

any *other* unnamed processors in the Apple Watch. Appx0063 at 33:8-10. The Asserted Claims, however, merely require the presence of a "first processor." In any event, the presence of a first processor is evident based upon the functionality of the Accused Devices and the fact that there is operating code. Appx0615 at ¶ 86; Appx0617-21 at ¶¶ 90-93; *Irise v. Axure Software Soln's,* 2009 WL 3615075 at *36 (C.D. Cal. 2009).

Second, the evidence establishes how the Apple Nike Watch performs the recited functions. *See, e.g.,* Appx0615 at ¶ 86 (citing Nike Source Code [Appx9567]); Appx0617-18 at ¶ 90 (citing Nike Source Code at Appx9568 as showing capture device code requiring an available memory device (*see* Appx0614-15 at ¶ 85)); Appx0620-21 at ¶ 93 (citing Nike Source Code at Appx9567 and Appx9569).

Third, the District Court failed to credit Vijh's reliance on typical computer architecture because the Court deemed such testimony and reliance as conclusory. Appx0063-64 at 33:27-34:5. The District Court was incorrect in its assessment for the same reasons as discussed *supra* with respect to Defendant Fitbit at § VI.D.7.a. For brevity, that discussion is adopted here in full. As with Fitbit, Vijh certainly did establish the basis for his reliance on typical system architecture, as set forth at, *e.g.,* Appx9445-49.

### c. "SECOND PROCESSOR"[35]

Claim 1 of the '847 Patent does *not* affirmatively recite a "second processor" as an element of the claimed system. The referenced "second processor" is merely "controlled by" Nike's infringing Mobile Application. *See* Appx0427 at Claim 1. Here, Vijh has: (i) explained that a processor is necessarily required in order for the Accused Mobile Application to execute; (ii) shown how Nike's Source Code is executed by the processor to perform recited functions; and (iii) presented screenshots and sniffing logs, as well as citations to Nike Source Code, evidencing the facts of infringement. *See* Appx0621-22 at ¶ 94; Appx0621-29 at ¶¶ 94-102; Appx9509-50.

### d. INTERNAL TESTING[36]

Here, the District Court offered the same erroneous analysis relating to Nike as it did in the portion of its Order relating to Fitbit. As such, Cellspin hereby adopts and incorporates by reference all arguments made *supra* concerning Fitbit. *See supra* at §§ VI.B and VI.D.3; *see also* Appx8793-94 at 19:20-20:18; Appx9420-24 at 80:24-83:9 and 84:12-23; Appx9425-26 at 119:23-120:2; Appx9573-74 at 26:21-27:9; Appx9576 at 32:3-18; Appx9591-94 at 61:1-64:10; Appx9609-12.

[35] This error impacts Asserted System Claim 1 of the '847 Patent.
[36] This error impacts all Asserted Claims.

#### e. ASSEMBLY[37]

Here, the District Court applied the same faulty argument as in the portion of the Order relating to Defendant Garmin, as discussed *supra* at § VI.E.4, which Cellspin hereby adopts and restates herein. *See also* Appx0613-31 at ¶¶ 83-107; Appx9433; Appx9450; Appx9499; Appx9555; Appx0613-14 at ¶ 83.

#### f. DIVIDED INFRINGEMENT[38]

The District Court repeated the same faulty argument applied by the District Court in its Order relating to Defendant Fitbit, as discussed *supra* at § VI.D.4.b, which Cellspin hereby adopts and restates herein. *See also* Appx8794-95 at 20:22-21:8 (citing Appx0598-601 at ¶¶ 50-51 and 53; Appx0691-93 at ¶¶ 223-227; Appx9214-22; Appx9584-85 at 44:20-45:10; Appx9586-86 at 50:22-51:4; Appx9589-91 at 59:16-61:1. Cellspin's factual assertion concerning the requirement of pairing is a specific and non-conclusory allegation, and is supported by evidence of record. Appx8795 at 21:4-7.

## VII. CONCLUSION AND PRAYER FOR RELIEF

The District Court's erroneous Order granting summary judgment as to each Defendant should be reversed, and these matters should be remanded for further proceedings and individual trials on the merits.

---

[37] This error impacts the Asserted System Claims of the '847 Patent.
[38] This error impacts the Asserted Method Claims of the '794 and '752 Patents.

Dated: December 19, 2022

*/s/ M. Scott Fuller*
Randall Garteiser
rgarteiser@ghiplaw.com
Christopher A. Honea
chonea@ghiplaw.com
M. Scott Fuller
sfuller@ghiplaw.com
**GARTEISER HONEA – IP TRIAL BOUTIQUE**
95 Third Street, 2nd Floor
San Francisco, California 94103
Telephone: (415) 785-3762
Facsimile: (415) 785-3805

*Attorneys for Plaintiff-Appellant*
CELLSPIN SOFT, INC.

## CERTIFICATE OF COMPLIANCE

This Brief complies with the type-volume limitation of Federal Circuit Rule 32(b) as modified by Order of the Court at Docket No. 37. This Brief contains 19,975 words, excluding those portions of the brief exempted by Federal Circuit Rule 32(b)(2). This Brief has been prepared in a proportionally spaced typeface using Microsoft Office Word 14-point Times New Roman font.

/s/ *M. Scott Fuller*
M. Scott Fuller

## CERTIFICATE OF CONFIDENTIAL MATERIAL

The foregoing Brief contains 46 unique text words (in addition to PDF text from an excerpt at pp. 11 and 44, and an electronic diagram at p. 50) marked Confidential and protected by the parties in the District Court. As such, this Brief exceeds the maximum number of words permitted by Federal Circuit Rule 25.1(d)(1)(A). A Motion to Waive Requirements pursuant to Federal Circuit Rule 25.1(d)(3) is being filed concurrently herewith.

/s/ *M. Scott Fuller*
M. Scott Fuller

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the above and foregoing document has been served on December 19, 2022 to all counsel of record who are deemed to have consented to electronic service via the Court's CM/ECF system.

/s/ *M. Scott Fuller*
M. Scott Fuller