**22-2025, 22-2028, 22-2029, 22-2030, 22-2032, 22-2037**

# United States Court of Appeals for the Federal Circuit

CELLSPIN SOFT, INC.,

*Plaintiff-Appellant,*

v.

FITBIT LLC, NIKE, INC., UNDER ARMOUR, INC., FOSSIL GROUP, INC., MISFIT, INC., NIKON AMERICAS, INC., NIKON INC., GARMIN INTERNATIONAL, INC., GARMIN USA, INC.,

*Defendants-Appellees.*

APPEALED FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA IN CASE NOS. 4:17-CV-05928, 4:17-CV-05931, 4:17-CV-05932, 4:17-CV-05933, 4:17-CV-05936, 4:17-CV-05934, JUDGE YVONNE GONZALEZ ROGERS

## BRIEF OF DEFENDANT-APPELLEE FITBIT LLC

Karim Z. Oussayef
Jamie L. Kringstein
DESMARAIS LLP
230 Park Avenue
New York, NY 10169
Telephone: (212) 351-3400
Fax: (212) 351-3401
koussayef@desmaraisllp.com
jkringstein@desmaraisllp.com

Adam Steinmetz
DESMARAIS LLP
1899 Pennsylvania Ave NW, Suite 400
Washington, D.C. 20006
Telephone: (202) 451-4900
Fax: (202) 451-4901
asteinmetz@desmaraisllp.com

*Counsel for Defendant-Appellee Fitbit LLC*

March 27, 2023

**Claim 1 of U.S. Patent No. 8,738,794 (per Fed. Cir. R. 32(a)(3))**

1. A method for acquiring and transferring data from a Bluetooth enabled data capture device to one or more web services via a Bluetooth enabled mobile device, the method comprising:

> providing a software module on the Bluetooth enabled data capture device;
>
> providing a software module on the Bluetooth enabled mobile device;
>
> establishing a paired connection between the Bluetooth enabled data capture device and the Bluetooth enabled mobile device;
>
> acquiring new data in the Bluetooth enabled data capture device, wherein new data is data acquired after the paired connection is established;
>
> detecting and signaling the new data for transfer to the Bluetooth enabled mobile device, wherein detecting and signaling the new data for transfer comprises:
>
>> determining the existence of new data for transfer, by the software module on the Bluetooth enabled data capture device; and
>>
>> sending a data signal to the Bluetooth enabled mobile device, corresponding to existence of new data, by the software module on the Bluetooth enabled data capture device automatically, over the established paired Bluetooth connection, wherein the software module on the Bluetooth enabled mobile device listens for the data signal sent from the Bluetooth enabled data capture device, wherein if permitted by the software module on the Bluetooth enabled data capture device, the data signal sent to the Bluetooth enabled mobile device comprises a data signal and one or more portions of the new data;
>
> transferring the new data from the Bluetooth enabled data capture device to the Bluetooth enabled mobile device automatically over the paired Bluetooth connection by the software module on the Bluetooth enabled data capture device;
>
> receiving, at the Bluetooth enabled mobile device, the new data from the Bluetooth enabled data capture device;

> applying, using the software module on the Bluetooth enabled mobile device, a user identifier to the new data for each destination web service, wherein each user identifier uniquely identifies a particular user of the web service;
>
> transferring the new data received by the Bluetooth enabled mobile device along with a user identifier to the one or more web services, using the software module on the Bluetooth enabled mobile device;
>
> receiving, at the one or more web services, the new data and user identifier from the Bluetooth enabled mobile device, wherein the one or more web services receive the transferred new data corresponding to a user identifier; and
>
> making available, at the one or more web services, the new data received from the Bluetooth enabled mobile device for public or private consumption over the internet, wherein one or more portions of the new data correspond to a particular user identifier.

Appx396 (11:48-12:38).

**Claim 1 of U.S. Patent No. 8,892,752 (per Fed. Cir. R. 32(a)(3))**

1. A method for transferring data from a Bluetooth enabled data capture device to a remote internet server via a Bluetooth enabled mobile device comprising:

performing at the Bluetooth enabled data capture device:

establishing a secure paired Bluetooth connection between the Bluetooth enabled data capture device and the Bluetooth enabled mobile device, wherein the secure paired Bluetooth connection uses a cryptographic encryption key;

acquiring new data in the Bluetooth enabled data capture device, wherein new data is data acquired after the secure paired Bluetooth connection is established;

detecting and signaling the new data for transfer, to the Bluetooth enabled mobile device, wherein detecting and signaling the new data for transfer comprises:

receiving a message from the Bluetooth enabled mobile device, over the established secure paired Bluetooth connection, to enable event notifications, corresponding to new data for transfer, on the Bluetooth enabled data capture device;

enabling event notification on Bluetooth enabled data capture device, corresponding to new data for transfer;

determining existence of the new data for transfer; and

sending an event notification to the Bluetooth enabled mobile device, corresponding to existence of new data for transfer, over the established secure paired Bluetooth connection, wherein the Bluetooth enabled mobile device is configured to listen for the event notification sent from the Bluetooth enabled data capture device;

encrypting, using the cryptographic encryption key, the new data acquired in the Bluetooth enabled data capture device; and

> transferring the encrypted data from the Bluetooth enabled data capture device to the Bluetooth enabled mobile device, over the established secure paired Bluetooth connection, wherein the Bluetooth enabled mobile device has access to the internet, wherein the Bluetooth enabled mobile device is configured to receive the encrypted data and obtain the new data from the encrypted data using the cryptographic encryption key, wherein the Bluetooth enabled mobile device is configured to attach a user identifier, an action setting and a destination web address of a remote internet server to the obtained new data, wherein the user identifier uniquely identifies a particular user of internet service provided by the remote internet server, wherein action setting comprises one of a remote procedure call (RPC) method and hypertext transfer protocol (HTTP) method, and wherein the Bluetooth enabled mobile device is configured to send the obtained new data with the attached user identifier, an action setting and a destination web address to a remote internet server.

Appx411 (11:48-12:37).

**<u>Claim 1 of U.S. Patent No. 9,749,847 (per Fed. Cir. R. 32(a)(3))</u>**

1. A system comprising:

a Bluetooth enabled data capture device, comprising:

a first memory device;

a first processor coupled to the first memory device;

a first Bluetooth communication device configured to establish a paired Bluetooth wireless connection between the Bluetooth enabled data capture device and a Bluetooth enabled cellular phone, wherein the Bluetooth enabled data capture device is configured to cryptographically authenticate identity of the Bluetooth enabled cellular phone when the first Bluetooth communication device establishes the paired Bluetooth wireless connection;

a data capture circuitry;

said first processor configured to acquire new-data using the data capture circuitry after the paired Bluetooth wireless connection between the Bluetooth enabled data capture device and the Bluetooth enabled cellular phone is established;

said first processor configured to store the acquired new-data in the first memory device; and said first processor configured to send an event notification and the acquired new-data to the cryptographically authenticated Bluetooth enabled cellular phone over the established paired Bluetooth wireless connection, wherein the event notification corresponds to the acquired new-data and comprises sending a signal to the cryptographically authenticated Bluetooth enabled cellular phone;

a mobile application in the Bluetooth enabled cellular phone comprising executable instructions that, when executed by a second processor inside the Bluetooth enabled cellular phone controls the second processor to:

detect and receive the acquired new-data, comprising:

listen for the event notification, sent from the Bluetooth enabled data capture device, over the established paired Bluetooth wireless connection, wherein the event notification corresponds to the acquired new-data; and

receive the event notification and the acquired new-data, from the Bluetooth enabled data capture device, over the established paired Bluetooth wireless connection, wherein receiving the event notification comprises receiving the signal sent by the Bluetooth enabled data capture device corresponding to the acquired new-data;

store the new-data received over the established paired Bluetooth wireless connection, in a second memory device of the Bluetooth enabled cellular phone before transfer to a website; and

use HTTP to transfer the new-data received over the established paired Bluetooth wireless connection, along with user information stored in the second memory device of the cryptographically authenticated Bluetooth enabled cellular phone, to the website, over the cellular data network;

wherein the mobile application further comprises executable instructions to control the processor to provide a graphical user interface (GUI) for the new-data.

Appx427-428 (12:13-13:3).

# CERTIFICATE OF INTEREST

Counsel for Fitbit LLC certify under Federal Circuit Rule 47.4 that the following information is accurate and complete to the best of their knowledge:

1. **Represented Entities.** Provide the full names of all entities represented by undersigned counsel in this case.

Fitbit LLC

2. **Real Party in Interest.** Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.

None.

3. **Parent Corporations and Stockholders.** Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.

Google LLC
XXVI Holdings Inc.
Alphabet Inc.

4. **Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court.

DESMARAIS LLP: Tuhin Ganguly, Alan S. Kellman, Jonathan V. Lewis, John Desmarais, Ameet A. Modi

VENABLE LLP: David Shane Brun

GOODWIN PROCTER LLP: Anjali Moorthy, Neel Chatterjee, Rachel W. Walsh

5. **Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

Yes.

6. **Organizational Victims and Bankruptcy Cases.** Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).

Not applicable.

Dated: March 27, 2023

*/s/ Karim Z. Oussayef*
Karim Z. Oussayef

# TABLE OF CONTENTS

**Page**


CERTIFICATE OF INTEREST ........................................................................2

TABLE OF CONTENTS..............................................................................4

TABLE OF AUTHORITIES ........................................................................4

I. STATEMENT OF RELATED CASES........................................................6

II. INTRODUCTION ....................................................................................7

III. STATEMENT OF THE ISSUES ...............................................................8

IV. STATEMENT OF THE CASE ..................................................................10

A. The Asserted Claims Are Directed To A Particular Way To Use Bluetooth To Transmit Data...............................................................13

B. After Over Five Years Of Litigation, Cellspin Has Failed To Marshal Evidence To Prove Infringement Of Any Asserted Claim. .......................................................................................13

1. The District Court's Claim Construction Order Made Clear That The Asserted Claims Are Limited To A Specific Way Of Using Bluetooth To Transmit Data...............16

2. Cellspin's Infringement Expert Produced Largely Identical Reports In Each Case And Relied On Cellspin's Infringement Contentions Appended With Unexplained String Citations. ...................................................................16

3. The District Court Granted Summary Judgment Of Noninfringement In Favor Of All Defendants..........................18

C. The District Court Granted Fitbit Summary Judgment Of Noninfringement On At Least Three Grounds For Every Claim. ......19

V. SUMMARY OF THE ARGUMENT .........................................................20

VI. ARGUMENT............................................................................................23

A. Standard Of Review ....................................................................24

B. Cellspin's Global Attacks Against The District Court's Summary Judgment Order Are Meritless. ........................................29

1. The District Court's Summary Judgment Order Reflects Its Careful Consideration Of The Evidentiary Record. ............30

2. The District Court Correctly Characterized Cellspin's Expert's Opinions As Conclusory. .........................................35

C. Cellspin Lacks Evidence That The Accused Instrumentalities Meet The "User Identifier" And "User Information" Limitations.........................................................................36

1. The District Court Did Not Abuse Its Discretion In Excluding Cellspin's Undisclosed Infringement Theory For The "User Identifier" And "User Information" Claim Limitations. ........................................................................37

2. The District Court Properly Granted Summary Judgment Because Cellspin Lacked Evidence To Support Infringement After The OAuth Token Theory Was Excluded...........................................................................40

D. Cellspin Cannot Demonstrate That The Accused Instrumentalities Perform The Steps Of The Asserted Method Claims In The Required Temporal Order. ..........................................42

E. Under Cellspin's Theory Of Infringement, The Step Of "Providing A Software Module" Is Not Performed In The United States.......................................................................45

1. Cellspin Relies On Incorrect Statements Of The Law Regarding Where And When Infringement Occurs. ................47

2. Cellspin's Alternative Arguments For The "Providing" Step Improperly Contradict Its Expert's Opinion.....................48

F. The Step Of "Establishing A Paired Bluetooth Connection" Is Not Performed By, Or Attributable To, Fitbit. ..................................51

1. Fitbit's Source Code Does Not Perform The Step Of Establishing A "Paired" Bluetooth Connection. ........................51

2. Fitbit Does Not Direct Or Control The User To Establish A "Paired" Bluetooth Connection. ...........................................54

3. Fitbit Cannot Be Liable For Indirect Infringement Without A Showing Of Direct Infringement. ...........................56

G. Under The District Court's Unchallenged Construction Of "Cryptographically Authenticate," Cellspin Cannot Demonstrate That The Accused Wearables Perform Decryption. ......48

H. Cellspin Cannot Demonstrate That The Accused Wearables Meet The Processor Limitations Of The Asserted System Claims. ..........................................................................................51

