**Nos. 22-2025, -2028, -2029, -2030, -2032, -2037**

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

CELLSPIN SOFT, INC.,

*Plaintiff-Appellant*,

v.

FITBIT LLC, NIKE, INC., UNDER ARMOUR, INC., FOSSIL GROUP, INC., MISFIT, INC., NIKON AMERICAS, INC., NIKON INC., GARMIN INTERNATIONAL, INC., GARMIN USA, INC.,

*Defendants-Appellees*.

Appeals from the United States District Court for the Northern District of California, Nos. 4:17-cv-005928, -005931, -005932, -005933, -005934, -005936, Judge Yvonne Gonzalez Rogers.

**NON-CONFIDENTIAL RESPONSE BRIEF OF NIKON AMERICAS, INC. AND NIKON INC.**

JACK W. LONDEN
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105

YUKA TERAGUCHI
MORRISON & FOERSTER LLP
Shin-Marunouchi Building, 29th Floor
1-5-1 Marunouchi
Chiyoda-ku, Tokyo, 100-6529

BRIAN R. MATSUI
SETH W. LLOYD
MORRISON & FOERSTER LLP
2100 L Street NW, Suite 900
Washington, DC 20037
Tel.: (202) 887-8784
BMatsui@mofo.com

*Counsel for Defendants-Appellees Nikon Americas, Inc. and Nikon Inc.*

MARCH 27, 2023

**U.S. Patent No. 8,738,794 Claim 1**

**1.** A method for acquiring and transferring data from a Bluetooth enabled data capture device to one or more web services via a Bluetooth enabled mobile device, the method comprising:

providing a software module on the Bluetooth enabled data capture device;

providing a software module on the Bluetooth enabled mobile device;

establishing a paired connection between the Bluetooth enabled data capture device and the Bluetooth enabled mobile device;

acquiring new data in the Bluetooth enabled data capture device, wherein new data is data acquired after the paired connection is established;

detecting and signaling the new data for transfer to the Bluetooth enabled mobile device, wherein detecting and signaling the new data for transfer comprises:

determining the existence of new data for transfer, by the software module on the Bluetooth enabled data capture device; and

sending a data signal to the Bluetooth enabled mobile device, corresponding to existence of new data, by the software module on the Bluetooth enabled data capture device automatically, over the established paired Bluetooth connection, wherein the software module on the Bluetooth enabled mobile device listens for the data signal sent from the Bluetooth enabled data capture device, wherein if permitted by the software module on the Bluetooth enabled data capture device, the data signal sent to the Bluetooth enabled mobile device comprises a data signal and one or more portions of the new data;

transferring the new data from the Bluetooth enabled data capture device to the Bluetooth enabled mobile device automatically over the paired Bluetooth connection by the software module on the Bluetooth enabled data capture device;

receiving, at the Bluetooth enabled mobile device, the new data from the Bluetooth enabled data capture device; applying, using the Software module on the Bluetooth enabled mobile device, a user identifier to the new data for each destination web service, wherein each user identifier uniquely identifies a particular user of the web service;

transferring the new data received by the Bluetooth enabled mobile device along with a user identifier to the one or more web services, using the Software module on the Bluetooth enabled mobile device;

receiving, at the one or more web services, the new data and user identifier from the Bluetooth enabled mobile device, wherein the one or more web services receive the transferred new data corresponding to a user identifier; and

making available, at the one or more web services, the new data received from the Bluetooth enabled mobile device for public or private consumption over the internet, wherein one or more portions of the new data correspond to a particular user identifier

# CERTIFICATE OF INTEREST

Counsel for Nikon Americas, Inc. and Nikon Inc. certify under Federal Circuit Rule 47.4 that the following information is accurate and complete to the best of their knowledge:

1. **Represented Entities.** Provide the full names of all entities represented by undersigned counsel in this case.

Nikon Americas, Inc.; Nikon Inc.

2. **Real Parties in Interest.** Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.

None.

3. **Parent Corporations and Stockholders.** Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.

Nikon Corporation, a publicly traded Japanese corporation, owns 100% of Nikon America, Inc.'s stock. Nikon Americas, Inc. owns 100% of Nikon Inc.'s stock.

4. **Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court.

MORRISON & FOERSTER LLP: Colette Reiner Mayer (no longer with firm), Jianing Liu (no longer with firm), Stephen J. H. Liu.

FINNEGAN HENDERSON FARABOW GARRETT AND DUNNER LLP: Houtan Khalili Esfahani, York Moody Faulkner, Jacob Adam Schroeder.

5. **Related Cases.** Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. Do not include the originating case number(s) for this case.

*Cellspin Soft, Inc. v. Moov Inc.*, 4:17-cv-05929 (N.D. Cal.)

*Cellspin Soft, Inc. v. Nike, Inc.*, 6:21-cv-00803 (W.D. Tex.)
*Cellspin Soft, Inc. v. Panasonic Corp.*, 20-1948 (Fed. Cir.)
*Cellspin Soft, Inc. v. Canon U.S.A., Inc.*, 20-1947 (Fed. Cir.)
*Cellspin Soft, Inc. v. Canon U.S.A., Inc.*, 4:17-cv-05938 (N.D. Cal)
*Cellspin Soft, Inc. v. GoPro, Inc.*, 4:17-cv-05939 (N.D. Cal)
*Cellspin Soft, Inc. v. Panasonic Corp. of N. Am.*, 4:17-cv-05941 (N.D. Cal)
*Cellspin Soft, Inc. v. JK Imaging Ltd.*, 4:17-cv-06881 (N.D. Cal)
*Cellspin Soft, Inc. v. Garmin Int'l, Inc.*, 4:20-cv-03673 (N.D. Cal)

6. **Organizational Victims and Bankruptcy Cases.** Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).

Not applicable.

Dated: March 27, 2023

/s/ Brian R. Matsui
Brian R. Matsui

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST ........................................................................ i

STATEMENT OF RELATED CASES ............................................................ vii

INTRODUCTION ..........................................................................................1

STATEMENT OF THE ISSUE........................................................................2

STATEMENT OF THE CASE.........................................................................3

A. Cellspin Claimed Specific Applications Of Standard Bluetooth Technology, And Disclaimed Broad Coverage For Its Claims ............3

B. Nikon's Products Use Multiple, Intermittent Connections To Transfer New Images From A Camera To A Mobile Device...............8

C. Cellspin Sued Nikon And Others Based On Hundreds Of Products But Failed To Produce Evidence Of Material Disputed Issues Of Fact To Survive Summary Judgment...................................9

1. In a ruling Cellspin does not challenge, the district court construed Cellspin's claims to require performing narrowly defined steps in a specifically recited order .............10

2. The district court granted summary judgment of non-infringement to Nikon for multiple, independent reasons........11

3. Long after the district court granted summary judgment, Cellspin moved to vacate the judgment and recuse Judge Gonzalez Rogers ...................................................................14

SUMMARY OF ARGUMENT .......................................................................15

STANDARD OF REVIEW ............................................................................17

ARGUMENT .................................................................................................17

A. For All Claims, There Is No Genuine Dispute That Nikon Does Not Infringe Under The Unappealed Construction Of "Established Paired Connection" And Related Terms........................17

CONFIDENTIAL MATERIAL OMITTED


1. The district court construed the claims to require using and maintaining the same, continuous connection, yet there is no dispute Nikon's products intermittently use two different connections ........ 17

2. Cellspin's contrary arguments focus on the wrong claim term ........ 22

B. For Each Patent, Independent Issues Further Support Affirmance ........ 28

1. For the '794 patent claims, there is no genuine dispute that Nikon's alleged performance of some claimed steps occurs outside the United States ........ 28

a. Unrebutted evidence shows Nikon's products are manufactured, and provided with software, outside the United States ........ 28

b. Unrebutted evidence shows the servers that allegedly receive and make available new data are located in Japan ........ 34

2. For the '752 patent claims, there is no genuine dispute that Nikon's cameras use an type Bluetooth connection, not the required "secure paired connection" ........ 37

3. For the '847 patent claims, there is no genuine dispute that Nikon's cameras use an type Bluetooth connection, which does not "cryptographically authenticate the identity" of a mobile device ........ 39

CONCLUSION ........ 41


**CONFIDENTIAL MATERIAL OMITTED**

In the non-confidential version of this brief, pages 3, 9, 13, 14, 16-17, 19-22, 24 and 36-41 omit specific technical details about Nikon products that have been kept confidential.