1. Cellspin Cannot Show That The Accused Wearables Have A "First Processor" "Configured To" Perform All Three Required Functions. .......................................................51

2. Cellspin Provided No Evidence That The Processors Its Expert Analyzed Are Representative Of The Accused Wearables. ........................................................................54

VII. CONCLUSION ........................................................................................56

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Akamai Techs., Inc. v. Limelight Networks, Inc.*,
797 F.3d 1020 (Fed. Cir. 2015) ........................................................ 40, 42, 45

*Allvoice Devs. US, LLC v. Microsoft Corp.*,
612 F. App'x 1009 (Fed. Cir. 2015) ..............................................................18

*Ariz. Dream Act Coalition v. Brewer*,
818 F.3d 901 (9th Cir. 2016) .........................................................................17

*Asetek Danmark A/S v. CMI USA Inc.*,
852 F.3d 1352 (Fed. Cir. 2017) ......................................................................39

*Atmel Corp. v. Info. Storage Devices, Inc.*,
No. 95-1987, 1998 WL 775115 (N.D. Cal. 1998)..........................................24

*Bernhardt, L.L. C. v. Collezione Europa USA, Inc.*,
386 F.3d 1371 (Fed. Cir. 2004) ......................................................................17

*Bio-Rad Labs. v. 10X Genomics*,
967 F.3d 1353 (Fed. Cir. 2020) ......................................................................34

*Carmen v. San Francisco Unified Sch. Dist.*,
237 F.3d 1026 (9th Cir. 2001) ........................................................................43

*Classen Immunotherapies, Inc. v. Elan Pharms., Inc.*,
786 F.3d 892 (Fed. Cir. 2015) ........................................................................17

*Dynacore Holdings Corp. v. U.S. Philips Corp.*,
363 F.3d 1263 (Fed. Cir. 2004) ............................................................... 21, 48

*E-Pass Techs., Inc. v. 3Com Corp.*,
473 F.3d 1213 (Fed. Cir. 2007) ......................................................................31

*Ferring B.V. v. Barr Lab'ys, Inc.*,
437 F.3d 1181 (Fed. Cir. 2006)) .....................................................................46

*Finjan, Inc. v. Qualys Inc.*,
No. 18-07229, 2021 WL 1253651 (N.D. Cal. Apr. 5, 2021) ........................26

*Forsberg v. Pac. Nw. Bell Tel. Co.*,
840 F.2d 1409 (9th Cir. 1988) ............................................................. 17, 43

*Genentech, Inc. v. Amgen, Inc.*,
289 F.3d 761 (Fed. Cir. 2002) ............................................................. 17, 18

*IBM v. Booking Holdings Inc.*,
775 F. App'x 674 (Fed. Cir. 2019) ..........................................................44

*In re PersonalWeb Techs., LLC Patent Litig.*,
No. 18-2834, 2020 WL 6821074 (N.D. Cal. Feb. 3, 2020) .................. 37, 39

*Inpro II Licensing, S.A.R.L. v. T-Mobile USA, Inc.*,
450 F.3d 1350 (Fed. Cir. 2006) ..............................................................21

*Invitrogen Corp. v. Clontech Lab'ys, Inc.*,
429 F.3d 1052 (Fed. Cir. 2005) ........................................................... 50, 55

*Joy Techs., Inc. v. Flakt, Inc.*,
6 F.3d 770 (Fed. Cir. 1993) ................................................................. 36, 48

*L&W, Inc. v. Shertech, Inc.*,
471 F.3d 1311 (Fed. Cir. 2006) ..............................................................55

*Linear Tech. Corp. v. Impala Linear Corp.*,
379 F.3d 1311 (Fed. Cir. 2004) ..............................................................48

*MasterObjects, Inc. v. Meta Platforms, Inc.*,
No. 21-05428, 2022 WL 4856269 (N.D. Cal. Oct. 3, 2022)........................28

*Medgraph, Inc. v. Medtronic, Inc.*
843 F.3d 942 (Fed. Cir. 2016) ................................................................47

*MediaTek Inc. v. Freescale Semiconductor, Inc.*,
No. 11-5341, 2014 WL 690161 (N.D. Cal. Feb. 21, 2014) ..........................26

*Nalco Co. v. Chem-Mod, LLC*,
883 F.3d 1337 (Fed. Cir. 2018) ..............................................................42

*Novartis Corp. v. Ben Venue Lab'ys, Inc.*,
271 F.3d 1043 (Fed. Cir. 2001) ....................................................................30

*NTP, Inc. v. Rsch. In Motion Ltd.*,
418 F.3d 1282 (Fed. Circ. 2005) ............................................................ 35, 36

*O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*,
467 F.3d 1355 (Fed. Cir. 2006) .................................................. 18, 24, 25, 28

*Ormco Corp. v. Align Tech., Inc.*,
463 F.3d 1299 (Fed. Cir. 2006) ....................................................................36

*Pandrol USA, LP v. Airboss Ry. Prod., Inc.*,
320 F.3d 1354 (Fed. Cir. 2003) ....................................................................32

*Parallel Networks, LLC v. Abercrombie & Fitch Co.*,
704 F.3d 958 (Fed. Cir. 2013) ......................................................................32

*Phigenix, Inc. v. Genentech, Inc.*,
783 F. App'x 1014 (Fed. Cir. 2019) .................................................. 18, 26, 28

*Sandisk Corp. v. Memorex Prods.*,
415 F.3d 1278 (Fed. Cir. 2005) ............................................................ 18, 24

*Semiconductor Energy Lab'y Co. v. Chi Mei Optoelectronics Corp.*,
485 F. Supp. 2d 1089 (N.D. Cal. 2007) .........................................................22

*SiRF Tech., Inc. v. ITC*,
601 F.3d 1319 (Fed. Cir. 2010) ....................................................................44

*Sitrick v. Dreamworks, LLC*,
516 F.3d 993 (Fed. Cir. 2008) ......................................................................21

*SmithKline Beecham Corp. v. Apotex Corp.*,
439 F.3d 1312 (Fed. Cir. 2006) ............................................................ 30, 39

*Syngenta Crop Prot., LLC v. Willowood, LLC*,
944 F.3d 1344 (Fed. Cir. 2019) ....................................................................40

*TechSearch, L.L.C. v. Intel Corp.*,
286 F.3d 1360 (Fed. Cir. 2002) ....................................................................22

*Tiger Lily Ventures Ltd. v. Barclays Cap. Inc.*,
35 F.4th 1352 (Fed. Cir. 2022) ....................25

*Traxcell Techs., LLC v. Sprint Commc'ns. Co. LP*,
15 F.4th 1121 (Fed. Cir. 2021) .................... 19, 20, 31

*Wi-Lan Inc. v. Sharp Elecs. Corp.*,
992 F.3d 1366 (Fed. Cir. 2021) ....................17

**<u>Statutes</u>**

35 U.S.C. § 271 ....................40

**<u>Rules</u>**

Federal Rule of Appellate Procedure 28 .................... 4, 16, 18

Northern District of California, Patent Local Rule 3-1 ....................8, 24

Northern District of California, Patent Local Rule 3-6 .................... 24, 28

## I. STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5(a), Fitbit LLC ("Fitbit") provides the following statement of related cases.

An appeal from the same civil action was previously before this Court as Case No. 18-1817. The Court issued a precedential opinion on June 25, 2019: *Cellspin Soft, Inc. v. Fitbit, Inc.*, 927 F.3d 1306 (Fed. Cir. 2019). The panel was composed of Judges Lourie, O'Malley, and Taranto.

The following cases are known to counsel to be pending that will directly affect or be affected by this Court's decision:

- *Cellspin Soft, Inc. v. Fitbit LLC*, *Nikon Americas, Inc.*, *Nikon Inc.*, Case No. 2023-1526 (Fed. Cir.)
- *Cellspin Soft, Inc. v. Nike, Inc.*, Case No. 2022-2028 (Fed. Cir.), originating from Case No. 4:17-cv-05931-YGR (N.D. Cal.)
- *Cellspin Soft, Inc. v. Under Amour, Inc.*, Case No. 2022-2029 (Fed. Cir.), originating from 4:17-cv-05932-YGR (N.D. Cal.)
- *Cellspin Soft, Inc. v. Fossil Group, Inc.*, *et al.*, Case No. 2022-2030 (Fed. Cir.), originating from 4:17-cv-05933-YGR (N.D. Cal.)
- *Cellspin Soft, Inc. v. Nikon Americas, Inc.*, *et al.*, Case No. 2022-2032 (Fed. Cir.), originating from 4:17-cv-05936-YGR (N.D. Cal.)

- *Cellspin Soft, Inc. v. Garmin International, Inc.*, *et al.*, Case No. 2022-2037 (Fed. Cir.), originating from 4:17-cv-05934 (N.D. Cal.)

Counsel for Fitbit know of no other cases pending in this Court or any other court that will directly affect or be affected by this Court's decision in this appeal.

## II. INTRODUCTION

The district court's decision on summary judgment was not close. For ***each Asserted Claim***, the court granted summary judgment of noninfringement on ***at least three independent grounds***. Accordingly, to vacate the district court's decision as to any Asserted Claim, Cellspin must convince this Court to reverse on at least three independent grounds.

The chart below lists the six discrete noninfringement grounds that Cellspin raises on appeal (corresponding to Sections VI.C through VI.H of this brief). The checkmarks identify which patent or patents each ground applies to. The district court granted summary judgment in favor of Fitbit on all six of these grounds.

| **Noninfringement Issue** | **Asserted Method Claims** | | **Asserted System Claims** |
|---|---|---|---|
| | **'794 Patent** | **'752 Patent** | **'847 Patent** |
| No "User Identifier" or "User Information" (§ VI.C) | ✓ | ✓ | ✓ |
| No Temporal Order (§ VI.D) | ✓ | ✓ | |
| No Performance In The United States (§ VI.E) | ✓ | | |
| No "Establishing A Secure Paired Bluetooth Connection" (§ VI.F) | ✓ | ✓ | |
| No "Cryptographically Authenticates" (§ VI.G) | | | ✓ |
| No "First Processor" (§ VI.H) | | | ✓ |

Of note, the first noninfringement ground in the above chart (and addressed in Section VI.C below) pertains to the "user identifier" or "user information" limitations, which appear in every Asserted Claim in every Asserted Patent. For that ground, the district court granted summary judgment based on its authority to exclude an untimely infringement theory under the patent local rules, which this Court reviews for abuse of discretion. Therefore, not only must Cellspin prevail on at least three independent grounds for any given Asserted Claim, but for one of those grounds it must do so under the highly deferential abuse of discretion standard.

Ultimately, Cellspin cannot succeed on any appeal issue it raises. The district court's well-reasoned summary judgment order identified numerous evidentiary deficiencies that make it impossible for Cellspin to prove infringement as a matter of law. Accordingly, for the reasons discussed below, this Court should affirm the grant of summary judgment.

## III. STATEMENT OF THE ISSUES

1. Whether, for all Asserted Claims, the district court properly exercised its discretion to exclude Cellspin's only infringement theory for the "user identifier" and "user information" limitations as untimely under the local patent rules and thus properly granted summary judgment of noninfringement.

2. Whether, for the Asserted Method Claims, the district court correctly granted summary judgment of noninfringement because Cellspin provided no

evidence that Fitbit's Accused Instrumentalities perform the claimed functions in the required temporal order.

3. Whether, for the Asserted Method Claims of the '794 patent, the district court correctly granted summary judgment of noninfringement because, under Cellspin's theory of infringement, Fitbit does not perform the claimed "providing a software module" step in the United States.

4. Whether, for the Asserted Method Claims, the district court correctly granted summary judgment of noninfringement because the step of "establishing a secure paired Bluetooth connection" is neither performed by, nor attributable to, Fitbit.

5. Whether, for the Asserted System Claims, the district court correctly granted summary judgment of noninfringement because Cellspin provided no evidence that Fitbit's Accused Wearables perform decryption as required by the unchallenged construction of "cryptographically authenticate."

6. Whether, for the Asserted System Claims, the district court correctly granted summary judgment of noninfringement because Cellspin provided no evidence that Fitbit's Accused Wearables have a "first processor" that is "configured to" "acquire new-data," "store the acquired new-data," and "send an event notification."