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Akamai Techs., Inc. v. Limelight Networks, Inc.*,
797 F.3d 1020 (Fed Cir. 2015) ....................31, 32, 33

*Aristocrat Techs. Austl. PTY Ltd. v. Int'l Game Tech.*,
709 F.3d 1348 (Fed. Cir. 2013) ....................17

*Cellspin Soft, Inc. v. Fitbit, Inc.*,
No. 4:17-cv-05928 (N.D. Cal. Feb. 15, 2023)....................14

*DSU Med. Corp. v. JMS Co.*,
471 F.3d 1293 (Fed. Cir. 2006) ....................31

*Ferring B.V. v. Barr Lab'ys, Inc.*,
437 F.3d 1181 (Fed. Cir. 2006) ....................35

*NTP, Inc. v. Rsch. in Motion, Ltd.*,
418 F.3d 1282 (Fed. Cir. 2005) ....................28, 35

*Roemer v. Peddie*,
132 U.S. 313 (1889)....................25

*Sage Prods., Inc. v. Devon Indus., Inc.*,
126 F.3d 1420 (Fed. Cir. 1997) ....................31

*SiRF Tech., Inc. v. ITC*,
601 F.3d 1319 (Fed. Cir. 2010) ....................33

*SmithKline Beecham Corp. v. Apotex Corp.*,
439 F.3d 1312 (Fed. Cir. 2006) ....................30

**Statutes**

35 U.S.C. § 271(a) ....................28

**Other Authorities**

*CellSpin Intellectual Property*, Cellspin,
http://www.cellspin.net/....................3

*About Nikon*, Nikon USA,
https://www.nikonusa.com/en/about-nikon/index.page ......................................3

## STATEMENT OF RELATED CASES

This Court previously decided an appeal from some of the actions in these consolidated appeals. *Cellspin Soft, Inc. v. Fitbit, Inc.*, 927 F.3d 1306 (Fed. Cir. June 25, 2019). The Court issued a precedential decision authored by Judge O'Malley and joined by Judges Lourie and Taranto. *Id.* Cellspin has also asserted claims of the patents here—U.S. Patent Nos. 8,738,794, 8,892,752, and 9,749,847—in the following cases:

*Cellspin Soft, Inc. v. Moov Inc.*, 4:17-cv-05929 (N.D. Cal.)

*Cellspin Soft, Inc. v. Nike, Inc.*, 6:21-cv-00803 (W.D. Tex.)

Counsel for Nikon Americas, Inc. and Nikon Inc. (collectively "Nikon") know of no other cases pending in this Court or any other court that will directly affect or be affected by this Court's decision in this appeal.

## INTRODUCTION

Cellspin's brief blames the district court for Cellspin's many errors. But Cellspin has only itself to blame. Cellspin made a strategic choice when it filed 14 contemporaneous suits against some of the biggest names in consumer electronics. In those suits, it asserted 21 claims from three patents based on hundreds of different products, 26 for Nikon alone. But unable to prove any of those assertions with evidence, Cellspin took short cuts. In the face of Nikon's clear non-infringement evidence on *six* different claim limitations, Cellspin used broad generalizations, supported its arguments with citations to large ranges of documents that failed to support its case, and suggested that documents and evidence showed things they did not. Unfortunately for Cellspin, the district court scrutinized all this evidence, detailing in an 83-page opinion the many deficiencies in Cellspin's case. For Nikon alone, those deficiencies mean Cellspin would now need to show error on every one of those six limitations to fully revive its case on appeal.

Cellspin fails to show error on even one. The patents here claim methods and systems that use Bluetooth wireless connections—which Cellspin did not invent—to transfer data (such as digital photos) from devices like digital cameras to mobile devices like smartphones; the mobile device then uploads the data to the internet. But given the ubiquity of both Bluetooth and devices like digital cameras by the time Cellspin filed its patent applications, Cellspin was forced during prosecution to limit

its claims in ways that are dispositive here. The district court held that Cellspin specifically gave up Bluetooth connections that are not continuously maintained. And Cellspin limited the claims to methods and systems that use the same continuous Bluetooth connection to perform all recited steps and functions. Cellspin's appeal challenges neither construction. Yet unrebutted evidence shows that the Nikon cameras here use only intermittent Bluetooth connections, and two different ones at that, to perform the steps that Cellspin alleges map to its claims.

Because those are just some of the many hurdles Cellspin does not and cannot clear on appeal, the Court should affirm.

## STATEMENT OF THE ISSUE

Whether to affirm the district court's grant of summary judgment of non-infringement to Nikon on all products because:

a. for all asserted claims, there is no genuine dispute of material fact that Nikon does not practice the "established paired connection" and related limitations; or

b. for the additional reasons that:

    1. for the claims of the '794 patent, there is no genuine dispute of material fact that Nikon—alone or together with any entity that Nikon directs, controls, or with which it has formed a joint enterprise—does not perform all required steps in the United States;

2. for the claims of the ’752 patent, there is no genuine dispute of material fact that Nikon’s cameras use an type paired connection, not the claimed secure paired connection; and

3. for the claims of the ’847 patent, there is no genuine dispute of material fact that Nikon’s cameras use an type paired connection, which does not cryptographically authenticate the identity of the mobile device.

## STATEMENT OF THE CASE

### A. Cellspin Claimed Specific Applications Of Standard Bluetooth Technology, And Disclaimed Broad Coverage For Its Claims

Nikon is the world leader in digital imaging, precision optics and photo imaging technology and is globally recognized for its groundbreaking products.[1] According to Cellspin’s own public website, its business monetizes a small number of patents.[2] Consistent with that business model, Cellspin has asserted here 21 claims of three U.S. patents.[3]

[1] *About Nikon*, Nikon USA, https://www.nikonusa.com/en/about-nikon/index.page (last visited Mar. 15, 2023)

[2] *CellSpin Intellectual Property*, Cellspin, http://www.cellspin.net/ (last visited Mar. 15, 2023)

[3] The asserted claims are: 1-4, 7, 9, 16-18, and 20-21 of the ’794 patent; 1-2, 4-5, and 12-14 of the ’752 patent; and 1-3 of the ’847 patent.

The three patents, filed in 2013 and 2014, share a written description and title: "Automatic Multimedia Upload for Publishing Data and Multimedia Content." Appx385, Appx384-398; Appx400, Appx399-413; Appx415, Appx414-428. The shared description focuses on using electronics-industry standard Bluetooth wireless radio connections to transfer data (like images) from a "digital data capture device" (like a digital camera) to a "mobile device" (like a smartphone), which can then be used to upload the data to the internet:



Appx385; Appx390. The transfer of newly captured data via Bluetooth generally involves two steps: (1) the data capture and mobile devices communicate that new data exists; and (2) the data capture device then transfers the new data.