## IV. STATEMENT OF THE CASE[1]

### A. The Asserted Claims Are Directed To A Particular Way To Use Bluetooth To Transmit Data.

Cellspin alleged that Appellees[2] directly and indirectly infringed U.S. Patent Nos. 8,738,794 (the "'794 patent"), 8,892,752 (the "'752 patent"), and 9,749,847 (the "'847 patent"), collectively the "Asserted Patents." Appx384-398, Appx399-413, Appx414-428. The district court provided a brief summary of the inventions in its Claim Construction Order, which is not challenged on appeal:

> The '794, '752, and '847 Patents share the same specification and are each directed to distribution of multimedia content (e.g., publishing a photo on social media). (*See* [Appx391 ('794 Patent at 1:32-36)].) According to the specification, distributing multimedia content before the inventions was cumbersome. A user would capture the image using a separate device, such as a camera, and then manually transfer the photo to an internet-capable device, such as a personal computer, using a USB or memory stick. ([Appx391 (1:37-45)].) The user would then manually upload the image to a website, which "takes time and may be inconvenient." ([Appx391 (1:45-47)].)
>
> To reduce this inconvenience, the asserted patents automate the process. (*See* [Appx391 (1:33-36)], [Appx391 (1:48-54)], [Appx391 (1:64-2:3)].) In place of a manual connection, the data capture and publishing devices are connected via a paired, wireless Bluetooth connection. ([Appx391 (2:10-13)].) The publishing device is a mobile phone that has a software application, which automatically detects the

---

[1] Pursuant to Federal Rule of Appellate Procedure 28(i), certain Appellees in this consolidated appeal join and incorporate by reference Sections IV.A and IV.B as indicated in their individual briefs.

[2] "Appellees" refers to Fitbit LLC ("Fitbit"); Nike, Inc. ("Nike"); Under Armour, Inc. ("UA"); Fossil Group, Inc. and Misfit Inc. (collectively, "Fossil"); Nikon Americas, Inc. and Nikon Inc. (collectively, "Nikon"); and Garmin International, Inc. and Garmin USA (collectively, "Garmin").

> presence of new data on the data capture device and transfers it to the mobile device. ([Appx391 (2:4-5)], [Appx391 (2:18-25)].) The transfer may be initiated by either the mobile device, in a "pull" mode, or by the data capture device, in a "push" mode. ([Appx391 (2:26-34)], [Appx392 (4:27-38)], [Appx392-393 (4:55-5:5)].) The mobile device automatically publishes the new content to one or more websites through the application. ([Appx391 (2:35-54)].)

Appx7989-7990.

The "Asserted Method Claims" are claims 1 (independent), 2-4, 7, 9, 16 (independent), 17, 18, and 20-21 of the '794 patent and claims 1 (independent), 2, 4-5, 12 (independent), 13, and 14 of the '752 patent. The "Asserted System Claims" are claims 1 (independent), 2, and 3 of the '847 patent. The Asserted Method Claims and the Asserted System Claims will collectively be referred to as the "Asserted Claims."

The Asserted Claims pertain to a particular way to use the Bluetooth communication protocol to transmit user data: (1) from a "data capture device" containing a "software module," (2) to an intermediary "mobile device" or "cellular phone" containing a "software module" or "mobile application," and (3) to a "web service" or "website." *See, e.g.*, Appx396 ('794 patent, claim 1, 11:48-12:38); Appx411 ('752 patent, claim 1, 11:48-12:38); Appx427-428 ('847 patent, claim 1, 12:12-13:3). It is not disputed that (with three exceptions, irrelevant to the issues on appeal) "the claim limitations must be performed ***in order*** for an individual bit of data." Appx7996 (emphasis added). And it is further undisputed that Cellspin did

not invent Bluetooth, pairing, wireless communication, or the two-step, two-device structure for transferring data. Appx9628-9629.[3] Thus, the claims comprise a long series of particular elements, which are indisputably not the only way to transfer data between devices using Bluetooth. Appx9628-9629.

### B. After Over Five Years Of Litigation, Cellspin Has Failed To Marshal Evidence To Prove Infringement Of Any Asserted Claim.

On October 16, 2017, Cellspin filed 13 lawsuits in the district court asserting patent infringement against a wide variety of consumer electronics companies: Adidas, Canon, Kodak, Fitbit, Fossil, Garmin, GoPro, Moov, Nike, Nikon, Panasonic, TomTom, and Under Armour. Several cases were stayed or dismissed—some before the prior appeal to this Court and some after—but the six cases against Appellees continued to summary judgment. Appx31. In those six cases alone, Cellspin accused over 300 products of patent infringement—products including fitness trackers, smart watches, athletic shoes, digital cameras, and many others. Appx34, Appx55, Appx68, Appx77, Appx91, Appx103. After years of litigation, the district court correctly determined—on multiple independent grounds—that a reasonable juror would not be able to find that Cellspin could prove infringement of any of the Asserted Claims by even a single product. *See generally* Appx31-113.

[3] The cited summary judgment order on Section 101 is not at issue in this appeal.

### 1. The District Court's Claim Construction Order Made Clear That The Asserted Claims Are Limited To A Specific Way Of Using Bluetooth To Transmit Data.

On April 14, 2021, the district court issued its Claim Construction Order, which applied to all Appellees and that Cellspin has not challenged on appeal. Appx7988-8010. In that order, the court made clear that the Asserted Claims did not cover every Bluetooth product and were instead limited to specific, narrowly defined implementations. *See generally* Appx7988-8010. For example, after ordering supplemental briefing on the issue, the court held that, aside from three exceptions,[4] "[t]he elements [of all asserted claims] must be performed in the order they appear in the claims." Appx8009; *see also* Appx7996 ("With the exceptions discussed below, the claim limitations must be performed in order for an individual bit of data."). In doing so, the court rejected "Cellspin's repeated attempt to ever expand the scope of the patent." Appx7998.

The district court also construed three additional key terms that are relevant to these related appeals: (a) "after the paired connection is established" was construed as "after the paired connection is established and maintained on a

---

[4] The three exceptions to the temporal order construction are not relevant to this appeal: (1) "'Providing a software module' in the '794 Patent can occur in any order before the 'detecting and signaling' step"; (2) "Sending a 'data signal' in claim 1 of the '794 Patent can occur simultaneously with transferring new data"; and (3) "Claim 1 of the '847 Patent requires an order for elements following the terms 'configured to' and 'controls to.'" Appx7996-7997.

continuous basis"; (b) "cryptographically authenticated" was construed as "verified as legitimate by use of encryption and decryption involving an algorithm"; and (c) "polling" was construed as "checking status [of] on a predetermined basis." Appx8010.

### 2. Cellspin's Infringement Expert Produced Largely Identical Reports In Each Case And Relied On Cellspin's Infringement Contentions Appended With Unexplained String Citations.

Rather than attempt to prove its case for each Accused Instrumentality, Cellspin elected to pursue a representative product theory of infringement. Thus, in its Patent Local Rule 3-1 infringement contentions, Cellspin provided claim charts only for the products Cellspin elected as representative in each case. And Cellspin's technical expert, Mr. Rahul Vijh,[5] only addressed infringement with respect to those elected representative products.

For Fitbit, the "Accused Instrumentalities" include 24 Fitbit smartwatches and fitness trackers (the "Accused Wearables") and Fitbit mobile applications compatible with iOS and Android mobile phone operating systems (the "Accused Mobile Applications"). Appx492, Appx494. The Accused Wearables include the

---

[5] Cellspin originally retained Dr. Ryan Garlick as its infringement expert and he drafted and signed the September 3, 2021 expert reports referred to now as the "Vijh Reports." Appx475. After Cellspin informed the district court of Dr. Garlick's unavailability, the district court allowed Cellspin to replace Dr. Garlick with Mr. Vijh, Appx11042, who adopted the opinions set forth in Dr. Garlick's reports in full and without modification. Appx9644-9645 (21:15-22:18).

following Fitbit devices: Versa Lite, Versa 2, Versa 2 SE, Ionic Adidas Edition, Blaze, Ionic, Charge 3, Charge 3 SE, Inspire HR, Inspire, Ace 2, Charge 4, Charge 4 Special Edition, Surge, One, Charge HR, Alta HR, Flex 2, Charge, Flex, Alta, Force, Zip, and Charge 2. Appx478. Cellspin alleged that the Fitbit Versa 2 and Charge 3—two Accused Wearables—were representative of the other 22 Accused Wearables for purposes of infringement. Appx3270; Appx493-494 (¶¶64-66); *see also* Appx34 ("Cellspin and its expert Rahul Vijh analyze Fitbit's Versa 2 and Charge 3 as representative of the other 22 accused products.").

For Fitbit, Mr. Vijh's discussion of the representative products is primarily set forth in Exhibit E to his report. Appx1237-1471; Appx1472-1699; Appx1992-2129; Appx2130-2406; Appx2407-2679; Appx2680-2815. Exhibit E to Mr. Vijh's expert report is comprised of six claim charts—a pair for each of the three Asserted Patents consisting of one chart for the Versa 2 device and one chart for the Charge 3 device. Appx1237-1471 ('752 patent, Versa 2); Appx1472-1699 ('752 patent, Charge 3); Appx1992-2129 ('847 patent, Versa 2); Appx2130-2406 ('794 patent, Versa 2); Appx2407-2679 ('794 patent, Charge 3); Appx2680-2815 ('847 patent, Charge 3). Those Exhibit E claim charts are verbatim copies of Cellspin's infringement contentions claim charts, but appended with string citations to Fitbit source code, documents, and witness testimony with vague parentheticals—often consisting of just a few words—purportedly setting out the relevance of the cited materials. *See*

Appx499-500 (¶81). There is no other explanation of the Fitbit documents in the claim charts or in Mr. Vijh's report.

Mr. Vijh's expert reports across all six cases were largely identical, *see* Appx32, despite Cellspin's accusation of infringement against over 300 different accused products. *See* Appx34, Appx55, Appx68, Appx77, Appx91, Appx103. Indeed, the district court found that Mr. Vijh's expert reports (for all cases) "contain much repetition and mimic much of Cellspin's contentions (hence the length), and, ultimately, do not carry evidentiary weight." Appx32.

#### 3. The District Court Granted Summary Judgment Of Noninfringement In Favor Of All Defendants.

On April 22, 2022, the district court heard argument on Appellees' motions for summary judgment of noninfringement. Appx4054-4227. After a five-hour hearing during which argument was presented on every issue in all six cases, the district court took the motions under advisement and issued an 83-page order nearly two months later. *See generally* Appx4054-4227; Appx31-113. At the hearing, the district court gave Cellspin every opportunity to explain its evidence of infringement, but Cellspin was unable to do so, instead relying on its expert who also failed to explain the evidence. For example, Cellspin's counsel argued that Mr. Vijh opines that it is the "persistent acquisition of data" that allows the devices to meet the temporal order requirement. Appx4063 (10:7-17). The district court "ask[ed] for examples specifically to evidence" supporting that opinion. Appx4063

(10:18-22). Following a long "[p]ause in the proceedings," during which Cellspin's counsel was searching the record for evidence, he was able to identify two documents that Mr. Vijh cited but he could not explain them. Appx4063-4064 (10:23-11:21). The district court stated:

> One of the recurring problems I have with Mr. Vijh's report is that he cites to a number of things, but when I look at the evidence, it's not supported. These are bald kind of statements. That's why I'm asking you the question. He never explains. He just says, *It is this way.* It's like, *Well, okay, how? Why?*
>
> An expert's opinion is only as good as the factual basis upon which it is based and then he has to explain it.
>
> . . .
>
> And the problem that I have with Mr. Vijh is that he has a lot of opinions, but when I look at the evidence, I don't see where he's getting them from, and he doesn't get to sit up on a stand and pontificate without having a factual basis for what he's saying or explaining.
>
> And rarely, if ever, does he. That's why I'm asking the question.

Appx4064-4065 (11:8-12:5); *see also* Appx4098-4099 (45:17-46:6); Appx4140-4141 (87:23-88:1); Appx4146-4147 (93:12-94:13). In response, Cellspin's counsel stated, "[a]ll I can do is direct Your Honor to the paragraph of his report where he discusses these specific pieces of evidence," but "I cannot elaborate on his paragraphs given that it is a technical opinion that he is qualified to give and I am not, so that's where my difficulty lies, Your Honor." Appx4064 (11:19-21), Appx4065 (12:20-23); *see also* Appx4146-4147 (93:17-94:13) (in response to a request from the district court to explain how two pages of source code demonstrate

the derivation of a user ID, counsel for Cellspin stated, "Mr. Vijh has explained it . . . And I cannot explain it any more than he has done . . . .").

On June 15, 2022, the district court granted each motion for summary judgment on nearly every ground asserted and entered judgment in favor of each defendant. *See generally* Appx31-113; Appx114-119. As the district court noted in its Summary Judgment Order, rather than recite its infringement theory for each accused product and each asserted claim, Cellspin and its expert cited "to swaths of documents without explanation" resulting in opinions that were "conclusory and lacking substance." Appx32. The district court found that Cellspin's "lengthy expert reports short in analysis or explanation for how they reach their conclusions" were insufficient to raise a genuine dispute of material fact in all six cases. Appx32. The district court repeatedly found that Cellspin either failed to offer a complete and viable infringement theory consistent with the court's claim construction or offered new theories never disclosed in discovery. *See generally* Appx31-113. Ultimately, the district court concluded that in each case, Cellspin "fail[ed] to marshal the evidence necessary to defeat the defendants' summary judgment motions." Appx32. As a result, the district court granted summary judgment of noninfringement to all Appellees on multiple grounds for each of the 21 Asserted Claims. *See generally* Appx31-113.