Claim 1 of the ’794 patent recites a method with those and other steps for transferring data using Bluetooth:

> 1. A method for acquiring and transferring data from a Bluetooth enabled data capture device to one or more web services via a Bluetooth enabled mobile device, the method comprising:
>
> *providing a software module on the Bluetooth enabled data capture device*;
>
> providing a software module on the Bluetooth enabled mobile device;
>
> *establishing a paired connection* between the Bluetooth enabled data capture device and the Bluetooth enabled mobile device;
>
> acquiring new data in the Bluetooth enabled data capture device, *wherein new data is data acquired after the paired connection is established*;
>
> detecting and signaling the new data for transfer to the Bluetooth enabled mobile device, wherein detecting and signaling the new data for transfer comprises:
>
> determining the existence of new data for transfer, by the software module on the Bluetooth enabled data capture device; and
>
> sending a data signal to the Bluetooth enabled mobile device, corresponding to existence of new data, by the software module on the Bluetooth enabled data capture device automatically, over the established paired Bluetooth connection, wherein the software module on

> the Bluetooth enabled mobile device listens for the data signal sent from the Bluetooth enabled data capture device, wherein if permitted by the software module on the Bluetooth enabled data capture device, the data signal sent to the Bluetooth enabled mobile device comprises a data signal and one or more portions of the new data;
>
> transferring the new data from the Bluetooth enabled data capture device to the Bluetooth enabled mobile device automatically over the paired Bluetooth connection by the software module on the Bluetooth enabled data capture device;
>
> receiving, at the Bluetooth enabled mobile device, the new data from the Bluetooth enabled data capture device;
>
> applying, using the software module on the Bluetooth enabled mobile device, a user identifier to the new data for each destination web service, wherein each user identifier uniquely identifies a particular user of the web service;
>
> transferring the new data received by the Bluetooth enabled mobile device along with a user identifier to the one or more web services, using the software module on the Bluetooth enabled mobile device;
>
> *receiving, at the one or more web services, the new data* and user identifier from the Bluetooth enabled mobile device, wherein the one or more web services receive the transferred new data corresponding to a user identifier; and
>
> *making available, at the one or more web services, the new data* received from the Bluetooth enabled mobile device for public or private consumption over the internet, wherein one or more portions of the new data correspond to a particular user identifier.

Appx396 (col.11:48-col.12:38) (emphasis added to indicate relevant limitations).

Other claims of the ’794 and ’752 patents are similar, although the claims of the ’752 patent require “establishing a *secure* paired Bluetooth connection between” the data capture and mobile devices. Appx411 (col.11:48-col.12:37) (emphasis added). The ’847 patent claims a system generally configured consistently with the ’794 and ’752 patents’ method claims. Appx427-428 (col.12:13-col.13:9). But rather than the “secure paired Bluetooth connection” of the ’752 patent, the ’847 patent requires a system “wherein the Bluetooth enabled data capture device is configured to cryptographically authenticate identity of the Bluetooth enabled cellular phone.” Appx427 (col.12:20-25).

While prosecuting the ’794 patent, Cellspin advised the public about the narrow scope of the claims here. The examiner rejected the then-pending claims over a prior art reference that disclosed intermittently establishing and terminating a Bluetooth connection as needed to transfer newly acquired data. Appx8176-8177, Appx8160-8198. Cellspin responded by amending its claims from reciting “establishing a *pairing* between” a data capture and mobile device to “establishing a *paired connection* between” the devices. Appx8121. It added other limitations based on use of that “established paired connection.” Appx8121-8122. Cellspin then argued that its amended claims differed from the prior art: “Conventional wisdom was to not have a constant BT connection between devices. On the contrary, conventional wisdom was to initiate the connection when required, use the

connection and then terminate the connection to conserve battery charge on the device." Appx8177 (using "BT" as acronym for Bluetooth). Cellspin then defined its purportedly different approach: "However, *applicant in his initial disclosure in 2007* took the opposing view i.e. to have the BT pairing connection between devices as a pre-requisite before the data is acquired by the data capture device, and maintain the BT paired connection on a continuous basis for the application." Appx8177. Cellspin "believed that having a constant connection would be the key to the overall improvement." Appx8177.

### B. Nikon's Products Use Multiple, Intermittent Connections To Transfer New Images From A Camera To A Mobile Device

Nikon sells iconic digital cameras beloved by professional and amateur photographers alike. The accused Nikon cameras allow users to transfer images directly to mobile devices, like Android and Apple smartphones, using an application called SnapBridge. Appx14097-14098, Appx14076-14176. If a user selects an "Auto link" option, the camera will automatically transfer newly captured images to a wirelessly connected mobile device through the SnapBridge application; the mobile device may then upload the transferred images to a service called Nikon Image Space, which is maintained by non-party Nikon Corp. Appx14097-14098.

The SnapBridge application works with Nikon cameras that have Bluetooth or Wi-Fi capabilities. Appx14097-14099. When using Bluetooth, Nikon's cameras balance performance and battery life. The cameras intermittently use two separate

connections with two different properties. Appx14107-14108. Each camera first establishes a type connection with a mobile device to notify the mobile device about new images. Appx14109-14111. This connection requires relatively property, connects in a mode that uses "property," and operates at relatively low speed. Appx14109-14111, Appx14153-14154; Appx14370, Appx14239-14465; Appx14469, Appx14466-14484.

When it is time to transfer newly acquired images, the camera and mobile device terminate the type connection and establish a separate type connection. Appx14111-14112. The devices temporarily use that higher-speed, property connection to send the new photos. Appx14111-14112. Once the transfer completes, the camera and mobile device terminate the type type connection. Appx14111-14112. Thus, much like the prior art Cellspin distinguished during prosecution, Nikon's products initiate and terminate Bluetooth connections as required to conserve energy while still enabling transfer of relatively large files like images.

### C. Cellspin Sued Nikon And Others Based On Hundreds Of Products But Failed To Produce Evidence Of Material Disputed Issues Of Fact To Survive Summary Judgment

Cellspin contemporaneously filed 14 suits against Nikon and others. These suits were related but not consolidated, and all were assigned to Judge Yvonne Gonzalez Rogers of the Northern District of California. In the case against Nikon,

Cellspin based its infringement claims on 26 different Nikon digital cameras. Appx14059-14075.

### *1. In a ruling Cellspin does not challenge, the district court construed Cellspin's claims to require performing narrowly defined steps in a specifically recited order*

The district court construed the claims in at least three ways relevant here, none of which Cellspin disputes on appeal. *First*, the district court held that Cellspin's amendments and statements during prosecution were a "clear and unambiguous disclaimer" of "the conventional approach of disconnecting the paired connection after data transfer to save power." Appx8001-8002, Appx7988-8010. It thus held that all asserted claims require "maintaining continuous paired connections." Appx8001.

*Second*, the district court held that the plain claim language and other intrinsic evidence require that the claim limitations be performed in the recited order (with limited exceptions). Appx7996-8000, Appx8009-8010. In so concluding, the district court "h[e]ld[] Cellspin to its word: the claim limitations must be performed in order" for the limitations relevant here. Appx7996-8000, Appx8009-8010.

*Third*, the district court held that the claims' recitation of multiple steps or configurations involving an "established paired connection" and similar terms require "the same connection throughout the claim." Appx103-104. Because the claims repeatedly refer to the established connection "with the definite article 'the,'

it is clear that the 'connection' is the same connection throughout the claim." Appx103-104. Thus, in claim 1 of the '794 patent, the claimed steps of signaling the existence of new data and transferring that new data must be performed using the same connection. Appx103-104.