### C. The District Court Granted Fitbit Summary Judgment Of Noninfringement On At Least Three Grounds For Every Claim.

As shown in the chart in the Introduction above, the district court granted summary judgment of noninfringement in favor of Fitbit for ***every Asserted Claim*** on at least ***three independent grounds***.[6] Accordingly, in order to reverse the district court's finding of noninfringement of ***any*** claim, this Court would have to reverse the district court on at least three, if not four, grounds.

## V. SUMMARY OF THE ARGUMENT

The district court's grant of summary judgment in favor of Fitbit should be affirmed on each of its six independent grounds. Fitbit first addresses noninfringement based on the "user identifier" and "user information" limitations because that ground cuts across all Asserted Claims and is reviewed under the deferential "abuse of discretion" standard. Fitbit addresses the remaining grounds in the same order that Cellspin presents them.

1. Every Asserted Claim includes a limitation directed to a "user identifier" or "user information." Cellspin attempted to rely on an untimely theory

---

[6] For Fitbit, the district court rejected one noninfringement argument for the Asserted System Claims—that Fitbit does not make, use, sell, or import a complete infringing system because the infringing system requires a Bluetooth enabled cellular phone. Appx40. The district court found that to be an environmental limitation, not a structural limitation. Appx41-42. Additionally, the district court "d[id] not reach Fitbit's argument that the Versa 2 and Charge 3 are not representative of the unanalyzed Fitbit products because it [found] that the analyzed Versa 2 and Charge 3 do not infringe the asserted patents." Appx54 (n.16).

for those limitations based on the Accused Instrumentalities' alleged use of "OAuth tokens," which Cellspin had not disclosed in its infringement contentions. The district court acted within its discretion to exclude the OAuth token theory for violation of its patent local rules. Upon exclusion of that untimely theory, the district court properly granted summary judgment because Cellspin had no evidence to prove that the "user identifier" or "user information" limitations are met by the Accused Instrumentalities.

2. According to the district court's claim construction order, which is not challenged on appeal, the Asserted Method Claims of the '794 and '752 patents must be performed in a particular temporal order. Cellspin's expert, Mr. Vijh, offered only a conclusory assertion that the method steps are performed by the Accused Instrumentalities in that order, but he failed to cite evidence to support that assertion. Accordingly, the district court was correct in granting summary judgment for the Asserted Method Claims on that basis.

3. The Asserted Method Claims of the '794 patent include a step directed to "providing a software module on the Bluetooth enabled data capture device." For that step, Cellspin's expert opined only that it is performed at the time the Accused Wearables are manufactured and shipped to consumers, which undisputedly occurs outside the United States. Thus, according to Cellspin's own theory of infringement, Cellspin cannot show that every step of the method is performed in the United States,

which is required for a finding of infringement. The district court correctly rejected Cellspin's three alternative theories because they contradict Cellspin's expert's opinion.

4. The Asserted Method Claims of the '794 and '752 patents require the step of establishing a "paired" Bluetooth connection. The undisputed evidence shows that the end user of the Accused Instrumentalities—not Fitbit—chooses whether or not to establish a "paired" Bluetooth connection. Accordingly, under the "single entity" requirement for infringement, Fitbit cannot infringe as a matter of law because not every step of the method is performed or attributable to Fitbit. The district court correctly rejected each of Cellspin's later attempts to circumvent that deficiency.

5. To prove infringement of the Asserted System Claims of the '847 patent, Cellspin must provide evidence that the Accused Wearables are configured to "cryptographically authenticate" the user's mobile device. Under the district court's claim construction for that term, which is not challenged on appeal, Cellspin must show that the Accused Wearables are configured to "verify [the mobile device] as legitimate by use of encryption and decryption involving an algorithm." The only evidence of decryption to which Cellspin has pointed relates to decryption by the mobile device—not the Accused Wearable.

6. To prove infringement of the Asserted System Claims of the '847 patent, Cellspin must show that they contain a "first processor" that is "configured to" "acquire new-data," "store the acquired new-data," and "send an event notification." The district court correctly granted summary judgment on this issue because Cellspin provided no evidence that any single "first processor" in the Accused Wearables was configured to perform all of the claimed functions.

## VI. ARGUMENT

The district court's grant of summary judgment should be affirmed on each of its six independent grounds. Cellspin begins its Blue Brief by attacking the district court's summary judgment order globally, arguing that "[t]hroughout its Order," the district court allegedly failed to properly credit Cellspin's cited evidence. Blue Br. at 17, 20, 37. Cellspin then proceeds to challenge each of the six grounds on which the district court granted summary judgment in favor of Fitbit. But Cellspin cannot prevail on ***any*** of its appeal issues, let alone a sufficient number to warrant vacatur of any portion of the summary judgment order with respect to any Asserted Claim.

### A. Standard Of Review[7]

In reviewing a grant of summary judgment, the Federal Circuit applies the law of the regional circuit. *Classen Immunotherapies, Inc. v. Elan Pharms., Inc.*, 786

[7] Pursuant to Federal Rule of Appellate Procedure 28(i) , certain Appellees in this consolidated appeal join and incorporate by reference Section VI.A as indicated in their individual briefs.

F.3d 892, 896 (Fed. Cir. 2015). The Ninth Circuit reviews a grant of summary judgment *de novo*. *Ariz. Dream Act Coalition v. Brewer*, 818 F.3d 901, 908 (9th Cir. 2016). On review of summary judgment, the Federal Circuit need not search for arguments and evidence that the litigant has not articulated or explained. *Bernhardt, L.L. C. v. Collezione Europa USA, Inc.*, 386 F.3d 1371, 1384 (Fed. Cir. 2004) ("[F]act finders are not required to furrow through voluminous evidentiary submissions in order to discern a party's case. A party has an obligation to highlight its contentions to the district court in some form."); *Forsberg v. Pac. Nw. Bell Tel. Co.*, 840 F.2d 1409, 1418 (9th Cir. 1988) ("The district judge is not required to comb the record to find some reason to deny a motion for summary judgment.").

To the extent that the grant of summary judgment is based on underlying evidentiary or procedural determinations, the Federal Circuit reviews those underlying decisions under the relevant standard of review. *See, e.g.*, *Wi-Lan Inc. v. Sharp Elecs. Corp.*, 992 F.3d 1366, 1370 (Fed. Cir. 2021) (reviewing grant of summary judgment *de novo* but underlying evidentiary rulings for abuse of discretion); *Genentech, Inc. v. Amgen, Inc.*, 289 F.3d 761, 768 (Fed. Cir. 2002) (reviewing the district court's evidentiary rulings under the Ninth Circuit's abuse of discretion standard). This Court "gives broad deference to the trial court's application of local procedural rules in view of the trial court's need to control the parties and flow of litigation before it." *Sandisk Corp. v. Memorex Prods.*, 415 F.3d

1278, 1292 (Fed. Cir. 2005). Accordingly, "[d]ecisions enforcing local rules in patent cases will be affirmed unless clearly unreasonable, arbitrary, or fanciful; based on erroneous conclusions of law; clearly erroneous; or unsupported by any evidence." *O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*, 467 F.3d 1355, 1366-67 (Fed. Cir. 2006) (citing *Genentech*, 289 F.3d at 774) (applying N.D. Cal. Patent Local Rules); *see also Allvoice Devs. US, LLC v. Microsoft Corp.*, 612 F. App'x 1009, 1013-14 (Fed. Cir. 2015) (nonprecedential) (on appeal from grant of summary judgment, reviewing the district court's exclusion of theory not disclosed in infringement contentions for abuse of discretion); *Phigenix, Inc. v. Genentech, Inc.*, 783 F. App'x 1014, 1016-17 (Fed. Cir. 2019) (nonprecedential) (affirming summary judgment of noninfringement for lack of evidence where the district court did not abuse its discretion in striking a theory first disclosed during expert discovery).

### B. Cellspin's Global Attacks Against The District Court's Summary Judgment Order Are Meritless.[8]

Cellspin first attacks the summary judgment order globally, arguing that the district court allegedly failed to adequately consider the evidentiary record as a whole, and improperly discredited its expert's opinions as conclusory. *See* Blue Br. at 17, 20, 37. To the contrary, the district court's summary judgment order reflects

[8] Pursuant to Federal Rule of Appellate Procedure 28(i), certain Appellees in this consolidated appeal join and incorporate by reference Section VI.B as indicated in their individual briefs.

its careful consideration of Cellspin's "swaths" of irrelevant evidence. This Court should reject Cellspin's attempts to blame the district court for Cellspin's own failure to marshal and explain the evidence necessary to support its infringement theories. Appx32.

**1. The District Court's Summary Judgment Order Reflects Its Careful Consideration Of The Evidentiary Record.**

The district court repeatedly found that, although Cellspin "cited swaths of documents" in its summary judgment briefing, including source code files and paragraphs from its expert report on infringement, Cellspin "failed to . . . explain how those documents support its infringement theory." *See* Appx35, Appx39, Appx42-43, Appx58-59, Appx60, Appx65, Appx66 (citing *Traxcell Techs., LLC v. Sprint Commc'ns. Co. LP*, 15 F.4th 1121, 1133 (Fed. Cir. 2021)). During oral argument, the district court provided Cellspin's counsel with numerous opportunities to identify evidence that supported Cellspin's infringement theories—as distinct from attorney argument or conclusory expert assertions or evidence cited without meaningful explanation—but counsel was unable to do so. *See, e.g.*, Appx4063 (10:3-6, 10:18-22), Appx4064-4065 (11:8-12:23), Appx4098-4099 (45:17-46:6), Appx4140-4141 (87:23-88:1), Appx4146-4147 (93:12-94:13).

Cellspin's Blue Brief advances the same flawed approach, and thus further demonstrates the correctness of the district court's conclusions. For example, Cellspin argues that the "instant facts . . . bear no resemblance to *Traxcell*, where the

party simply 'slammed' its briefing 'full of volumes upon volumes of evidence.'" Blue Br. at 18. Ironically, in the very next sentence, Cellspin cites 113 paragraphs of its expert report and 235 pages of claim charts—with no explanation—in an effort to suggest that Cellspin has done something different than the patentee in *Traxcell*. *Id.* Moreover, even when Cellspin cites specific paragraphs, it does so in the form of string citations with parentheticals that fail to explain its expert's opinions. *See, e.g.*, *id.* at 19 (string citations with parentheticals such as "summarizing opinions" and "opining with respect to infringement of system claims"). This Court should reject Cellspin's arguments and affirm summary judgment.

#### 2. The District Court Correctly Characterized Cellspin's Expert's Opinions As Conclusory.

The district court specifically and repeatedly "analyzed the bases underlying [Cellspin's] expert Rahul Vijh's opinions and f[ound] them conclusory and lacking substance." Appx32; *see also* Appx35, Appx46. Indeed, the district court noted that Cellspin frequently cited paragraphs in its expert report that "contain[] the problematic formula of conclusory-assertion-followed-by-unexplained-source-code." Appx53.

Cellspin argues on appeal that Mr. Vijh provided opinions on a "claim-by-claim and element-by-element basis." *See* Blue Br. at 21. But that argument fails to address the deficiencies that the district court identified. Patent infringement requires a showing that each and every element of the claims is present in the accused

device. *See, e.g.*, *Inpro II Licensing, S.A.R.L. v. T-Mobile USA, Inc.*, 450 F.3d 1350, 1357-58 (Fed. Cir. 2006). Therefore, Cellspin's argument that Mr. Vijh performed his analysis element-by-element demonstrates only that his format followed a necessary approach to patent infringement analysis; not that the substance of his opinions was sufficient to meet Cellspin's burden of proof.

Cellspin also argues that Mr. Vijh's "opinions are not limited to the statements and materials discussed and cited in the body of his Written Reports." Blue Br. at 21. Cellspin asserts that his opinions include hundreds of pages of claim charts, "together with the discussions, technical explanations, screenshots, testing, and evidence of record as cited therein." *Id.* But that argument serves only to highlight and reinforce the same deficiency that the district court identified, namely, that Mr. Vijh failed to explain ***how*** the cited documents support his corresponding assertions. Without such explanation, the district court correctly noted that Mr. Vijh's statements were merely conclusory, and it is well-established that such "[c]onclusory expert assertions cannot raise triable issues of material fact on summary judgment." *Sitrick v. Dreamworks, LLC*, 516 F.3d 993, 1001 (Fed. Cir. 2008) (citing *Dynacore Holdings Corp. v. U.S. Philips Corp.*, 363 F.3d 1263, 1278 (Fed. Cir. 2004) ("It is well settled that an expert's unsupported conclusion on the ultimate issue of infringement is insufficient to raise a genuine issue of material fact. . . .")).