#### 2. *The district court granted summary judgment of non-infringement to Nikon for multiple, independent reasons*

The district court granted Nikon's motion for summary judgment of non-infringement for all asserted claims and all Nikon products, concluding that no reasonable factfinder could find that Nikon practices several distinct claim limitations.

***"established paired connection"* (all claims/patents):** The district court granted summary judgment to Nikon on all claims because all claims require using the same, continuously maintained connection to perform recited steps or functions yet Nikon's products use two different connections that are intermittently connected and disconnected. Appx103-106.

The district court noted that "Cellspin does not contest that Nikon's accused products operate through the termination of" one type of Bluetooth connection and "the engagement of" another. Appx105. There thus was no dispute about how Nikon's products operate. Appx105-106. Nor did Cellspin contest its "clear and unambiguous disclaimer of paired connections that are not maintained on a continuous basis." Appx104. Rather, Cellspin's sole argument to avoid summary

judgment was that the "established paired connection" limitations were met "*because the user is not required to repeat the pairing procedure*" each time a new Bluetooth connection is connected or disconnected. Appx106 (emphasis in summary judgment order). But "measuring the connection by how many times it is paired (and not by whether it connects or disconnects)" is "not the focus of the asserted patents, which require the same 'established connection' throughout and maintained on a 'continuous basis.'" Appx106.

***performance outside the United States*** **('794 patent claims):** The district court granted summary judgment to Nikon on all claims of the '794 patent because unrebutted evidence showed that the conduct Cellspin relied on for three different claim limitations occurs outside the United States. Appx107. For the limitation "providing a software module on the Bluetooth enabled data capture device," Cellspin's infringement expert stated in conclusory fashion that "it is obvious and necessarily true that the Accused Instrumentalities are each provided with a software module at the time they are manufactured and shipped." Appx1000-1001. Yet it is undisputed that the Nikon cameras here are manufactured and shipped from outside the United States. Appx14560, Appx14558-14564; Appx107.

Similarly, for the claim limitations "receiving, at the one or more web services, the new data" and "making available, at the one or more web services, the new data," Cellspin's expert relied on "image data" purportedly uploaded to and

made available from Nikon Image Space servers. Appx953, Appx1002, Appx923-1030; Appx107-108. Yet there is no dispute that the Nikon Image Space servers that store and process customer images are located in Japan. Appx107-108; Appx8353, Appx8352-8358.

***"secure paired connection"*** **('752 patent claims):** The district court granted summary judgment to Nikon on all claims of the '752 patent based on the limitation "establishing a secure paired Bluetooth connection," which must be performed before capturing new data. Appx109-110. Unrebutted evidence showed that Nikon's products use an type Bluetooth connection before capturing new data. Appx109-110. Cellspin's expert could only speculate that Nikon's products use a secure paired connection because Bluetooth connections "typically use cryptographic link keys." Appx109-110. Because the specification documents for Nikon's products here show that the products do not follow that allegedly typical approach, summary judgment was proper. Appx109-110.

***"cryptographically authenticate"*** **('847 patent claims):** The district court granted summary judgment to Nikon on all claims of the '847 patent for similar reasons. Those claims require a data capture device configured "to cryptographically authenticate identity of the Bluetooth enabled cellular phone" before acquiring new data. Appx110-111. As with the "secure paired connection" requirement of the '752 patent claims, Cellspin never disputed that Nikon's accused

products operate in an type Bluetooth mode before new data acquisition. Appx110-111. Although Cellspin again offered testimony speculating that the Bluetooth protocol generally includes other security options, it failed to tie that testimony to evidence showing Nikon's products use those options in the manner claimed. Appx110-111.

#### *3. Long after the district court granted summary judgment, Cellspin moved to vacate the judgment and recuse Judge Gonzalez Rogers*

More than seven months after the district court granted summary judgment, six months after filing the notice of appeal, and a month after filing the opening appeal brief, Cellspin filed a motion asking the district court judge to vacate her summary judgment orders in all the related cases here and recuse herself. *Cellspin Soft, Inc. v. Fitbit, Inc.*, No. 4:17-cv-05928 (N.D. Cal. Feb. 15, 2023) (ECF 376).

Based on public information, some first disclosed by Judge Gonzalez Rogers in 2012, Cellspin argued that her impartiality could reasonably be questioned, thus requiring recusal under 28 U.S.C. § 455. *Id.* Judge Gonzalez Rogers rejected the request as untimely because Cellspin "sat on the motion and strategically litigated this case through summary judgment" before seeking recusal. *Id.* at 8. On the merits, Judge Gonzalez Rogers found that Cellspin's motion was "based upon nothing but speculation and attenuation" and was "divorced from the law and the facts." *Id.* at 2. She noted that "plaintiff's motion attaches over 1500 pages of

exhibits" but "does not cite to the documents with any degree of particularity." *Id.* at 4. And she said that "some of the documents cited do not exist, others are illegible copies, and many more do not stand for the proposition asserted even under a liberal construction." *Id.* at 9. For example, Judge Gonzalez Rogers noted that her actual nomination disclosure "differs significantly from plaintiff's reconstruction in its motion." *Id*. at 11. Despite these various deficiencies, she went through Cellspin's motion and addressed each issue in detail, concluding that "plaintiff's attack on the integrity of the judiciary" based on such timing and speculation "demonstrates a measure of desperation." *Id.* at 2.

Although the order denying recusal and vacatur was entered into each of the 13 separate cases, Cellspin has appealed that order only as to Fitbit. *Cellspin Soft, Inc. v. Fitbit LLC*, No. 23-1526 (Fed. Cir.).

## SUMMARY OF ARGUMENT

Cellspin's conclusory appeal assertions fail to overcome the multiple, independent grounds supporting affirmance.

A. Cellspin does not contest that all asserted claims of all patents require using the same, continuously maintained Bluetooth connection to perform all recited steps and functions. Those constructions are dispositive—Nikon's experts walked through Nikon's source code and showed the accused products intermittently use two different Bluetooth connections. Rather than identify contrary evidence,

Cellspin focuses on a different issue—whether the accused products use and maintain a single Bluetooth pairing. But Cellspin’s own expert testimony, and other unrebutted evidence, confirm that devices can be paired without being connected.

B. Were it necessary, the Court can also affirm for the following independent, patent-specific reasons.

1. For the ’794 patent, unrebutted evidence shows alleged performance of critical claim limitations happens outside the United States. For example, the claims require “providing a software module,” and Cellspin’s expert testimony shows the alleged providing step happens outside the United States. Similarly, the claims require “receiving” and “making available” new data at a web service. But the servers for the alleged web service are operated in Japan.

2. For the ’752 patent, the asserted claims require establishing a “*secure* paired Bluetooth connection,” which must be done before other steps like detecting and acquiring new data. Yet it is undisputed that before detecting or acquiring new data, Nikon’s cameras use only an [redacted] Bluetooth connection, one that is expressly identified as having “[redacted].” Appx14370.

3. For the ’847 patent, the asserted claims require “cryptographically authenticat[ing] the identity” of a cellular device before performing other recited

claim functions like acquiring new data. But as just explained, Nikon's cameras use a connection with "[redacted] properties [redacted]." Appx14370.

## STANDARD OF REVIEW

This Court reviews a grant of summary judgment "under the law of the regional circuit, and the Ninth Circuit reviews" such grants "de novo." *Aristocrat Techs. Austl. PTY Ltd. v. Int'l Game Tech.*, 709 F.3d 1348, 1364-65 (Fed. Cir. 2013).