Finally, Cellspin cites nonbinding caselaw to suggest that an expert's "personal examination of the accused instrumentalities" supposedly protects the expert's opinion from challenge. *See* Blue Br. at 20 (citing *Semiconductor Energy Lab'y Co. v. Chi Mei Optoelectronics Corp.*, 485 F. Supp. 2d 1089, 1100 (N.D. Cal. 2007)). Not so. Rather, *Semiconductor Energy Lab* confirms that "wholly conclusory or unsupported statements of experts are insufficient to raise a genuine issue of material fact precluding summary judgment." 485 F.Supp.2d at 1100 (citing *TechSearch, L.L.C. v. Intel Corp.*, 286 F.3d 1360, 1372 (Fed. Cir. 2002)). On the facts of that case, the district court found that an expert's "direct analysis of the photomicrographs" involving various "tests and measurements" could support an opinion that the accused transistors had the claimed exposed surface. *Id*. By contrast, here, Cellspin's expert merely repackaged screenshots from the Fitbit Mobile Application that Cellspin previously generated for its infringement contentions. *See* Blue Br. at 22 (citing Appx1253-1259); *cf.* Appx10171-10177. Cellspin's expert provided no explanation of how any "direct analysis" or "tests and measurements" were relevant to any claim element at issue in this appeal.

For the foregoing reasons, Cellspin's global generic attacks against the summary judgment order are meritless. This Court should affirm.

### C. Cellspin Lacks Evidence That The Accused Instrumentalities Meet The “User Identifier” And “User Information” Limitations.[9]

The Asserted Method Claims require “attaching” or “applying” a “user identifier” at an intermediary device and the Asserted System Claims require that “user information” be “stored” at an intermediary device before being sent “along with” new data. Appx396 (’794 patent, claim 1, 12:20-24); Appx397 (’794 patent, claim 16, 14:46-50) Appx411 (’752 patent, claim 1, 12:17-37), Appx412 (’752 patent, claim 12, 14:26-32); Appx427-428 (’847 patent, claim 1, 12:62-67). Fitbit moved for summary judgment on the basis that Cellspin lacked evidence that the Accused Instrumentalities meet the “user identifier” and “user information” claim limitations. In response, Cellspin relied exclusively on an infringement theory based on an “OAuth token” that Cellspin never disclosed in its infringement contentions. The district court exercised its discretion to exclude that untimely infringement theory for violation of the Northern District of California Patent Local Rules, and the district court then found that Cellspin lacked any evidence that those limitations are met by the Accused Instrumentalities. Appx48. That decision disposes of every Asserted Claim against Fitbit, and this Court can affirm summary judgment in favor of Fitbit on that basis alone, particularly under the abuse of discretion standard.

[9] Cellspin also raises issues concerning the “user identifier” and “user information” limitations with respect to Appellees Fossil, Nike, and Garmin.

### 1. The District Court Did Not Abuse Its Discretion In Excluding Cellspin's Undisclosed Infringement Theory For The "User Identifier" And "User Information" Claim Limitations.

As this Court has noted, "[t]he Northern District of California has adopted local rules that require parties to state early in the litigation and with specificity their contentions with respect to infringement and invalidity." *O2 Micro*, 467 F.3d at 1359. The early disclosure of contentions is "designed specifically to 'require parties to crystallize their theories of the case early in the litigation.'" *Id.* (quoting *Atmel Corp. v. Info. Storage Devices, Inc.*, No. 95-1987, 1998 WL 775115, at *2 (N.D. Cal. 1998)). To that end, the patentee must serve a "Disclosure of Asserted Claims and Infringement Contentions," Northern District of California, Patent L.R. 3-1, that includes a "chart identifying specifically where and how each limitation of each asserted claim is found within each Accused Instrumentality," *id.*, Patent L.R. 3-1(c). "Amendment of the Infringement Contentions . . . may be made only by order of the Court upon a timely showing of good cause." *Id.*, Patent L.R. 3-6.

Here, the district court enforced its local rules by excluding Cellspin's "OAuth token" theory—disclosed for the first time in its expert report—on the basis that it was outside the scope of Cellspin's infringement contentions. Appx47-49. That decision to enforce the local rules was within the district court's "sound discretion," *SanDisk*, 415 F.3d at 1292, and it should not be disturbed unless Cellspin can show that it was "clearly unreasonable, arbitrary, or fanciful; based on erroneous

conclusions of law; clearly erroneous; or unsupported by any evidence." *See O2 Micro*, 467 F.3d at 1366–67. On appeal, Cellspin disagrees with the district court's finding, Blue Br. at 40-43, but offers no basis on which to conclude that the district court abused its discretion in making that finding. *See, e.g.*, *Tiger Lily Ventures Ltd. v. Barclays Cap. Inc.*, 35 F.4th 1352, 1366 (Fed. Cir. 2022).

Cellspin's infringement contentions disclosed a theory that the Accused Instrumentalities meet the "user identifier" and "user information" claim limitations because they allegedly use a "username or email address, or information based off of a user or the user's associated wearable device." Appx10005, Appx10285, Appx10452; *see also* Appx47. However, Cellspin's expert candidly acknowledged that he was abandoning that theory, and instead advanced a new theory—absent from the infringement contentions—that an "OAuth token" is the claimed "user identifier" or "user information." Appx9667-9668 (224:17-225:4).

The district court concluded that the language of Cellspin's infringement contentions "does not disclose a theory based on the use of 'OAuth tokens,' much less any infringement theory for 'user information' or 'user identifier.'" Appx48. That was a logical conclusion given that the term "OAuth" never appeared in Cellspin's contentions. Relying on well-established case law from the Northern District of California, the district court found that "[b]ecause Cellspin did not disclose this theory in its infringement contentions, this theory is barred from trial."

Appx48 (citing *Finjan, Inc. v. Qualys Inc.*, No. 18-07229, 2021 WL 1253651, at *2 (N.D. Cal. Apr. 5, 2021); *MediaTek Inc. v. Freescale Semiconductor, Inc.*, No. 11-5341, 2014 WL 690161, at *1 (N.D. Cal. Feb. 21, 2014)).

On appeal, Cellspin argues—as it argued unsuccessfully in the district court below—that its expert's "OAuth token" theory was timely disclosed because it allegedly fell within the scope of "information based off of a user or the user's associated wearable device," identified in Cellspin's infringement contentions. *See* Blue Br. at 40-43. But Cellspin's argument that the new OAuth token theory was a mere clarification of its prior position fails for a number of reasons.

First, although Cellspin attempts to retroactively identify language in its infringement contentions that may be broad enough to encompass the OAuth token theory—"information based off of a user or the user's associated wearable device"—the district court correctly recognized that phrase to be a nonsensical tautology. Appx48. At best, it rephrases the claim language itself (*i.e.*, "user identifier" or "user information"), but it provided no information to Fitbit about what component in the Accused Instrumentalities allegedly meets the claim limitations. This Court has recognized that district courts can properly reject attempts from plaintiffs to "include broadly scoped infringement theories in their contentions only to unilaterally narrow them after the close of fact discovery" because such "infringement contentions would provide little relief to defendants." *Phigenix*, 783 F. App'x at 1018.

Second, Cellspin's expert witness confirmed at deposition that he was no longer relying on what Cellspin had disclosed during fact discovery. Appx9667-9668 (224:9-225:4). He admitted that he was instead shifting to reliance on the OAuth token. Appx9667-9668 (224:25-225:4) ("Q. Okay. So sitting here right now, you are not relying on the user name or email address or unique identifier for user information. You are relying on the OAUTH token? A. That is correct.").

Third, Cellspin's Blue Brief introduces, without a citation to the evidentiary record, that the term "OAuth" refers to "Open Authorization," which "is one of any number of interchangeable mechanisms (*e.g.*, OpenID Connect, Auth0, JSON Web Token, Keycloak, SAML, SSO) allowing for the sharing of information about user accounts with mobile applications." Blue Br. at 41-42. That alone highlights the lack of disclosure provided by the infringement contentions: Cellspin did not disclose that it would rely on OAuth as opposed to "any number of interchangeable mechanisms" for sharing a "user identifier" or "user information."[10]

Cellspin's only excuse for the untimely disclosure—that its expert confirmed the use of OAuth tokens only by reviewing Fitbit's source code, Blue Br. at 41—fares no better. Fitbit's use of OAuth tokens is public information that was available

[10] Notably, at the summary judgment hearing below, Cellspin suggested that OAuth was the only computer code that could comprise a user identifier or user information—a position that the district court challenged, Fitbit refuted, and that Cellspin has now abandoned on appeal. Appx4135-4137 (82:19-84:8).

to Cellspin from the start of the case. *See, e.g.*, Appx10486; Appx10490. Even taking Cellspin's argument at face value, Cellspin had access to the source code during fact discovery with sufficient time to update its infringement contentions.[11] Cellspin offers no explanation why it failed to comply with the Northern District of California's procedure to timely supplement its contentions before expert discovery. *See* Northern District of California, Patent L.R. 3-6 ("Amendment of the Infringement Contentions . . . may be made only by order of the Court upon a timely showing of good cause.").

Cellspin's effort to change its infringement theory long past the deadline is the type of conduct that the Northern District of California Patent Local Rules are designed to prevent. This Court has recognized that a district court may penalize failure to obey those rules by rejecting belatedly disclosed theories. *Phigenix*, 783 F. App'x at 1016 (citing *O2 Micro*, 467 F.3d at 1363). The district court did not abuse its discretion by excluding the OAuth token theory as untimely in this case.

[11] Cellspin's reliance on *MasterObjects, Inc. v. Meta Platforms, Inc.*, No. 21-05428, 2022 WL 4856269, at *1 (N.D. Cal. Oct. 3, 2022) is unavailing. There, the alleged infringer submitted misleading and inaccurate discovery responses describing the products' operations, which the patentee only discovered immediately before expert reports. *Id.* at *2. The court acted within its discretion to permit the expert to opine beyond the scope of the contentions given the discovery violations. *Id*. Cellspin does not (and cannot) allege any similar discovery misconduct here, nor can Cellspin explain how *MasterObjects* compels finding that the district court abused its discretion in the instant case.

### 2. The District Court Properly Granted Summary Judgment Because Cellspin Lacked Evidence To Support Infringement After The OAuth Token Theory Was Excluded.

The district court correctly noted that the OAuth token theory was the only theory that Cellspin put forth in response to Fitbit's summary judgment motion regarding the "user identifier" and "user information" limitations. Appx47 ("Cellspin responds with a different infringement theory involving the use of 'Oauth tokens' as the 'user information' or 'user identifier.'"). This is undisputed on appeal. Indeed, although during summary judgment proceedings below Cellspin took issue with Fitbit's characterization that it had "abandoned" any infringement theory—*i.e.*, because Cellspin argued that the OAuth token theory was within the scope of its contentions—Cellspin ***did not*** dispute that it was no longer relying on any theory other than that based on OAuth tokens. Appx451-452; *see also* Appx9667-9668 (224:25-225:4). And on appeal, Cellspin again does not dispute that it did not raise any other theory at summary judgment. *See* Blue Br. at 40-43. In other words, Cellspin does not dispute that—if the district court correctly excluded its untimely OAuth theory—the district court correctly granted summary judgment.

Accordingly, upon the district court's decision to exclude the OAuth token theory, Cellspin was left with a complete absence of evidence to support its contentions for the "user identifier" and "user information" limitations. On that record, the district court properly granted summary judgment. *See Novartis Corp.*

*v. Ben Venue Lab'ys, Inc.*, 271 F.3d 1043, 1054 (Fed. Cir. 2001) ("Since this was Novartis's only theory of how the infringing product might be created in Ben Venue's process, there is no evidence in the record that the infringing product would form in Ben Venue's proposed manufacturing process. In the absence of such evidence, Ben Venue was entitled to summary judgment of noninfringement.").

For the foregoing reasons, the district court correctly granted summary judgment because Cellspin lacks evidence sufficient to raise a genuine dispute of material fact regarding the "user identifier" and "user information" claim limitations. Because those limitations are in all Asserted Claims, this Court should affirm summary judgment of noninfringement and need not reach the remainder of Cellspin's arguments.

### D. Cellspin Cannot Demonstrate That The Accused Instrumentalities Perform The Steps Of The Asserted Method Claims In The Required Temporal Order.[12]

For the Asserted Method Claims, the district court determined as a matter of claim construction that "[t]he elements must be performed in the order they appear in the claims," with three exceptions. Appx7996-7997.[13] The district court granted

[12] Cellspin also raises issues concerning the temporal order of the claims with respect to Appellee Garmin.