## ARGUMENT

Cellspin's appeal brief, like its district court filings, rely on conclusory allegations and unsupported assertions to try to show genuine factual disputes.

### A. For All Claims, There Is No Genuine Dispute That Nikon Does Not Infringe Under The Unappealed Construction Of "Established Paired Connection" And Related Terms

#### *1. The district court construed the claims to require using and maintaining the same, continuous connection, yet there is no dispute Nikon's products intermittently use two different connections*

Claim 1 of the '794 patent requires an "established paired connection" using Bluetooth between a data capture device (such as a camera) and a mobile device (such as a smartphone). Appx396 (col.11:56-61). That "established paired connection" is used to perform a series of steps, such as signaling that the data capture device has new data and then transferring the new data to the mobile device. The other asserted independent claims of the '794, '752, and '847 patents include

similar requirements. Appx397 (col.14:21-43) ('794 patent claim 16); Appx411 (col.11:52-56) ('752 patent); Appx427 (col.12:17-25) ('847 patent).

The district court construed these requirements in two ways that are dispositive here, and Cellspin disputes neither. First, the district court held that the claims require a "paired connection that is established and maintained on a continuous basis." Appx8000. It held that Cellspin disclaimed during prosecution "paired connections that are not maintained on a continuous basis." Appx8001-8002; Appx104 (court reiterating same). As already explained, to distinguish prior art that used intermittent connections to save energy, Cellspin amended the claims to require an "established paired connection" and similar requirement and argued that "having a constant connection would be the key" to "responsiveness of the application." Appx8177; Appx104; *supra* pp. 7-8.

Second, the district court held that when the claims recite various limitations involving an "established paired connection" and the like, those recitations all refer to "the *same* connection throughout the claim." Appx103-104 (emphasis added). Thus in the method of '794 patent claim 1, the claimed steps of signaling the existence of new data and then transferring the new data must all be performed using the same connection. Appx103-104.

Together, these two unchallenged constructions are dispositive on appeal. Undisputed facts and unrebutted testimony show that the Nikon products use two

connections, not one. One is a low-speed, property connection and the other is a high-speed, property connection. Nikon's products initiate and terminate these connections as needed to conserve energy. Nikon's source code expert walked through the code from Nikon's products line by line and explained that a Nikon camera and mobile device first initiate a type connection, as shown in the flowchart below:

source code
technical details

Appx14186-14188, Appx14177-14238. Using that type connection, the camera signals to the mobile device when there are new images ready to transfer. Appx14187-14189. That signal includes a specific software flag described in the code as a "code." Appx14187-14189. When the mobile device detects a "code," it disconnects

the [redacted] connection with the camera and initiates instead a [redacted] connection. Appx14188-14189; Appx14109-14111.

As shown in the flowchart below, the camera and mobile device then use the higher speed [redacted] connection, not the [redacted] connection, to transfer the large amount of data contained in each new image:

[redacted]

Appx14189-14191. Nikon's source code expert identified the specific programming methods used to create the new connection for transferring images, including methods on Android devices from the [redacted] class. Appx14189-14191. As with the [redacted] connection, the source code shows that the [redacted] connection is disconnected, rather than maintained, once images are transferred. Appx14189-14191; Appx14111-14112.

On these undisputed facts and under the district court's claim constructions, no reasonable factfinder could find Nikon infringes any asserted claim. Although the claims indisputably require an "established paired connection" that is maintained on a continuous basis, unrebutted evidence shows Nikon's products use intermittent

connections that are initiated and terminated. Like the prior art approach that Cellspin expressly disclaimed during prosecution, Nikon's products conserve energy by connecting the property type connection only when needed to transfer new image data. Appx14189-14191; Appx105-106. They do not maintain the continuous connection that Cellspin's claims require.

As the district court recognized, there is another, independent reason why no reasonable factfinder could find for Cellspin. Appx105-106. The asserted claims require the "same connection" to be used for the various actions. Appx103-104. But Nikon's products indisputably perform some of those actions with one connection and others with a different connection. For example, the claims require using the same connection both to signal the existence of new data and then to transfer that data. But the record shows—and Cellspin never contests—that Nikon's products use type connections to signal when there is new data and type connections to transmit that data. Appx105-106 (district court explaining same). Indeed, Cellspin's own invalidity expert's testimony confirms that type connections and type connections are fundamentally distinct: he admitted that a device with only type functionality would be incapable of communicating with a device with only type functionality. Appx14501-14519 (131:19-149:19), Appx14485-14523; Appx105 (district court citing same); Appx14528, Appx14524-14532.

### ***2. Cellspin's contrary arguments focus on the wrong claim term***

Cellspin argues for reversal by conflating the requirements to use and maintain the same continuous connection with the different requirement that the connection be "paired." Quoting the construction of the term "paired," Cellspin argues that the district court failed to appreciate that "an infringing 'paired' connection is one which persists 'in the condition of having an exchanged link key.'" Cellspin Br. 76-79 (citing Appx8005). According to Cellspin, Nikon's products allegedly "establish a paired Bluetooth connection by the exchange of link keys" and "maintain the exchanged keys" even when connecting and disconnecting different [redacted] and [redacted] connections. Cellspin Br. 76-79. Cellspin argues that a reasonable jury could conclude that the [redacted] and [redacted] connections are actually "a single 'paired connection'" because "there is a *single exchange of link keys*" for both connections. Cellspin Br. 76-79 (emphasis by Cellspin).

Cellspin's brief, like its expert testimony, gives no further explanation, leaving the Court and Nikon to search through material referenced in string citations (material that often includes more string citations) to try to understand Cellspin's position. Cellspin Br. 76-79. Cellspin points to its infringement contentions, which show a typical Bluetooth pairing process in which a user inputs a numeric code to pair a Nikon camera to a mobile device via Bluetooth:


Connect to camera
Select camera for connection.
Digital SLR camera
D6, D850, D780, D500, D7500, D5600, D3500, D3400
mirrorless camera
Z 7, Z 6, Z 50
COOLPIX
P1000, P950, A1000, A900, A300, B700, B600, B500, W300
Pair with camera
Receiving transmission from camera. Choose the name displayed in the camera monitor from the following list.
Select the name of the camera with which to pair
D3500_5463034
Pair with camera
D3500
Connecting to camera...
Connecting to camera. Please wait.
Cancel
Pair with camera
D3500
Bluetooth Pairing
"D3500_5463034" wants to pair with your phone. Please confirm that the pairing code "636989" is displayed on "D3500_5463034".
Cancel
Pair
Cancel
Pair with camera
D3500
Press the camera OK button when an authentication code is displayed in the camera monitor.
Cancel
Pair with camera
D3500
Pairing complete
Connected to camera.
OK

Appx8245-8246, Appx8218-8343. According to Cellspin, this pairing produces a set of "link keys" that allow the devices to remember each other. Appx937. Cellspin argues that this pairing occurs only once despite the later use of two different and intermittent connections in Nikon's devices. Cellspin Br. 76-79. From that, Cellspin argues there is a "a single 'paired connection'" that "maintain[s] the exchanged keys." Cellspin Br. 76-79.