[13] Cellspin does not challenge that claim construction in its Blue Brief, and any challenge is thus waived. *SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1319 (Fed. Cir. 2006) ("Our law is well established that arguments not raised in the opening brief are waived.").

summary judgment because Cellspin presented no evidence that the claimed "event notifications" are enabled after "acquiring new data in the Bluetooth enabled data capture device" and before "determining existence of the new data for transfer," as required by each Asserted Method Claim. Appx34-35 ("Cellspin provides no evidence demonstrating that Fitbit's accused products function in the required order."). This Court should affirm the grant of summary judgment. *See E-Pass Techs., Inc. v. 3Com Corp.*, 473 F.3d 1213, 1222 (Fed. Cir. 2007) (affirming summary judgment of non-infringement where patentee lacked proof that claimed method steps were performed in order).

On appeal, Cellspin takes the same approach that the district court rejected, namely, improperly citing swaths of evidence without explaining how that evidence shows the performance of the method steps in order. *See Traxcell*, 15 F.4th at 1133. Cellspin's summary judgment briefing in the district court and its Blue Brief set forth a combination of attorney arguments along with string citations of documents without explanation, conclusory expert assertions, and unexplained claim charts. *See, e.g.*, Appx437-439. Indeed, Cellspin's Blue Brief contains lengthy block quotes of its summary judgment responsive briefing, which further highlights the lack of explanation that Cellspin provided to the district court. *See* Blue Br. at 25, 27-28. Cellspin cannot conceal the flaws in its infringement case under a pile of irrelevant evidence. *See Pandrol USA, LP v. Airboss Ry. Prod., Inc.*, 320 F.3d 1354, 1366

(Fed. Cir. 2003) ("There is no onus on the district court to distill any possible argument which could be made based on the materials before the court. Presenting such arguments in opposition to a motion for summary judgment is the responsibility of the non-moving party, not the court.").

The record reflects that Mr. Vijh purported to address the order of the claim elements in only one single paragraph in his report—Paragraph 134, where he stated:

> [T]he message to enable event notifications is received at the Accused Instrumentalities after pairing and after the Accused Instrumentalities initiate the data acquisition process. *See* discussion above concerning Elements 1.I.c to 1.I.c.i.A of Claim 1 of the '752 Patent.

Appx536 (¶134). Notably, Mr. Vijh's citation is only his earlier analysis of the individual claim elements, with no analysis of the order in which the elements are performed. Appx523-525 (¶¶115-117). Said differently, Mr. Vijh's decision to structure his report in the order of the claims does not amount to an analysis that the Accused Instrumentalities, in fact, perform the steps in the order of the claims. A careful consideration of Paragraph 134 reveals that Mr. Vijh's assertion that the method steps are performed in order is nothing more than inadmissible *ipse dixit*, insufficient to defeat summary judgment. *See, e.g.*, *Parallel Networks, LLC v. Abercrombie & Fitch Co.*, 704 F.3d 958, 970 (Fed. Cir. 2013) (finding expert's "*ipse dixit* statements . . . are not sufficient to avoid summary judgment").

Cellspin also argues that the temporal order "is *observable* and aspects can also be tested by various methods." Blue Br. at 25 (emphasis in original). But

Cellspin's assertion relies on unexplained references to "captured screenshots of the testing 'sniffing logs' of Bluetooth data and message flows between the capture device and the mobile device." *Id.* at 26. In fact, Cellspin has now failed three times—first in its expert report, second in its summary judgment opposition, and third in its Blue Brief—to explain how the sniffing logs purportedly demonstrate that the Accused Instrumentalities perform the method steps in the required order. Indeed, the district court credited Mr. Vijh with mentioning "sniffing logs," but found that he offered "no explanation how they indicate performance of the claimed steps, much less performance in order." Appx35. Cellspin does not contend otherwise on appeal.

Likewise, in support of Cellspin's argument that "it is the persistent acquisition of data which largely informs and evidences the temporal aspect of the claimed event notifications," Blue Br. at 26-27, Cellspin cites paragraph 114 of Mr. Vijh's report, which states—without explanation or citation—that "it is obvious and necessarily true that the processors of the Accused Instrumentalities are programmed and configured such that they persistently acquire new data." Appx522 (¶114). Yet even on appeal, there is no explanation how the purported "persistent" acquisition of data—for which Cellspin cites no evidence—would demonstrate anything at all about the order in which event notifications are enabled.

Cellspin suggests that the district court improperly "sought to independently evaluate the technical merits of the testing evidence," Blue Br. at 26, but that is not accurate. The district court correctly found that "none of Cellspin's evidence actually shows Fitbit products practicing the asserted claims in order." Appx35. Cellspin cannot change that outcome by citing case law for the uncontested proposition that an expert's testing can, in some circumstances, be sufficient evidence of infringement. *See* Blue Br. at 26 (citing *Bio-Rad Labs. v. 10X Genomics*, 967 F.3d 1353, 1369 (Fed. Cir. 2020)). In other words, testing can be sufficient evidence of infringement ***only if it demonstrates infringement***, which Cellspin's testing does not.

Accordingly, the district court correctly granted summary judgment because Cellspin lacks evidence sufficient to raise a genuine dispute of material fact regarding the order in which the claim steps are performed for a given bit of data.[14]

[14] Cellspin also argues that the district court improperly granted summary judgment as to Cellspin's theory based on internal testing by Fitbit. Blue Br. at 34-35. The district court held that "the evidence Cellspin points to does not provide sufficient evidence that Fitbit's accused products constitute a system performing all of the recited acts." Appx42. Cellspin again fails to explain how its cited evidence raises a genuine dispute that Fitbit tests the Accused Instrumentalities in their ordinary manner of use. And, even if it does, as explained herein, Cellspin fails to explain how such ordinary manner of use performs the claimed steps in the required order. Appx43. Thus, this Court should affirm.

### E. Under Cellspin's Theory Of Infringement, The Step Of "Providing A Software Module" Is Not Performed In The United States.[15]

To prove infringement of the Asserted Method Claims of the '794 patent, Cellspin must show that each step—including "providing a software module on the Bluetooth enabled data capture device," Appx396 (claim 1, 11:52-53), Appx397 (claim 16, 14:17-18)—was performed ***in the United States***. *See, e.g.*, *NTP, Inc. v. Rsch. In Motion Ltd.*, 418 F.3d 1282, 1318 (Fed. Circ. 2005). For that "providing" step, Mr. Vijh opined only that "it is obvious and necessarily true that the Accused Instrumentalities are each provided with a software module ***at the time they are manufactured and shipped*** to consumers by the Defendant." Appx553 (¶166) (emphasis added). It is undisputed that Fitbit manufactures and assembles the Accused Wearables ***outside the United States***. Appx15669 (Plaintiff's Opposition to [Fitbit's] Statements of Undisputed Facts, Issue A, Fact 6, agreeing it is "[u]ndisputed" that "[t]he Accused Wearables are manufactured and assembled outside the United States."); *see also* Appx10853 (citing Appx10877); Appx10503 (same). The district court thus found that, as a matter of law, Cellspin's expert opinion could not support infringement. Appx36 ("Given Vijh's opinion that performance [of the "providing" method step] occurs when a product is

---

[15] Cellspin also raises issues concerning the "providing a software module" limitation with respect to Appellees Garmin and Nikon.

manufactured, Fitbit cannot infringe because it performs – manufactures – its products outside of the United States.”).

### 1. Cellspin Relies On Incorrect Statements Of The Law Regarding Where And When Infringement Occurs.

It is well established that infringement occurs upon ***use of the patented method***. *See, e.g.*, *Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1311 (Fed. Cir. 2006); *Joy Techs., Inc. v. Flakt, Inc.*, 6 F.3d 770, 773 (Fed. Cir. 1993). And a method claim is only infringed if ***each step*** is performed in the United States. *See NTP*, 418 F.3d at 1318. But Cellspin argues that, regardless of where performance of the actual patented ***method*** occurs, the claims of the ’794 patent can be infringed “at the time of ***use of the Accused Instrumentalities***.” Blue Br. at 30. That argument conflates any generic “use” of the Accused Instrumentalities (*i.e.*, a user using a Fitbit device) with “use” of the patented method (*i.e.*, performing the specific steps of the claim), which is simply incorrect under the law. It is Cellspin’s burden to marshal evidence that each step of the method is performed in the United States.

Here, the method at issue comprises some steps directed to use—*e.g.*, “establishing a paired connection . . .,” Appx396 (11:56-58)—and other steps directed to manufacture and assembly—*e.g.*, “providing a software module . . .,” Appx396 (11:52-35). Indeed, it was Cellspin’s expert, Mr. Vijh, who opined that the “providing” step was performed at the time the Accused Wearables are “manufactured and shipped to consumers.” Appx553 (¶166). And Cellspin agrees

that Fitbit manufactures and ships the Accused Wearables from locations outside the United States. Appx10853 (Issue A, Fact 6); Appx15669 (same); Appx10503; Appx10877. Thus, the "providing" step—as explained by Cellspin's own expert—is not performed in the United States.

#### 2. Cellspin's Alternative Arguments For The "Providing" Step Improperly Contradict Its Expert's Opinion.

In response to Fitbit's motion for summary judgment of noninfringement, Cellspin abandoned its expert's opinions and provided three alternative arguments for how the "providing" step is performed in the United States. But Cellspin "may not replace its expert's analysis with attorney arguments to create a factual dispute." *In re PersonalWeb Techs., LLC Patent Litig.*, No. 18-2834, 2020 WL 6821074, at *12 (N.D. Cal. Feb. 3, 2020) (rejecting "inconsistent" arguments, instead "rel[ying] on the expert's stated opinion"). Nevertheless, the district court considered but rejected all three alternatives. First, the district court rejected the nonsensical theory that the Fitbit software performs the step of "providing a software module." Appx36 (noting that Cellspin's interpretation that "software provides itself" was "counter-intuitive"). Second, the district court rejected the argument that end users perform the "providing" step because it is at odds with Mr. Vijh's opinion that the software module is provided at the time the Accused Wearables are manufactured and shipped. Appx36. And third, the district court found that the record does not support the theory that Fitbit's United States-based technology team performs the

"providing" step. Appx39. Though Cellspin complains that the district court improperly weighed evidence, the district court actually found that the ***only*** evidence in the record—Mr. Vijh's opinions—contradicted Cellspin's attorney argument.

Cellspin effectively repeats the same arguments on appeal. Cellspin notes that its "primary contention" is that the method is performed by Fitbit's software. Blue Br. at 33. Cellspin focuses on "software updates," arguing that the claim does not preclude the "providing" step from occurring multiple times, *i.e.*, each time the software is updated. *Id.* at 31. But Cellspin cites the record only to support the unremarkable fact that the Accused Instrumentalities perform software updates, *see id.*, while citing no evidence that the software allegedly "provided" during those updates performs any functions of the claimed "software module." And Cellspin's attorney argument about software updates contradicts Mr. Vijh's opinion that the "providing" step is performed "at the time" the Accused Wearables are "manufactured and shipped." *See* Appx553 (¶166).

Cellspin's alternative argument that Fitbit end users perform the claimed providing step, *see* Blue Br. at 32-33, likewise fails because Mr. Vijh relied only on the manufacture and shipping of the products, Appx553 (¶166), and because Cellspin conceded several times that its only theory required that all method steps are "directly performed by Fitbit's software." Appx440 ("[T]he claimed methods are carried out and performed entirely by Fitbit's software."). Additionally,

Cellspin's customer-based infringement theory would redefine "providing" to mean "being provided with," which contradicts the plain and ordinary meaning.[16] And Cellspin's belated attempt to summarily rely on a divided infringement theory of "direction and control," *see* Blue Br. at 33, should be rejected because Cellspin failed to sufficiently develop its argument.[17] *See SmithKline Beecham*, 439 F.3d at 1320 (concluding that an insufficiently developed argument was waived).

Ultimately, Cellspin's argument that it was allowed to offer alternative infringement theories, *see* Blue Br. at 33, is not only incorrect, *see PersonalWeb Techs.*, 2020 WL 6821074, at *12, but also a red herring, because Cellspin's alternative theories are unsupported. Cellspin's expert opined on one theory that could not prevail as a matter of law, and Cellspin's alternative theories lack any support and contradict its own expert's opinions.