Yet even if Cellspin had evidence to support those alleged facts, its argument ignores the claim requirements that are the basis for the district court's summary judgment order. The issue is not whether the devices are "paired" once or whether the "paired" link keys are maintained. The issue is whether "the same *connection*" is used and whether that "*connection* [is] 'maintained on a continuous basis.'" Appx106, Appx103-106 (emphasis altered). The district court itself explained this when rejecting the same argument from Cellspin: infringement does not depend on "measuring the connection by how many times it is paired"; rather, it requires showing "the same 'established connection' throughout," and one that is "maintained on a 'continuous basis.'" Appx106. Cellspin thus is wrong that the district court "failed to address" "evidence of record" showing "that the Bluetooth Specifications do not disallow a single connection that may use both radio technologies." Cellspin Br. 79 (citing Appx8206-8207). The district court recognized Cellspin was arguing "the type and type are not different connections but

rather a single infringing connection with two different radio technologies" and explained why Cellspin's arguments failed to show a genuine dispute of material fact under the given claim constructions. Appx106. And Cellspin's purported "evidence of record" is not evidence but its own attorney argument from its summary judgment opposition. Appx8206-8207, Appx8199-8215.

In any event, intrinsic and unrebutted extrinsic evidence confirm that using and maintaining the same Bluetooth pairing is different from using and maintaining the same Bluetooth connection. Cellspin itself distinguished the two during prosecution. Before amending the '794 patent's claims and disclaiming non-continuously maintained connections, the claims had recited "establishing *a pairing* between the Bluetooth enabled data capture device and the Bluetooth enabled mobile device." Appx8121 (emphasis added). It was the addition of the "connection" requirement that Cellspin argued distinguished its claims from the prior art, because the applicant "believed that having a constant *connection* would be the key." Appx8177 (emphasis added). Cellspin cannot run from that disclaimer now—once a patentee adopts "limitations and restrictions for the purpose of obtaining" a patent, "he cannot after he has obtained it, claim that it shall be construed" without those limitations and restrictions. *Roemer v. Peddie*, 132 U.S. 313, 317 (1889).

Cellspin has never contested the settled definition of the prosecution-added term "connection" in the context here and thus has forfeited any contrary definition.

Appx4197 (Cellspin's counsel agreeing that "paired" and "connection" have distinct meanings). For example, the Bluetooth protocol describes how a Bluetooth connection is established in a "[c]onnecting phase," which may "follow[] *after* the link establishment phase is completed" for pairing. Appx14584, Appx14581-14586 (emphasis added). During the connecting phase, devices perform "[c]onnection establishment," which involves "mapp[ing] onto a channel," such as a "physical" wireless radio channel. Appx14584. Once the connection is established, devices are in a "connection state" where "packets can be sent back and forth." Appx14585.

Cellspin's infringement expert confirmed that a "connection" between devices is different from a "pairing" between them. He conceded that, after "two devices are paired and they have exchanged link keys," "[i]f one of the devices is turned off," the devices "no longer have an active connection between them, but the pairing is still there between the two devices." Appx14573 (214:11-17); Appx14572 (213:5-24), Appx14565-14580. Although the expert attempted to draw a distinction between an "active connection" and a "paired connection," he based that opinion on the same flawed, litigation-driven conflation of "connection" and "pairing" that Cellspin offers on appeal. Appx14571-14578 (212:1-218:7) (stating, "if the two devices are paired, that is a connection between them").

Given Cellspin's repeated failures to address the issues at stake, its broadside on the district court for purportedly "repeatedly and consistently fail[ing] to consider

the evidence" and deeming Cellspin's expert opinions "merely conclusory" falls flat. Cellspin Br. 17-23; *see* Fitbit Br. at Argument, Part B (similar). As shown, the district court marched through the evidence and expert report cited by Cellspin and explained specifically why that evidence failed to show any genuine dispute of material fact. Appx103-106. Although Cellspin complains the district court purportedly "failed to address" alleged "evidence of record" (at Br. 17-18), Cellspin's continued conflation of the relevant issues confirms the district court was correct—Cellspin lacks evidentiary support for its conclusory assertions of infringement. In the end, Cellspin cannot pin its failures on the district court because Cellspin's own actions led to the adverse judgment here.

* * *

Unrebutted evidence shows Nikon's products intermittently use different connections but the asserted claims require using the same continuously maintained connection. Cellspin's arguments about being "paired" once and using the same pairing fail to address the actual claim requirements at issue. Because Cellspin does not contest that affirmance on this issue alone requires affirming the grant of summary judgment to Nikon on all claims and for all products, the Court should affirm and need not address any other issues for the appeal against Nikon.

### B. For Each Patent, Independent Issues Further Support Affirmance

Although Part A, *supra*, alone requires affirmance for all asserted claims and patents, there are independent reasons to affirm on each individual patent.

#### ***1. For the '794 patent claims, there is no genuine dispute that Nikon's alleged performance of some claimed steps occurs outside the United States***

The district court correctly granted summary judgment to Nikon on the '794 patent's claims because Cellspin lacks any evidence from which a reasonable factfinder could find performance of all claimed steps within the United States. Appx107-108. On appeal, Cellspin fails to identify such evidence for two sets of claim limitations, which provide further independent reasons to affirm the district court.

##### ***a. Unrebutted evidence shows Nikon's products are manufactured, and provided with software, outside the United States***

As relevant here, patent infringement includes an express territorial limit requiring acts committed "within the United States." 35 U.S.C. § 271(a). For method claims, which includes all '794 patent claims here, that territorial limit requires proof that "each of the [method's] steps is performed within this country" to prove infringement. *NTP, Inc. v. Rsch. in Motion, Ltd.*, 418 F.3d 1282, 1318 (Fed. Cir. 2005).

Here, every asserted claim of the '794 patent requires "providing a software module on the Bluetooth enabled data capture device." Appx396 (col.11:47-col.12:38, col.14:12-64). For that step, Cellspin's expert offered only a single conclusory reason for finding infringement—"it is obvious and necessarily true that the Accused Instrumentalities are each provided with a software module *at the time they are manufactured and shipped* to consumers by [Nikon]." Appx1000-1001, Appx1014-1015 (emphasis added). Yet it is undisputed that the accused Nikon cameras are manufactured and shipped from outside the United States. Appx14560 (Cellspin's statement of undisputed facts); Appx107 & n.62 (district court noting same).

Cellspin's appeal brief points to no contrary evidence. Cellspin Br. 79. Indeed, Cellspin points to no evidence about Nikon on this issue at all. Its two-sentence discussion of the issue for Nikon instead "adopts and incorporates by reference all arguments made *supra* concerning Fitbit and Garmin." Cellspin Br. 79. But Cellspin's arguments about Fitbit and Garmin reference only material specific to the Fitbit and Garmin cases, such as about Fitbit sales and Garmin software updates. Cellspin Br. 31-32 (citing material from Fitbit case), 53-54 (citing material from Garmin case). None of that material shows a genuine dispute about *Nikon*'s alleged infringement. Cellspin Br. 31-32, 53-54. Indeed, as the Fitbit and Garmin

briefs show, it does not even show a genuine dispute about Fitbit's or Garmin's non-infringement.

Cellspin thus has waived, or at least forfeited, any issue about whether there is evidence from which a reasonable juror could find that Nikon performs the "providing a software module" step in the United States. *SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1319 (Fed. Cir. 2006). This Court's "law is well established that arguments not raised in the opening brief are waived." *Id.* At most, Cellspin's two-sentence incorporation by reference without citing any evidence related to Nikon amounts to mere statements of disagreement about whether there is a factual dispute relevant to Nikon. Yet "mere statements of disagreement with the district court as to the existence of factual disputes do not amount to a developed argument" sufficient to preserve the issue on appeal. *Id.* at 1320. Nikon is not required to guess what evidence Cellspin purportedly thought might create a dispute of fact. *Id.*

Cellspin's arguments lack merit anyway. Referring to Fitbit, Cellspin argues that "*at the time of use* of the Accused Instrumentalities (and hence, the infringing performance of the claimed methods), the jury could reasonably find that the software module is 'provided' by Fitbit either: (i) at the time of original sale; or (ii) by virtue of software updates." Cellspin Br. 30 (emphasis by Cellspin). But even if Cellspin had Nikon-specific evidence on those issues, Nikon camera users,

not Nikon, are the ones performing actions "*at the time of use*." Yet neither Cellspin's summary judgment opposition nor its appeal brief identify any evidence for or even suggest theories of indirect or divided infringement against Nikon. Appx8199-8215 (summary judgment opposition repeatedly asserting Nikon "directly" infringes); Cellspin Br. 75-84 (despite raising both indirect and divided infringement for other defendants, raising no such issue for Nikon).