---

[16] The plain and ordinary meaning governs because neither party sought claim construction. *See, e.g.*, *Asetek Danmark A/S v. CMI USA Inc.*, 852 F.3d 1352, 1359 (Fed. Cir. 2017). Indeed, in the portion of Cellspin's brief directed to Fitbit, Cellspin concedes that the plain and ordinary meaning applies. *See* Blue Br. at 29. To the extent Cellspin suggests elsewhere that the district court applied an improper construction of "providing a software module," *see id.* at 53, Cellspin does not accurately recount the district court's analysis, which recognized that Cellspin's infringement theory relied on manufacturing and shipment to consumers, not that the claim itself required manufacturing or shipping. Appx92.

[17] In a single generic paragraph on direction and control, Cellspin cites only its summary judgment briefing, which itself contained only attorney argument and unexplained string citations that failed to show how any benefit is conditioned on users performing the step of "providing a software module." *See* Blue Br. at 33 (citing Appx442-Appx443).

### F. The Step Of "Establishing A Paired Bluetooth Connection" Is Not Performed By, Or Attributable To, Fitbit.

Direct infringement under 35 U.S.C. § 271(a) has a "single-entity requirement." *Syngenta Crop Prot., LLC v. Willowood, LLC*, 944 F.3d 1344, 1360 (Fed. Cir. 2019). If multiple actors perform the steps in the method, there is no direct infringement absent further evidence that "the acts of one are attributable to the other such that a single entity is responsible for the infringement." *Akamai Techs., Inc. v. Limelight Networks, Inc.*, 797 F.3d 1020, 1022 (Fed. Cir. 2015)

Here, the Asserted Method Claims require establishing a "paired" Bluetooth connection.[18] Fitbit does not itself, under any circumstances, perform that step of the claims. As an initial matter, the evidence from Fitbit's expert, Dr. Bims, demonstrates that a "paired" Bluetooth connection is not necessary at all for the Accused Instrumentalities to function as intended to track health information. Appx10641-10642 (¶216); Appx10756 (¶481) (Dr. Bims citing the testimony of Mr. Boccon-Gibod, Fitbit's corporate designee, at Appx10839, who explained that "Bluetooth pairing is an optional step" because "the Fitbit mobile app will still be able to – able to sync data over a nonpaired connection."). Regardless, to the extent

[18] *See, e.g.*, Appx396 ('794 patent, claim 1, 11:56-58) ("establishing a paired connection between the Bluetooth enabled data capture device and the Bluetooth enabled mobile device."); Appx411 ('75 patent, claim 1, 11:52-54) ("establishing a secure paired Bluetooth connection between the Bluetooth enabled data capture device and the Bluetooth enabled mobile device").

a "paired" Bluetooth connection is established at all, the end user—not Fitbit—must choose whether to establish that "paired" Bluetooth connection. Appx10506-10507; Appx10753-10755 (¶¶473-480) (Dr. Bims explaining in detail how his testing of the Accused Instrumentalities demonstrated that the user—not Fitbit—has an option of choosing whether any Bluetooth connection will be "paired," as required by the claims, or not). For example, as Dr. Bims' testing showed, the Accused Mobile Application prompts the user to elect whether or not to establish a "paired" Bluetooth connection.




Appx10641 (¶215).

That evidence is unrebutted because Cellspin's expert, Mr. Vijh, admitted that he never tested the Accused Instrumentalities' functionality when the user declines to establish a "paired" Bluetooth connection. Appx46 (citing Appx9653 (147:7-14)). Indeed, Cellspin has never disputed Fitbit's expert testing that proves that users choose whether to establish a "paired" Bluetooth connection. *See* Appx10643 (¶221).

Without a showing that Fitbit itself performs the step of establishing a "paired" Bluetooth connection, Cellspin can only prevail on its claim for direct infringement if it can show that performance of that method step is otherwise "attributable to" Fitbit. *See Nalco Co. v. Chem-Mod, LLC*, 883 F.3d 1337, 1351 (Fed. Cir. 2018) ("The key inquiry, '[w]here more than one actor is involved in practicing the steps,' is whether 'the acts of one are *attributable* to the other such that a single entity is responsible for the infringement.'" (quoting *Akamai*, 797 F.3d at 1022) (emphasis in original)). Cellspin attempts to circumvent that problem by asserting three theories. First, Cellspin argues that Fitbit's "source code" establishes a "paired" Bluetooth connection. Blue Br. at 36. Second, Cellspin argues that Fitbit "directs and controls" its end users to establish a "paired" Bluetooth connection. *Id.* at 37. And third, Cellspin argues that even if Fitbit is not liable for direct infringement, it should be liable for indirect infringement. *Id.* at 40. The district court correctly determined that all three theories fail. Appx43-47.

#### 1. Fitbit's Source Code Does Not Perform The Step Of Establishing A "Paired" Bluetooth Connection.

Cellspin's theory that Fitbit's source code establishes a "paired" Bluetooth connection fails for two reasons. First, as the district court noted, Cellspin provided no evidence that Fitbit's source code performs pairing, which Cellspin concedes is required to establish a "paired" Bluetooth connection. Appx44. The district court found that Cellspin's only evidence was Mr. Vijh's conclusory statements that he

inspected the source code and located evidence of pairing, and that he performed testing to confirm that the Accused Instrumentalities operate in accordance with the claims. Appx44. Yet critically, he failed to explain what evidence of pairing he located or what testing he did. *See* Appx540-541 (¶143).

Cellspin argues that its expert's opinions are "supported and explained in the evidentiary record," *see* Blue Br. at 36, but it was Cellspin's burden to explain its infringement theories to the district court. *See Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001) ("[A] district court is 'not required to comb the record to find some reason to deny a motion for summary judgment.'" (quoting *Forsberg*, 840 F.2d at 1418)). In its briefing to the district court, Cellspin pointed generally to its expert report, which in turn pointed to pages of evidence with no explanation. Appx44; Appx447; Appx540-541 (¶143). For example, both Cellspin's summary judgment brief and its expert report stated that FB-SC-000311 "details parameters specific to the Bluetooth pairing process on the device," *see* Appx447; Appx504 (¶88), but neither its brief nor report offered any explanation how that pairing process occurs. Cellspin repeats that flawed strategy in its Blue Brief, identifying the same page of source code without explanation, and citing seven pages of claim charts that contain unexplained pictures of Fitbit products. *See* Blue Br. at 36 (citing Appx2014-Appx2020).

Second, even if Cellspin provided evidence that the Fitbit source code is involved in establishing a "paired" Bluetooth connection, this "source code" theory would still fail because the end user must choose whether or not to establish a "paired" Bluetooth connection. Cellspin relies on *SiRF Tech., Inc. v. ITC*, 601 F.3d 1319 (Fed. Cir. 2010), *see* Blue Br. at 30, but that case is distinguishable because the third parties in that case performed only ***unclaimed*** steps. *SiRF*, 601 F.3d at 1330 (finding that the actions taken by third parties were "not required by the claims, and, therefore, the fact that other parties perform these actions does not preclude a finding of direct infringement" by the accused infringer). As this Court later characterized the *SiRF* case, "[a]fter the user put the system into operation, the user was no longer involved in the performance of the method steps." *IBM v. Booking Holdings Inc.*, 775 F. App'x 674, 678 (Fed. Cir. 2019) (nonprecedential) (citing *SiRF*, 601 F.3d at 1330-31). Here, in contrast, the end users must perform the ***claimed*** step of establishing a "paired" Bluetooth connection to establish infringement. That claimed step is not automatically performed by the Fitbit Mobile Application; rather it is the user that must choose to perform that claim step. Appx10641-10642 (¶¶215-216), Appx10643 (¶221), Appx10753-10755 (¶¶473-480). Therefore, as a matter of law, Fitbit's source code cannot perform the step of establishing a "paired" Bluetooth connection as required by the claims.

### 2. Fitbit Does Not Direct Or Control The User To Establish A "Paired" Bluetooth Connection.[19]

Cellspin argues on appeal, as it argued unsuccessfully in the district court, *see* Appx448-449, that Fitbit should be liable under a divided infringement theory because it "directs and controls" its users to perform the method step of establishing a "paired" Bluetooth connection. Blue Br. at 37-40. But the district court correctly rejected Cellspin's attempt to avoid summary judgment by relying on attorney argument that directly contradicts the factual evidence about the consequences—or lack thereof—of a user's decision to decline to establish a "paired" Bluetooth connection. Appx44-46. As Dr. Bims' testing showed, Fitbit leaves the choice entirely up to users whether or not to establish a "paired" Bluetooth connection because the Accused Instrumentalities function for their intended purpose without such a "paired" Bluetooth connection. Appx10643 (¶222).

Cellspin failed to provide evidence to prove that Fitbit directs and controls its users by "condition[ing] participation in an activity or receipt of a benefit upon performance of a step or steps of a patented method and establish[ing] the manner or timing of that performance." *See Akamai*, 797 F.3d at 1023. First, before the district court, Cellspin made no effort to show that Fitbit controls the manner or timing of establishing a "paired" Bluetooth connection, *see* Appx448-449, which

[19] Cellspin appeals similar issues raised by Appellees Nike, Fossil, and Garmin.

alone is dispositive. And second, the district court was unpersuaded by Cellspin's attempt to identify alleged benefits supposedly obtained by performing the step of establishing a "paired" Bluetooth connection. *See* Appx448-449; Appx45-46. After quoting five "facts" upon which Cellspin relied, the district court found that three of those facts do not identify benefits that Fitbit conditions upon performing the "establishing" step, and one of the facts actually constituted an admission by Cellspin that users ***do not*** require a Bluetooth connection because Fitbit devices can be connected to mobile devices "via Wi-Fi instead of Bluetooth." Appx45-46.

As to the fifth fact—that "users cannot use Live Tracking without Bluetooth"—the district court noted that, if true, it "may plausibly be a benefit conditioned upon performance," but it was "offered without any citation to the record" and it was thus "attorney argument [] insufficient to overcome a motion for summary judgment." Appx45-46 (quoting *Ferring B.V. v. Barr Lab'ys, Inc.*, 437 F.3d 1181, 1193 (Fed. Cir. 2006)). The district court recognized that Cellspin's expert never "examine[d] the operation of Fitbit's accused products without Bluetooth," and he was thus in no position to opine on whether establishment of a Bluetooth connection was an activity upon which Fitbit conditions the provision of benefits. Appx46.

In contrast, Fitbit's expert tested the products and demonstrated that the Accused Wearable synced to his mobile device and kept track of his health

information without a "paired" Bluetooth connection. Appx10641-10642 (¶216), Appx10643 (¶222). As this Court found in the *Medgraph, Inc. v. Medtronic, Inc.* case, there is no direction and control when the accused infringer "does not deny users the ability to use [the accused products] without performance of the claim step," but rather "freely permits using" the accused products without performing the step "and it denies no benefit to such users for their choices to do so." 843 F.3d 942, 948 (Fed. Cir. 2016) (finding that "the evidence presented to the district court indisputably shows that Medtronic does not condition the use of, or receipt of a benefit from, the CareLink System on the performance of all of Medgraph's method steps"). Here, like in *Medgraph*, Fitbit does not deny users the ability to obtain the benefits of the Accused Instrumentalities—*i.e.*, the ability to sync to a mobile device and track health information—without a "paired" Bluetooth connection. Appx10641-10642 (¶216), Appx10643 (¶222). And, analogous to *Medgraph*, the evidence shows that Fitbit "freely permits using" the Accused Instrumentalities without a "paired" Bluetooth connection, and it does not deny benefits to users "for their choices to do so." *See Medgraph*, 843 F.3d at 948.

#### 3. Fitbit Cannot Be Liable For Indirect Infringement Without A Showing Of Direct Infringement.

Unable to show direct infringement under its "source code" theory or its divided infringement theory that Fitbit directs and controls its users, Cellspin resorts to an unexplained indirect infringement theory. Blue Br. at 40. But, axiomatically,

"[t]here can be no inducement or contributory infringement without an underlying act of direct infringement." *Linear Tech. Corp. v. Impala Linear Corp.*, 379 F.3d 1311, 1326 (Fed. Cir. 2004) (citing *Joy Techs.*, 6 F.3d at 774); *see also Dynacore*, 363 F.3d at 1272 ("Indirect infringement, whether inducement to infringe or contributory infringement, can only arise in the presence of direct infringement. . . .").

As discussed above, no one entity is responsible for performing all steps of the method claim. To the extent the step of establishing a "paired" Bluetooth connection is performed at all, it is performed by a user of the Accused Wearables, not Fitbit itself. And it is undisputed that the user does not perform all of the other method steps of the claim. *See* Appx440 (Cellspin asserting that "Mr. Vijh has opined that all method steps are directly performed by Fitbit's software."). Thus, because there is no direct infringement attributable to any single entity, there can be no indirect infringement as a matter of law. *Linear Tech.*, 379 F.3d at 1326.