That failure dooms Cellspin's appeal for two reasons. First, it shows Cellspin failed to preserve any appeal argument that it can avoid summary judgment based on theories of either indirect or divided infringement. This Court sits as a court of "review"; it "do[es] not consider a party's new theories" that were never squarely raised at the trial court. *Sage Prods., Inc. v. Devon Indus., Inc.*, 126 F.3d 1420, 1426 (Fed. Cir. 1997).

Second, because Cellspin never raised theories of divided or indirect infringement against Nikon in opposing summary judgment, it has no evidence to support such theories—it certainly identifies none on appeal. Cellspin Br. 79. A claim of indirect infringement requires proof of direct infringement. *DSU Med. Corp. v. JMS Co.*, 471 F.3d 1293, 1303 (Fed. Cir. 2006). And proof of direct infringement requires proof that "all steps of a claimed method are performed by or attributable to a single entity." *Akamai Techs., Inc. v. Limelight Networks, Inc.*, 797 F.3d 1020, 1022 (Fed Cir. 2015) (en banc). When more than one entity performs

claimed steps, such proof requires evidence that one "entity directs or controls others' performance," or "the actors form a joint enterprise." *Id.* But Cellspin never even identifies who it believes practices each claim step. Cellspin Br. 79. Its argument about Fitbit that infringement occurs "at the time of use of the Accused Instrumentalities" suggests a focus on actions by the consumer. Cellspin Br. 30-31 (emphasis omitted). But Cellspin has no evidence that consumers sell products to themselves or provide their own software updates, the two actions it belatedly points to for the "providing" step. Cellspin Br. 30-31, 79.

Nor can Cellspin show a triable factual dispute with Nikon by arguing (again about Fitbit) that "Fitbit (via Fitbit software) provides software updates to the Accused Devices in the United States." Cellspin Br. 30-31. Even if that argument applies to Nikon, Cellspin has never identified who allegedly provides software updates to Nikon products. Cellspin Br. 79. That failure is significant because it is unrebutted that "neither Nikon Americas, Inc. nor Nikon, Inc. is responsible for the technical development of hardware or software for the accused Nikon products." Appx14099-14100. Nor has Cellspin offered evidence that the accused Nikon entities direct, control, or have formed a joint enterprise with the unidentified software provider.

Cellspin thus misses the point when it dings the district court for purportedly stating that "software cannot 'provide' itself." Cellspin Br. 30-31 (citing Appx38);

*see* Appx107. The district court's statement that Cellspin was trying to "imply that Nikon's own software provides the software" recognized that Cellspin was failing to identify who performs the "providing" step. Appx107. Pointing to software alone fails to identify which "entity" Cellspin believes performs each step of the claimed methods, as would be required to prove infringement. *Akamai*, 797 F.3d at 1022. Cellspin argues that this Court's decision in *SiRF Tech., Inc. v. ITC* allows holding a defendant "accountable for direct infringement when its software performed the infringing steps." Cellspin Br. 30 (citing 601 F.3d 1319, 1329-30 (Fed. Cir. 2010)). But in the cited discussion in *SiRF*, the defendant was liable because it used software on its own server—"SiRF's server"—to perform the claimed method steps. 601 F.3d at 1329-30; *see id*. at 1330-31 (for other claims, similarly holding that "only SiRF's actions are involved" because SiRF-operated servers performed or triggered automatic performance of all claim steps). *SiRF* thus accords with *Akamai* and the district court's decision because it requires identifying the entity, not software, that allegedly performs each claimed step.

Cellspin's software-update theory independently fails because Cellspin has no evidence of any software update including the required software module. The claims require "providing a software module" that performs specific claim steps, such as "determining the existence of new data for transfer." Appx396 (col.11:48-col.12:38). But as with its other arguments, Cellspin lacks any evidence to support

finding that any software updates for Nikon products provide such a module. Cellspin Br. 31-32, 53-54, 79.

#### ***b. Unrebutted evidence shows the servers that allegedly receive and make available new data are located in Japan***

Every claim of the '794 patent also requires "receiving, at the one or more web services, the new data" and "making available, at the one or more web services, the new data." Appx396 (col.12:29-38), Appx397 (col.14:55-64). The '794 patent's claims define "new data" as "data acquired" by a "Bluetooth enabled data capture device," such as a camera, "after the paired connection is established." Appx396 (col.11:59-61), Appx397 (col.14:24-26). Cellspin's infringement expert identified only one piece of purported "new data" as allegedly meeting this claim limitation in his infringement analysis: "image data." Appx953, Appx1002. Yet the terms of service for Nikon Image Space—the alleged web service here operated by non-party Nikon Corp.—state: "NIKON IMAGE SPACE is operated in Japan by Nikon, a Japanese company, and when using this service customers store and process image data on servers located in Japan." Appx8353.

The district court correctly granted summary judgment for all '794 patent claims given this unrebutted evidence. Appx107-108. Because the alleged web service receives and makes available image data only on servers in Japan, Cellspin

cannot show Nikon performs either of the receiving or making available steps within the United States. *NTP*, 418 F.3d at 1318.

Cellspin never contests that Nikon Image Space stores image data only in Japan and that Cellspin thus cannot show Nikon practices the "receiving" or "making available" steps based on image data. Cellspin Br. 79-81. Instead, Cellspin offers attorney speculation that "'other data' (*i.e.*, non-image data) is stored or processed on servers located in the United States." Cellspin Br. 80. Cellspin bases that argument on a part of the Nikon Image Space terms of use that identify the United States among four potential countries for the "locations of the servers on which other data are stored or processed." Cellspin Br. 80; Appx8353. Cellspin also cites another part of the terms of use that explain that users are "responsible for all content, including text and other writings, image, data, software, music and other audio, drawings, and videos, posted or otherwise published" to Nikon Image Space. Appx8354. Cellspin thus contends, contrary to its own expert's infringement analysis, that this other data *could* be the claimed "new data" from a camera and Nikon's purported storage or processing of it within the United States *could* amount to infringement.

Cellspin cannot manufacture a genuine dispute of material fact based on "[c]onclusory allegations and attorney arguments" that contradict its own expert. *Ferring B.V. v. Barr Lab'ys, Inc.*, 437 F.3d 1181, 1193 (Fed. Cir. 2006). After all,

Cellspin's own evidence consistently shows that only image data could possibly meet the claim requirements for new data. For example, some asserted claims *require* "data capture circuitry" that is used "to acquire new-data." Appx953. Cellspin's infringement expert identified camera "shutters and lenses" as the "data capture circuitry," which are elements used to capture images. Appx953; Appx8382 (same in Cellspin's infringement contentions for '794 patent). Similarly, the asserted claims require "transferring the new data" "over the paired Bluetooth connection" to a mobile device, such as a phone. Appx396 (col.12:13-17), Appx397 (col.14:39-43). Yet Cellspin's evidence shows that Nikon's products transfer only images over Bluetooth to a phone, and even then large-file-size images that use a RAW format require a higher-speed Wi-Fi connection, not Bluetooth. Appx8383-8390; Appx8349 (Nikon COOLPIX manual stating that "AVI format movies (COOLPIX A300 movies) cannot be uploaded"). Thus, although Cellspin cites two passing references in its infringement contentions (which are not evidence) to "images and/or video," its actual evidence uniformly shows transfer of only new *image* data via Bluetooth, matching its expert's opinion identifying only image data as the claimed new data. Appx8439-8448; Appx953, Appx1002.