### G. Under The District Court's Unchallenged Construction Of "Cryptographically Authenticate," Cellspin Cannot Demonstrate That The Accused Wearables Perform Decryption.[20]

Cellspin alleges that the Accused Wearables are the claimed "Bluetooth enabled data capture device." Appx486 (¶50). The Asserted System Claims require

[20] Cellspin also raises issues concerning the "cryptographically authenticate" limitations with respect to Appellees UA, Fossil, and Nikon.

that "the Bluetooth enabled data capture device is configured to cryptographically authenticate identity of the Bluetooth enabled cellular phone." Appx427 ('847 patent, claim 1, 12:20-23). And the district court construed the term "cryptographically authenticated" to mean "verified as legitimate by use of encryption and decryption involving an algorithm," which is unchallenged on appeal. Appx8005. Thus, to prove infringement, Cellspin needed to provide evidence that the ***Accused Wearables*** are configured to "verify as legitimate by use of encryption ***and decryption*** involving an algorithm." Yet Cellspin provided no evidence that the Accused Wearables (as opposed to other devices) are configured to use decryption (as opposed to just encryption), and the district court correctly granted summary judgment on this basis. Appx49-51.

Like it did in its summary judgment briefing, Cellspin continues to identify evidence about the wrong device. For example, Cellspin cites evidence that allegedly shows that information is received by "multiple apps on the ***mobile device*** . . . (assuming they [*i.e.*, those mobile apps] are able to decrypt)," as well as source code that allegedly shows that "[t]he mobile device should decrypt each encrypted block." Blue Br. at 44 (showing screenshot from Mr. Vijh's claim chart (Appx2027-2028) quoting Fitbit documents). But there is no dispute that a user's mobile device (such as an Apple iPhone) is not an Accused Wearable (such as a Fitbit activity tracker). *See* Appx486 (¶50) (Cellspin's expert acknowledging that the data capture

device and mobile device are "physically-separate"). And like it did in its summary judgment briefing, when Cellspin cites evidence about the Accused Wearables, that evidence does not refer to decryption. For example, Cellspin cites evidence of "tracker encryption" and that the "tracker will use a shared . . . encryption key." Blue Br. at 44 (showing screenshot from Mr. Vijh's claim chart (Appx2027-2028) quoting Fitbit documents). But the district court's construction requires encryption and decryption—not just encryption. In summary, none of Cellspin's numerous citations show that the Accused Wearables are configured to "verif[y] as legitimate" by performing "decryption" as required in the claims.

Cellspin attempts to remedy that deficiency by relying on unsupported attorney argument that it is "self-evident" and "common sense" that encrypted data must be decrypted, as well as alleged "circumstantial evidence" that "encrypted data is eventually presented to the user in decrypted form." *See* Blue Br. at 43-45. But, at most, Cellspin suggests that data are encrypted at one point in time and later those data are decrypted. That fact is neither disputed nor relevant. What is relevant is that, as the district court correctly found, Cellspin has no evidence that the Accused Wearables are the devices that perform the decryption and therefore cannot demonstrate that the Accused Wearables meet the "cryptographically authenticate" limitation. *See Invitrogen Corp. v. Clontech Lab'ys, Inc.*, 429 F.3d 1052, 1068 (Fed. Cir. 2005) ("Unsubstantiated attorney argument regarding the meaning of technical

evidence is no substitute for competent, substantiated expert testimony. It does not, and cannot, support Clontech's burden on summary judgment.").

### H. Cellspin Cannot Demonstrate That The Accused Wearables Meet The Processor Limitations Of The Asserted System Claims.

The Asserted System Claims of the '847 patent recite a "first processor" "configured to" perform three steps: (1) "acquire new-data;" (2) "store the acquired new-data;" and (3) "send an event notification." Appx427-428 (claim 1, 12:16-13:3) The district court granted summary judgment on two bases. First, the district court found that Cellspin failed to raise a genuine dispute of material fact regarding whether the Accused Wearables contain the claimed "first processor" configured to perform all three steps. Appx53. And second, the district court found that Cellspin failed to raise a genuine dispute of material fact regarding the alleged representative Accused Wearables because Cellspin relied on evidence about the wrong devices. Appx54. This Court should affirm on both grounds.

#### 1. Cellspin Cannot Show That The Accused Wearables Have A "First Processor" "Configured To" Perform All Three Required Functions.[21]

Cellspin argued below that (1) "the Fitbit hardware carries out the instructions as defined by the Fitbit software" and (2) "the presence of a first processor is evident based upon the functionality of the Accused Devices and the fact that there is

[21] Cellspin also raises issues concerning the "first processor" limitation with respect to Appellees Garmin and Nike.

operating code." Appx51-52. As the district court explained, however, the ***existence*** of (1) software and (2) a processor does not indicate that there is any single "first processor" that is "configured to" perform all three of the required functions in the multi-processor accused devices:

> However, saying that a device contains the claimed "first processor" simply because the devices function in a certain way and because "there is operating code" does not necessarily imply that the device contains a "first processor" "configured to" perform three specific steps: "acquire new-data," "store the acquired new-data," and "send an event notification." Even assuming that a device performs the claimed functions, Cellspin offers no proof that a single processor operating the device is responsible for these activities.

Appx52. The district court noted that "Cellspin's presumption is especially difficult to square with Fitbit's evidence that the accused Versa 2 and Charge 3 products operate with multiple processors that it claims are each responsible for different functions." Appx52 (n.14) (citing Appx10837 (21:10-15)).

Cellspin's Blue Brief repeats the exact same argument that failed below. Cellspin argues that (1) "Fitbit's software defines the functions of acquiring, storing, and sending new data," Blue Br. at 46, and (2) "Vijh explains the elementary fact that the software code requires a processor to work, and cites exemplary Fitbit Source Code which is written in C language, and thus requires a processor for execution," *id*. at 48. In other words, Cellspin again argues that (1) Fitbit software on the Accused Wearables as a whole performs the claimed functions and (2) Fitbit's Accused Wearables contain at least one processor. But again, Cellspin does not

grapple with the claims' requirement that the same "first processor" must be "configured to" "acquire new-data;" "store the acquired new-data;" and "send an event notification." This is a critical omission because the Accused Wearables are multiprocessor devices. *See* Appx2007 (Vijh's infringement chart citing at Appx1755 (21:13-15) Fitbit's corporate designee describing Fitbit Accused Wearables as "multiprocessor device[s]"); Appx2696 (same). Indeed, when asked during summary judgment briefing to admit the undisputed fact that "[a]ll of the Accused Wearables contain multiple processors," Cellspin responded with a one-word unequivocal response: "Undisputed."[22] Appx15677 (Plaintiff's Opposition to [Fitbit's Statements of Undisputed Facts for Issue E, Fact 1).

The district court correctly held that Cellspin failed to identify a genuine dispute of material fact that the Accused Wearables contain a "first processor" "configured" to perform the three claim steps, and this Court should affirm the district court's grant of summary judgment.

[22] In a blatant attempt to contradict its prior admission, Cellspin argues that "[t]he 'multi-processor' counter-narrative offered by Fitbit is belied by the fact that Appx3417 (as cited and relied upon by Vijh at Appx2053) illustrates a single Toshiba processor in the Accused Versa 2." Blue Br. at 50. Of course, the diagram that Cellspin cites simply depicts "a processor" and does not state that there is a "single" processor. *Id*. Even beyond Cellspin's admission, the record is replete with evidence that the Accused Wearables have multiple processors. *See, e.g.*, Appx1755 (21:13-15). Moreover, as discussed below in Section VI.H.2., Cellspin continues to rely on evidence about the wrong device.

### 2. Cellspin Provided No Evidence That The Processors Its Expert Analyzed Are Representative Of The Accused Wearables.

Instead of analyzing each of the Accused Wearables individually, Cellspin sought to prove infringement under a representative products theory. *See* Appx3270; Appx493-494 (¶¶64-66). Under that theory, Cellspin attempted to characterize the Fitbit Versa 2 and Charge 3 products as representative of all of the other Accused Wearables. Appx3270; Appx493-494 (¶¶64-66). But instead of providing evidence of the processors in the allegedly representative Fitbit Versa 2 and Charge 3 products, Cellspin relied on third-party hardware analysis or "teardowns" of different products, namely the Fitbit Surge and Blaze. Appx53; *see, e.g.*, Appx3293. The district court correctly determined that Mr. Vijh failed to explain "how or why the processor in the Versa 2 is sufficiently similar to the teardown-analyzed Cortex M3 processor for infringement purposes." Appx53. The district court further noted that Mr. Vijh's reliance on "the typical hardware architecture of microcontrollers" was "at best" a conclusory assertion that the different operating systems, interfaces, and sensors do not change his analysis. Appx53. And the district court rejected Cellspin's attempt to rely on its expert's unsubstantiated claim charts without any explanation. Appx53-54.

On appeal, Cellspin fails to address those deficiencies. Rather, Cellspin attempts to rely on abstract assertions from an expert about generic computer

functionality, rather than evidence of how the Accused Wearables actually operate. First, Cellspin argues that the "specific model is not relevant to the fact to be determined, and [Mr.] Vijh expressed his opinions based on exemplary hardware and the fact that Source Code must be processed." Blue Br. at 51. But Cellspin's arguments are contrary to law; to survive summary judgment, a patentee must have evidence with which it could prove at trial that ***the Accused Instrumentalities*** infringe. *Accord L&W, Inc. v. Shertech, Inc.*, 471 F.3d 1311, 1318 (Fed. Cir. 2006) (holding that the patentee "cannot simply 'assume' that all of [the accused] products are like the one [the expert] tested and thereby shift to [the accused infringer] the burden to show that is not the case" because the patentee must satisfy its burden of proof "as to each accused device"). Second, Cellspin argues that the district court was "misunderstanding . . . the evidence as cited" and the supposed "accompanying explanation." Blue Br. at 52. But the district court was correct that there was no "accompanying explanation" of the cited evidence beyond Mr. Vijh's assertion that it did not matter whether he relied on the correct hardware. And the district court was also correct to reject "mere attorney argument" about the unexplained string citations in Mr. Vijh's claim charts because "[u]nsubstantiated attorney argument regarding the meaning of technical evidence is no substitute for competent, substantiated expert testimony." *Invitrogen*, 429 F.3d at 1068.

At bottom, the district court correctly concluded that Cellspin has no evidence to show that the teardowns its expert analyzed are sufficiently similar in their functionality to the representative Accused Wearables. Accordingly, the district court correctly granted summary judgment, and this Court should affirm.

## VII. CONCLUSION

For the foregoing reasons, this Court should affirm the district court's grant of summary judgment.

Dated: March 27, 2023

Respectfully submitted,

/s/ *Karim Z. Oussayef*
Karim Z. Oussayef
Jamie L. Kringstein
DESMARAIS LLP
230 Park Avenue
New York, NY 10169
Telephone: 212-351-3400
Facsimile: 212-351-3401
koussayef@desmaraisllp.com
jkringstein@desmaraisllp.com

Adam Steinmetz
DESMARAIS LLP
1899 Pennsylvania Ave. NW, Suite 400
Washington, D.C. 20006
Telephone: (202) 451-4900
Fax: (202) 451-4901
asteinmetz@desmaraisllp.com

*Counsel for Defendant-Appellee Fitbit LLC*

# CERTIFICATE OF SERVICE

I hereby certify that on March 27, 2023, I served a complete copy of the foregoing on all counsel of record by filing it with the United States Court of Appeals for the Federal Circuit using the CM/ECF system.

Dated: March 27, 2023

Respectfully submitted,

/s/ *Karim Z. Oussayef*
Karim Z. Oussayef
koussayef@desmaraisllp.com
DESMARAIS LLP
230 Park Avenue
New York, NY 10169
Telephone: 212-351-3400
Facsimile: 212-351-3401

*Counsel for Defendant-Appellee*
*Fitbit LLC*

## CERTIFICATE OF COMPLIANCE

The undersigned certifies that this brief complies with the type-volume limitation set forth in Fed. Cir. R. 32(b) and Fed. R. App. P. 32(a)(7)(B). Excluding exempt portions, this brief contains:

- 13,089 words as counted by Microsoft Word 365, the word-processing system used to prepare this paper; and
- 14 words in the illustrations, counted manually.

This brief's total word count, excluding exempt portions, is **13,103** words, which complies with the 14,000-word limit set by Fed. Cir. R. 32(b).

The undersigned further certifies that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 365 and 14-point Times New Roman type.

Dated: March 27, 2023

Respectfully submitted,

/s/ *Karim Z. Oussayef*
Karim Z. Oussayef
DESMARAIS LLP
230 Park Avenue
New York, NY 10169
Telephone: 212-351-3400
Facsimile: 212-351-3401
koussayef@desmaraisllp.com

*Counsel for Defendant-Appellee Fitbit LLC*