For these independent reasons, the Court should affirm summary judgment of non-infringement for all claims of the '794 patent.

### 2. *For the '752 patent claims, there is no genuine dispute that Nikon's cameras use an [redacted] Bluetooth connection, not the required "secure paired connection"*

As with the other Nikon issues, Cellspin's independent failure to show Nikon practices the '752 patent claims' requirement to establish a "secure paired Bluetooth connection"/"secure paired connection" provides another basis to affirm. The district court's undisputed construction requires the secure connection to be established before performing claimed steps like "detecting and signaling the new data for transfer." Appx8009-8010.

The uncontested evidence shows that Nikon does not practice this step. In the accused Nikon cameras, the only paired connection established before detecting and signaling the existence of new data is an [redacted] connection. As Nikon's technical design documents show, Nikon's cameras establish a [redacted] connection using [redacted], which has "[redacted]." Appx14370; Appx14469; Appx14154 (Nikon expert explaining same). Because the connection is [redacted], the district court correctly granted summary judgment that Nikon does not practice this limitation.

Cellspin offers nothing to support a different conclusion. Instead, it mostly just repeats its arguments about whether "a single set of link keys is exchanged, and hence a single 'paired connection' exists." Cellspin Br. 81-82 (similarly arguing

about "use of the same context objects" as showing a single connection; citing Appx951-952; Appx8216-8217). Those arguments are wrong for all the reasons explained in Part A, *supra*. Yet they are also wrong because, even were there evidence that Nikon's cameras use and maintain a single connection, that would not change the unrebutted evidence showing that the connection is property when the cameras detect and signal the existence of new data. Appx14370; Appx14469; Appx14154.

Cellspin also cites its expert's declaration stating that "Bluetooth pairing typically use[s] cryptographic link keys" and other evidence that such features are part of the Bluetooth protocol generally. Cellspin Br. 81-82; Appx951-952; Appx8243-8254. But Cellspin's expert never supports a conclusion that Nikon's products use those cryptographic link keys. On the contrary, he admitted, "[t]here are many optional features within the Bluetooth core." Appx14491. "[D]epending on the use case that you're trying to implement, you may or may not require all those features." Appx14491; Appx14545-14546, Appx14533-14557. Given these admissions and the undisputed evidence that Nikon implemented an type type connection that uses "properties properties," Cellspin's evidence about what is typically or optionally done in other implementations fails to create a genuine dispute of material fact.

### ***3. For the ’847 patent claims, there is no genuine dispute that Nikon’s cameras use an [redacted] Bluetooth connection, which does not “cryptographically authenticate the identity” of a mobile device***

For similar reasons, the Court should affirm summary judgment on the ’847 patent claims. Those claims require a data capture device “to cryptographically authenticate the identity of the Bluetooth enabled cellular phone” when the two devices establish “the paired Bluetooth wireless connection.” Appx427 (col.12:17-25). Similar to the claims of the ’752 patent, the system must be configured to perform that cryptographic authentication before “acquir[ing] new data.” Appx427 (col.12:27-31). The district court construed “cryptographically authenticate” to mean “verified as legitimate by use of encryption and decryption involving an algorithm.” Appx8005. Cellspin does not challenge this construction on appeal.

As just explained, unrebutted evidence shows that, before acquiring data, the Nikon cameras establish only a [redacted] connection using [redacted], which has “[redacted].” Appx14370; Appx14469; Appx14154. The undisputed record thus shows that Nikon’s products do not “cryptographically authenticate the identity” of the mobile phone before acquiring new data, as the claims require.

Once again, Cellspin’s arguments about there being only a single pairing fail to support reversal. Those arguments are wrong on for all the reasons given in Part A, *supra*. And regardless, nothing about the use of a single pairing would show

cryptographic authentication occurs before data acquisition, as the claims require. For example, Cellspin argues that "the purported 'type' operation of the Accused Instrumentalities is merely a starting point," and Cellspin includes long string cites to evidence it argues shows Nikon's products perform a different type of authentication at some later point. Cellspin Br. 82-84 (citing, e.g., Appx952-953, Appx969-970; Appx8256; Appx8488-8490). But neither Cellspin's brief nor its evidence show that allegedly different authentication happens before acquiring data or the other limitations of the district court's unchallenged construction requiring a temporal order. Cellspin Br. 82-84; *e.g.*, Appx952-953, Appx969-970; Appx8256; Appx8488-8490. Instead, unrebutted evidence shows Nikon's products establish only connections using type before acquiring data. Appx14370; Appx14469; Appx14154.

Cellspin also argues that "authentication is used in Bluetooth LE Legacy and Bluetooth LE Secure Pairing, and both use cryptographic keys for authentication." Cellspin Br. 84 (citing Appx938 (¶56)). But Cellspin elides that its cited evidence is an expert opinion discussing the scope of the asserted claims, not any feature of Nikon's products. Appx938 (¶56) (appearing under heading "The Asserted Patents And Asserted Claims"). When addressing Nikon's actual products here, the best Cellspin's expert could muster is that those "methods of Bluetooth pairing *typically* use cryptographic link keys." Appx951-953 (¶¶88-89) (emphasis added). Indeed,

any other testimony would contradict the plain statements in the Bluetooth protocol that one permitted Bluetooth security mode is “properties properties.” Appx14469. Because it is unrebutted that Nikon’s products use only that security mode before data acquisition, the district court correctly granted summary judgment to Nikon.

## CONCLUSION

For the reasons given, the judgment should be affirmed.

Dated: March 27, 2023

Respectfully submitted,

/s/ Brian R. Matsui

BRIAN R. MATSUI
SETH W. LLOYD
MORRISON & FOERSTER LLP
2100 L Street NW, Suite 900
Washington, DC 20037
Tel.: (202) 887-8784
BMatsui@mofo.com

JACK W. LONDEN
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105

YUKA TERAGUCHI
MORRISON & FOERSTER LLP
Shin-Marunouchi Building, 29th Floor
1-5-1 Marunouchi
Chiyoda-ku, Tokyo, 100-6529

*Counsel for Defendants-Appellees Nikon Americas, Inc. and Nikon Inc.*

## CERTIFICATE OF CONFIDENTIAL MATERIAL

I hereby certify that the foregoing brief complies with the confidential word count limitation as set by Fed. Cir. R. 25.1(d)(1)(A), (C) because it contains 8 unique words marked as confidential beyond those previously marked confidential in the opening brief.

Dated: March 27, 2023

/s/ Brian R. Matsui
Brian R. Matsui

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Circuit Rule 32(b) because it contains 8,297 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Federal Circuit Rule 32(b)(2), as determined by the word-counting feature of Microsoft Word.

This brief complies with the typeface requirement of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface, including serifs, using Microsoft Word in Times New Roman 14-point font.

Dated: March 27, 2023

/s/ Brian R. Matsui

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Federal Circuit by using the appellate CM/ECF system on March 27, 2023.

I further certify that I caused a copy of the confidential version of this brief to be served via email and U.S. Mail on all counsel of record.

Dated: March 27, 2023 /s/ Brian R. Matsui

ny-2505451