22-2025, 22-2028, 22-2029, 22-2030, 22-2032, 22-2037

# United States Court of Appeals for the Federal Circuit

CELLSPIN SOFT, INC.,

Plaintiff-Appellant,

v.

FITBIT LLC; NIKE, INC.; UNDER ARMOUR, INC.; FOSSIL GROUP, INC.; MISFIT, INC.; NIKON AMERICAS, INC.; NIKON, INC.; GARMIN INTERNATIONAL, INC., GARMIN USA, INC.,

Defendants-Appellees,

*Appeal from the United States District Court for the Northern District of California in case nos. 4:17-cv-05928, 4:17-cv-05931, 4:17-cv-05932, 4:17-cv-05933, 4:17-cv-05936, and 4:17-CV-05934*
*Judge Yvonne Gonzalez Rogers*

**[NON-CONFIDENTIAL] REPLY BRIEF OF PLAINTIFF-APPELLANT**

May 1, 2023

*/s/ M Scott Fuller*

Randall Garteiser
rgarteiser@ghiplaw.com
(415) 568-0553
Christopher A. Honea
chonea@ghiplaw.com
(918) 510-5375
M. Scott Fuller
sfuller@ghiplaw.com
(214) 729-6548
**GARTEISER HONEA PLLC**
119 West Ferguson Street
Tyler, Texas 75702
Main Telephone: (415) 785-3762
Facsimile: (415) 785-3805

*Attorneys for Plaintiff-Appellant*
CELLSPIN SOFT, INC.

# CERTIFICATE OF INTEREST

The undersigned counsel for the Plaintiff-Appellant certifies the following, pursuant to Federal Circuit Rule 47.4:

(i) The full name of every entity represented by me in this case is:

Cellspin Soft, Inc.

(ii) The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

N/A

(iii) All parent corporations and any publicly held companies that own 10 percent or more of the stock of the entity represented by me are:

N/A

(iv) The names of all law firms, partners, and associates that have not entered an appearance in the appeal, and (A) appeared for the entity in the lower tribunal; or (B) are expected to appear for the entity in this court, are:

**COLLINS EDMONDS & SCHLATHER, PLLC**
John J. Edmonds
Shea N. Palavan
Brandon G. Moore

(v) Other than the originating case number(s), the title and number of any cases known to counsel to be pending in this or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal.

*Cellspin Soft, Inc. v.* Fitbit LLC; Nikon Americas, Inc.; and Nikon, Inc.; Federal Circuit Appeal 2023-1526

Date: May 1, 2023

*/s/ M. Scott Fuller*
M. Scott Fuller

# TABLE OF CONTENTS

STATEMENT OF REDACTION: This redacted Brief contains confidential information which was maintained as Confidential in the District Court. Generally, such information includes Source Code and proprietary operational and functional specifications of certain Defendants. The redacted material appears on the following pages of this Brief: 9, 10, and 29.

**CERTIFICATE OF INTEREST** ........ xvii

**TABLE OF CONTENTS** ........ xviii

**TABLE OF AUTHORITIES** ........ xxiii

**I. INTRODUCTION** ........ 1

**A. THE DISTRICT COURT ERRED IN FAILING TO CONSIDER THE EVIDENTIARY RECORD AS A WHOLE** ........ 2

**B. CELLSPIN'S EXPERT REPORTS** ........ 3

**C. THE RECUSAL MOTION AND PENDING APPEAL** ........ 4

**D. THE DISTRICT COURT ERRED IN FINDING THAT THE EXPERT OPINIONS OF CELLSPIN'S TECHNICAL EXPERT WERE CONCLUSORY** ........ 5

**II. DEFENDANT FITBIT** ........ 7

**A. "USER IDENTIFIER" AND "USER INFORMATION"** ........ 7

**B. TEMPORAL ORDER** ........ 14

**C. FITBIT SOURCE CODE PERFORMS RECITED FUNCTION** ........ 16

**D. "PROVIDING A SOFTWARE MODULE" PERFORMED IN THE UNITED STATES** ........ 18

**E. THE ACCUSED WEARABLES PERFORM DECRYPTION** ........ 18

III. DEFENDANT GARMIN ....................19

A. "USER IDENTIFIER" AND "USER INFORMATION" ....................20

B. DIRECT INFRINGEMENT ("PAIRING") ....................21

C. TEMPORAL ORDER ....................22

D. GARMIN DETECTS, SIGNALS, AND DETERMINES NEW DATA FOR TRANSFER ....................23

IV. DEFENDANT FOSSIL ....................24

A. "CRYPTOGRAPHICALLY AUTHENTICATE" ....................26

V. DEFENDANT NIKON ....................27

A. NIKON'S SO-CALLED "TWO-CONNECTION" PROCESS INFRINGES ....................27

B. NIKON'S RELEVANT SERVERS ARE LOCATED IN THE UNITED STATES ....................29

C. CRYPTOGRAPHICALLY AUTHENTICATE THE IDENTITY ....................29

VI. DEFENDANT UNDER ARMOUR ....................30

A. THE OPTIONAL BLUETOOTH FEATURES ....................32

VII. DEFENDANT NIKE ....................33

VIII. CONCLUSION AND PRAYER FOR RELIEF ....................34

# TABLE OF AUTHORITIES

**CASES:**

*Core Wireless Licensing v. Apple Inc.*,
899 F.3d 1356 (Fed. Cir. 2018) ....................6

*Dynacore Holdings Corp. v. U.S. Philips Corp.*,
363 F.3d 1263 (Fed. Cir. 2004) ....................6

*Eat Right Foods Ltd. v. Whole Foods Market,*
880 F.3d 1109 (9th Cir. 2018) ....................7

*Energy Lab. Co. Ltd. v. Chi Mei Optoelectronics Corp.*,
485 F.Supp.2d 1089 (N.D. Cal. 2007)....................6

*Koninklijke Philips N.V. v. Zoll Med. Corp.*,
656 F. App'x 504 (Fed. Cir. 2016).................... 21

*MasterObjects, Inc. v. Mets Platforms, Inc.*,
2022 WL 4856269 (N.D. Cal Oct. 3, 2022).................... 12

*Novartis Corp. v. Ben Venue Labs., Inc*.,
271 F.3d 1043 (Fed. Cir. 2001) .................... 19

*Pandrol USA v. Airboss Ry. Prod., Inc.*,
320 F.3d 1354 (Fed. Cir. 2003) .................... 15

*SiRF Tech., Inc. v. ITC,*
601 F.3d 1319 (Fed. Cir. 2010) .................... 21, 22

*Sitrick v. Dreamworks, LLC,*
516 F.3d 993 (Fed. Cir. 2008) ....................5

*Skidmore v. Led Zeppelin,*
905 F.3d 1116 (9th Cir. 2018) ....................7

# I. INTRODUCTION

The Defendants have now collectively presented this Court with the same faulty argument as the District Court; one which turns a blind eye to the mountain of evidence cited with specificity by Plaintiff and its technical experts in favor of a lazy and self-serving assertion that the evidence doesn't show what Plaintiff's expert says it does. It is the unquestionable province of the jury to weigh the evidence and assign credibility and weight – not the District Court, and certainly not counsel for the Defendants. There is but a single reasonable take-away from the evidence as cited by Plaintiff and explained at great length by Plaintiff's expert: All Defendants directly infringe the Asserted Claims. There is nothing any Defendant can say or do to change that fact, and there is nothing in any of the sixty-six thousand words tendered collectively by the Defendants in their Response Briefs that comes close to justifying the clear errors committed by the District Court in its omnibus Order. In sum, no matter how many times the Defendants claim the opinions offered by Plaintiff's expert are conclusory does not make it so, and this Court's careful examination of the full body of evidence should correctly result in the reversal and remanding of these cases, once again, to the District Court.

Plaintiff has identified, in its Blue Brief, substantial clear error on the part of the District Court. To the extent any issues raised in the respective Responses are not directly addressed herein, Plaintiff states that the facts and argument as set forth

in its Blue Brief stand on their own, and there is no rebuttal required in order for this Court to reverse and remand on each and every issue.

### A. THE DISTRICT COURT ERRED IN FAILING TO CONSIDER THE EVIDENTIARY RECORD AS A WHOLE

Defendants, through Fitbit, contend that the District Court actually *did* consider the evidentiary record as a whole, and offer the same incongruent argument as the District Court; namely that: (i) Cellspin failed to marshal sufficient evidence; yet (ii) Cellspin cited *too much* (*e.g.* "swaths") evidence. *See* Dkt. 65 at 18-19 (hereafter as "Fitbit Red Br."). Defendants cannot have it both ways, and a comprehensive objective assessment of the record reveals the following: (i) Cellspin routinely cites to specific pages and lines of Defendant Source Code in support of its expert opinions; (ii) Cellspin routinely cites to specific pages and lines of Defendant Deposition Testimony in support of its expert opinions; (iii) Cellspin routinely cites to specific pages of Defendant Technical Production (and provides specific excerpts of the pertinent language from those pages) in support of its expert opinions; (iv) Cellspin routinely cites to specific screenshots of the actual Accused Instrumentalities *in infringing use* in support of its expert opinions; (v) Cellspin routinely cites to specific results of testing on the actual Accused Instrumentalities *in infringing use* in support of its expert opinions; and (vi) Cellspin's expert cites to, and relies upon, industry knowledge and known technical operations under the

Bluetooth Standard in support of his expert opinions. These facts are laid out and explained in full detail in Plaintiff's Blue Brief. *See, e.g.,* Blue Br. at 6-12, 17-19.

The error perpetuated by the District Court, and again here by Defendants, follows from its inability to appreciate the totality of the record. As explained in Cellspin's Blue Brief, the opinions offered by Cellspin's technical expert are not limited to the four corners of the individual written reports; rather, they each specifically recite, and incorporate by reference, the claim charts appended thereto. *See, e.g.,* Blue Br. at 6-12 (explaining report structure). The written reports, in combination with the claim charts, are the result of countless hours of document and Source Code review carried out by Cellspin and its experts, as well as hours of testing and documented use of the actual physical accused Instrumentalities, and the taking of over two dozen technical depositions. The pertinent evidence on which Plaintiff's expert relies is cited with specificity and, drawing all reasonable inferences in favor of Cellspin, summary judgment is improper.

## B. CELLSPIN'S EXPERT REPORTS

Several Defendants suggest that the overall similarities between the respective Expert Reports served by Plaintiff reflect a weakness in the infringement allegations. Plainly, the technical Reports are necessarily substantially similar, given the facts that the exact same Asserted Claims are discussed, the exact same Bluetooth technologies are in play, the infringing activities are all fundamental to the operation

of each Accused Instrumentality, and each Accused Instrumentality comprises a data capture device which, together with the individual Accused Mobile Applications, captures and delivers data to a web service of the respective Defendant. In the process, each Accused Instrumentality uses a Bluetooth paired connection, cryptographic authentication, event notifications, polling, HTTP, and user identifiers. As such, and while the structure of each individual Expert Report is consistent, the evidence and specific element-by-element discussions are unique. It is beyond obvious that a single Expert, tasked with preparing multiple Reports involving substantially the same technologies, will streamline the effort when appropriate and when factually and technically correct. That is precisely what Mr. Vijh did, and Defendants' suggestions to the contrary have literally nothing whatsoever to do with the merits.

### C. THE RECUSAL MOTION AND PENDING APPEAL

Apart from the instant Appeal, Plaintiff also seeks review and reversal of the District Court's post-judgment refusal to recuse itself. Such Appeal is lodged as CAFC 2023-1526. While Plaintiff declined to address this issue in its Blue Brief, Defendant Nikon has offered a discussion in its individual Red Brief. *See* Dkt. No. 68 at 14-15 (hereafter as "Nikon Red Br."). Without belaboring the point, and because Plaintiff will address the errors committed by the District Court in its separate briefing in the -1526 Case, here Plaintiff states only that the District Court

has previously ruled against Plaintiff only to be reversed by this Court. *See Cellspin Soft, Inc. v. Fitbit,* 927 F.3d 1306 (Fed. Cir. 2019). The facts establishing recusal are substantial, and in view of such facts, a reasonable person would question the impartiality of the District Court Judge.

### D. THE DISTRICT COURT ERRED IN FINDING THAT THE EXPERT OPINIONS OF CELLSPIN'S TECHNICAL EXPERT WERE CONCLUSORY

The District Court consistently rejected Cellspin's expert opinions as purportedly "conclusory," and Defendants (again through Fitbit) point to the District Court's assertion that it "analyzed the bases underlying" the opinions before finding them lacking. Fitbit Red Br. at 20-21. This highlights two fundamental errors committed by the District Court by failing to view all evidence in a light most favorable to Cellspin, and further by resolving a battle of the experts on summary judgment.

In their Response, Defendants cite *Sitrick v. Dreamworks, LLC,* 516 F.3d 993, 1001 (Fed. Cir. 2008) as authority in support of the District Court's erroneous findings. *See* Fitbit Red Br. at 21. The expert in *Sitrick,* however, provided far less than Cellspin's expert, inasmuch as the expert opinions in *Sitrick* on the issue of enablement were "not supported by any factual information." *See Sitrick,* 516 F.3d at 1001. Further, the expert in *Sitrick* admitted that he lacked relevant experience. *Id.* Of course, neither of those issues exists in the instant case, as even Defendants

acknowledge the fact that Cellspin's expert cites to substantial factual evidence of record in support of his opinions. The same is true with respect to the expert in the *Dynacore* case, which is indirectly relied upon by Defendants. *See* Fitbit Red Br. at 21. In *Dynacore,* the experts offered only "conclusory assertions, reached using words in ways that contradict their plain meaning, that a critical claim limitation is found in the accused device." *Dynacore Holdings Corp. v. U.S. Philips Corp.,* 363 F.3d 1263, 1278 (Fed. Cir. 2004). Again, Cellspin's expert tendered a painstakingly cited Expert Report complete with full and specific citations to the evidence of record supporting each and every opinion. Such is more than adequate to survive summary judgment, and the District Court plainly erred. *See, e.g., Core Wireless Licensing v. Apple Inc.,* 899 F.3d 1356, 1363 (Fed. Cir. 2018) (affirming jury verdict of infringement in view of expert testimony based on citation to accused source code).

Still further, Defendants take issue with Plaintiff's citation of *Semiconductor Energy Lab. Co. Ltd. v. Chi Mei Optoelectronics Corp.,* 485 F.Supp.2d 1089, 1100 (N.D. Cal. 2007). *See* Fitbit Red Br. at 22. According to Defendants, the *Semiconductor* opinion is inapposite because, in their view, Cellspin's expert "merely repackaged screenshots" from its original infringement contentions. *Id.* Defendants' argument illustrates their collective failure to accept the reality that Cellspin's expert report expressly states that the cited screenshots are pertinent and

reliable (*e.g.,* Appx0480 at ¶ 18), and Cellspin's expert explained in detail how the pertinent tests were conducted (*e.g.,* Appx4574 at 75:17-76:14) and their relevance to infringement (*e.g.,* Appx4582-4583 at 108:10-110:15). Again, and just as in *Semiconductor Energy,* the expert in this case has properly relied upon testing, and summary judgment is inappropriate.

## II. DEFENDANT FITBIT

### A. "USER IDENTIFIER" OR "USER INFORMATION"

The crux of this "issue" lies in Defendants' collective argument that Cellspin somehow so egregiously violated the Local Patent Rules so as to be precluded from identifying the *exact variable name* assigned to the infringing "user identifier" and "user information" limitations in Defendants' own Source Code. As explained, under no circumstance did Cellspin "reverse course" and assert a new infringement theory; rather, Cellspin used the discovery tools available to it and made specific Source Code citation to the infringing feature in full agreement with its original infringement contentions. No Defendant has shown how it was in any way prejudiced, the plain relevancy of the OAuth evidence to the trial in these cases is undeniable, and the grossly unfair result of the District Court's ruling all suggest an abuse of discretion. *See, e.g., Skidmore v. Led Zeppelin,* 905 F.3d 1116, 1135-36 (9th Cir. 2018) (abuse of discretion to exclude highly probative evidence when low risk of prejudice); *Eat Right Foods Ltd. v. Whole Foods Market,* 880 F.3d 1109,

1120 (9th Cir. 2018) (district court commits abuse of discretion if it rests a decision on a clearly erroneous finding of material fact). Again, no Defendant ever raised any question or concern over the scope and content of Plaintiff's infringement contentions, and certainly not with respect to the adequacy of Cellspin's "user identifier" disclosures, and should not now be heard to complain that Cellspin's theory was a so-called "nonsensical tautology." *See* Fitbit Red Br. at 26.

Further, Defendants continue to misrepresent the facts by arguing that Cellspin originally identified only a user name or an email address as satisfying the claimed "user identifier" and "user information" limitations. *See, e.g.,* Fitbit Red Br. at 27 (citing purported "shift in reliance" by Cellspin technical expert). But this is plainly not the case, as the record makes abundantly clear. What Cellspin has consistently argued is simply that the claimed limitations are satisfied in Defendants' Source Code via a "username or email address, or information based off of a user or the user's associated wearable device." By way of its Expert Reports, Cellspin identified with specificity the Source Code excerpts which evidence infringement under this precise theory, including the following:

1. As to Defendant Fitbit, Cellspin's expert identifies specific Source Code as illustrating the implementation of user-specific OAuth credentials. Indeed, Fitbit's own Source Code states that the infringing "OAuthCredential" are "userID" and "user credential." *See* Appx0515 at ¶ 102; *see also* Appx0560-0561 at ¶ 183;

**REDACTED**

Appx1386 (citing App15742, excerpted below:).

**SOURCE CODE**

2. As to Defendant Garmin, Cellspin's expert identifies specific Source Code as illustrating the implementation of OAuth user credentials. *See* Appx1075 at ¶ 102; *see also* Appx1092 at ¶ 127 (OAuth token contains identifying information related to a user) (citing Appx4649, excerpted below:).

**SOURCE CODE**

3. As to Defendant Fossil, the term "OAuth" is never used; rather, Cellspin identifies specific Source Code illustrating the implementation of a User ID and an Access Token. *See* Appx0851-0852 at ¶ 105 (citing Appx15743, excerpted

**REDACTED**

below:).

SOURCE CODE

SOURCE CODE

As illustrated above, three different Defendants employed multiple distinct internal variable names to send the infringing "user information" to the respective website/web-services. The District Court, however, abused its discretion in making the erroneous factual finding that Cellspin had improperly "shifted" to a so-called "OAuth theory." Yet, the phrase "OAuth theory" never appears in any of Cellspin's Expert Reports, and is simply a coined phrase of the Defendants designed to avoid

the merits. Again, Cellspin's expert fully maintained and applied its longstanding theory of infringement, whereby the Defendants each infringe by employing "user identifiers" in the form of a "username or email address, *or information based off of a user or the user's associated wearable device.*" Such infringing identifiers take the form of a token or access token or a user ID, depending on the particular naming and use conventions employed by the programmers for each Defendant, as discerned and identified by Cellspin only via Source Code inspection at the close of discovery.

Further, and in their collective zeal to characterize Plaintiff's original contentions as overly broad, Defendants and the District Court all fail to consider the Asserted Claims themselves, which provide specific limiting parameters defining the accused and infringing "user identifier" and "user information." More specifically, Independent Claims 1 and 16 of the '794 Patent each recite "wherein each user identifier uniquely identifies a particular user of the web service." *See* Appx0396-0397; *see also* Appx0411 (Independent Claim 1 of the '752 Patent reciting substantially similar limitation). Dependent Claims 2 and 17 of the '794 Patent further recite: "wherein the user identifier comprises one or more elements from user information, and wherein the one or more elements of the user information comprise user-name, user-password, user-device-information, user settings, or user preferences." *See* Appx0396-0398. Further, dependent Claim 2 of the '847 Patent recites "wherein the user information corresponds to user related information used

by the website to process the new-data." *See* Appx0427-0428. Collectively, the Asserted Claims themselves support Plaintiff's longstanding infringement theories and provide notice to Defendants with respect to the identity of the infringing features. Moreover, no party suggested that either "user identifier" or "user information" required construction, inasmuch as they are each plain-English terms without sophisticated or specialized meanings in the context of the Asserted Claims. *See* Appx8009-8010. At no point did Cellspin allege that infringement was found exclusively in Defendants' user names and email addresses, as Defendants themselves admit. Here, there is zero argument from any Defendant that their respective specific Code implementations (whether OAuth or token or Access token or User ID) do not literally satisfy the recited "user identifier" and/or "user information" limitations, as each is plainly and obviously "information based off of a user or the user's associated wearable device" and uniquely identifies a particular user of the webservice / website of each Defendant.

In any event, the Local Patent Rules for the Northern District of California "do *not* require identification of every evidentiary item of proof;" rather, they must merely "provide *reasonable notice* why the disclosing party believes it has a reasonable chance of proving its theory at trial." *MasterObjects, Inc. v. Mets Platforms, Inc.,* 2022 WL 4856269 at *1 (N.D. Cal Oct. 3, 2022) (emphasis added). In this case, there is no doubt Plaintiff provided reasonable notice to each Defendant

concerning "user identifier" and "user information," and the District Court abused its discretion in finding otherwise.

With respect to Defendant Fitbit's argument that Cellspin's expert "admitted" he was "shifting reliance" to OAuth, Fitbit grossly mischaracterizes both the testimony and the facts. The testimony offered by Cellspin's technical expert, and relied upon by Fitbit, merely confirms that the infringing implementation is not limited to strictly a user name or email address, but rather an OAuth Token. Fitbit's own source code as shown above says OAuth Credential are "userID". Moreover, Cellspin's expert went on to explain how an OAuth Token specifically exists as information based off of a user or the user's associated wearable device. *See* Appx1983-1987 at 224:17-24, 226:1-228:13. Again, Cellspin has maintained the same theory of infringement throughout this litigation, and the District Court plainly abused its discretion in rejecting Cellspin's identification of the specific variables used by Defendants to carry out their infringing processes.

With respect to Defendant Fitbit's argument that Cellspin should have known about its infringing use of OAuth prior to the time Cellspin conducted a targeted expert review of the infringing Source Code, Cellspin points out that the needle in the haystack identified by Fitbit does nothing to support an argument that Cellspin was not diligent. Indeed, the screenshots relied upon by Fitbit (at Appx10486 and Appx10490) were not even part of the production in this case (thus, even Fitbit itself

did not find the material relevant enough to disclose), and are apparently lifted from an undated "Developer Guide" buried on Fitbit's Internet. Even assuming the information itself was publicly available, there is no duty on the part of Cellspin to turn over every rock on the planet in search of Fitbit's specific implementations, especially when the Source Code is the best evidence and Cellspin had already provided notice to Fitbit of the infringing implementation (*i.e.,* "information based off of a user or the user's associated wearable device").

## B. TEMPORAL ORDER

The opposition argument offered by Fitbit mirrors, once again, the District Court's own erroneous approach. Generally, Fitbit claims that the District Court did everything right, and that Plaintiff does nothing more than "cite swaths of evidence" in its Opening Brief. In the process, Fitbit continues to ignore the totality of Plaintiff's evidentiary basis, and reduces the opinions of Plaintiff's expert down to a single paragraph. Once again, as Plaintiff has now repeated numerous times to both the Defendants and to the District Court, the expert opinions of Mr. Vijh concerning the temporal order are plainly *not* limited to the single summary statement in ¶ 134 of his Written Report.

On this point, Plaintiff has directed the Court to the extensive portions of the record wherein Mr. Vijh addresses temporal order and the evidentiary bases for his conclusions concerning infringement. The fact that the record is lengthy and

detailed is a function not only of the complexities of the Asserted Claims themselves and their numerous limitations, but also of the volume of evidence relied upon by Mr. Vijh. While Fitbit views the length and volume of disclosure as some sort of indicator of a *lack* of evidence, the reality is that trial to the jury in this matter will be heavy on exhibits and long on expert testimony.

Defendant Fitbit's reliance on *Pandrol USA v. Airboss Ry. Prod., Inc.,* 320 F.3d 1354, 1366 (Fed. Cir. 2003) is entirely misplaced, given that the Court in that case was reflecting upon the absolute failure of a party to offer any argument on an issue whatsoever. Here, of course, Plaintiff has made specific argument, supported by expert testimony and a wealth of cited evidentiary support.

With respect to Fitbit's complaints over the "persistent acquisition of data" carried out by its Accused Instrumentalities, Mr. Vijh has explained (and Plaintiff has cited) how such a configuration evidences the straightforward fact that the Fitbit Instrumentalities do indeed "acquire new data *after* the secure paired Bluetooth connection is established." *See, e.g.,* Appx0522-0523 at ¶ 114. Simply put, if the Fitbit Instrumentalities acquire new data on a near-constant basis, there can be no other conclusion drawn except that such data is necessarily acquired both before and "after" pairing. Again, this is explained by Mr. Vijh in his Written Report. Appx0522-0523 at ¶ 114 (explaining this concept and citing observation and Fitbit Source Code).

With respect to Fitbit's argument that the testing data cited by Mr. Vijh fails to prove anything because the relevancy is unexplained, Plaintiff again points out that Mr. Vijh did explain the relevance of his testing results, including the "sniffing logs," in numerous instances. By way of example, and as cited by Plaintiff, Mr. Vijh explained:

> Further, for example, as noted above, when the Fitbit Versa 2 Wearable and Bluetooth enabled mobile device communicate to enable event notifications, the Fitbit Versa 2 Wearable notifies the Bluetooth enabled mobile device that event notifications have been enabled, *inter alia*, by initiating the sending of event notifications, which correspond to, and are because of, the new Fitness Data, as shown in the log of Bluetooth communication traffic received by the Bluetooth enabled mobile device from the Fitbit Versa 2 Wearable, for example:

| | | | | | | |
|---|---|---|---|---|---|---|
| 512 | 13.623518 | OnePlusT_cc:87:b0 (OnePlus 6T) | e3:2a:d5:42:ec:ed (Versa 2) | ATT | 14 | Sent Write Request, Handle: 0x0004 (Generic Attribute Profile: Service Changed: Client ( |
| 513 | 13.647387 | e3:2a:d5:42:ec:ed (Versa 2) | OnePlusT_cc:87:b0 (OnePlus 6T) | ATT | 14 | Rcvd Find Information Request, Handles: 0x0054..0xffff |
| 514 | 13.648066 | controller | host | HCI_EVT | 8 | Rcvd Number of Completed Packets |
| 515 | 13.648394 | OnePlusT_cc:87:b0 (OnePlus 6T) | e3:2a:d5:42:ec:ed (Versa 2) | ATT | 14 | Sent Error Response - Attribute Not Found, Handle: 0x0054 (Unknown: Unknown: Unknown) |
| 516 | 13.692880 | remote () | OnePlusT_cc:87:b0 (OnePlus 6T) | L2CAP | 481 | Rcvd |
| 517 | 13.693647 | remote () | OnePlusT_cc:87:b0 (OnePlus 6T) | L2CAP | 485 | Rcvd Connection oriented channel |
| 518 | 13.694604 | remote () | OnePlusT_cc:87:b0 (OnePlus 6T) | L2CAP | 404 | Rcvd |
| 519 | 13.695291 | remote () | OnePlusT_cc:87:b0 (OnePlus 6T) | L2CAP | 344 | Rcvd |
| 520 | 13.695856 | remote () | OnePlusT_cc:87:b0 (OnePlus 6T) | L2CAP | 49 | Rcvd |
| 521 | 13.696368 | controller | host | HCI_EVT | 8 | Rcvd Number of Completed Packets |
| 522 | 13.696827 | e3:2a:d5:42:ec:ed (Versa 2) | OnePlusT_cc:87:b0 (OnePlus 6T) | ATT | 10 | Rcvd Write Response, Handle: 0x0004 (Generic Attribute Profile: Service Changed: Client |

| | | | | | | |
|---|---|---|---|---|---|---|
| 529 | 13.872689 | e3:2a:d5:42:ec:ed (Versa 2) | OnePlusT_cc:87:b0 (OnePlus 6T) | ATT | 14 | Rcvd Write Request, Handle: 0x003a (Unknown: Unknown: Cli( |
| 530 | 13.874626 | OnePlusT_cc:87:b0 (OnePlus 6T) | e3:2a:d5:42:ec:ed (Versa 2) | ATT | 13 | Sent Write Request, Handle: 0x00f2 (Unknown: Unknown) |
| 531 | 13.878535 | OnePlusT_cc:87:b0 (OnePlus 6T) | e3:2a:d5:42:ec:ed (Versa 2) | ATT | 10 | Sent Write Response, Handle: 0x00f2 (Unknown: Unknown) |
| 532 | 13.917991 | controller | host | HCI_EVT | 8 | Rcvd Number of Completed Packets |
| 533 | 13.962343 | e3:2a:d5:42:ec:ed (Versa 2) | OnePlusT_cc:87:b0 (OnePlus 6T) | ATT | 10 | Rcvd Write Response, Handle: 0x00f2 (Unknown: Unknown) |

> *See, e.g.,* Bluetooth Sniffing Traffic Logs for the Fitbit Versa 2 Wearable (*see* above) and Fitbit Mobile Application (showing a Write Request is received by the Fitbit Versa 2 Wearable (*see* above) to configure the configuration descriptor of step counting (Attribute Handle value: 0x0004) and/or heart rate (Attribute Handle value: 0x00f2) characteristics and a Write Response is sent by the Fitbit Versa 2 Wearable (*see* above) enabling Bluetooth notifications for such.

*See* Appx1318-1319 (emphasis added). Thus, Fitbit's self-serving contention that the evidence of record fails to indicate infringement is plainly wrong, and should be rejected.

## C. FITBIT SOURCE CODE PERFORMS RECITED FUNCTION

As to this point, Fitbit contends that Cellspin purportedly "provided no

evidence that Fitbit's source code performs the pairing." Fitbit Red Br. at 42. This argument lacks merit, given that Mr. Vijh's opinions specifically incorporate the discussions and evidence contained in his Exhibits E, and specifically including the cited portion at 1.I.c of the '847 Patent. *See* Appx503-504 at ¶ 88 (citing Appx2007-2021). In his Exhibit E, as is customary throughout his Written Reports, Mr. Vijh elaborates and provides extensive evidentiary citations in support of his conclusions. Here, Mr. Vijh expressly finds the following: (i) "The Bluetooth chipset of the Fitbit Versa 2 Wearable *is configured to*, inter alia, establish, *and does establish*, a paired Bluetooth wireless connection between the Fitbit Versa 2 Wearable and the Bluetooth enabled cellular phone;" (ii) "the Fitbit Versa 2 Wearable *establishes a secure Bluetooth wireless connection* with the Bluetooth enabled cellular phone, including *as facilitated by the Fitbit Mobile Application*;" and (iii) "the Fitbit Versa 2 Wearable *establishes a paired Bluetooth connection* with the Bluetooth enabled cellular phone, and interacts with the Fitbit Mobile Application." Appx2007-2021. Further, Mr. Vijh identifies Fitbit Source Code which illustrates the Bluetooth pairing process "on the device." Appx503-504 at ¶ 88. In view of the foregoing, summary judgment was improper, given the evidence of record and the fully supported expert testimony concerning infringement.

The crux of Fitbit's argument seems to be in its erroneous position that the user necessarily "performs" the "establishing a paired Bluetooth connection"

because the user presses a button to initiate the process. *See* Fitbit Red Br. at 44. Citing nothing beyond attorney argument, Fitbit's strained reading of the Asserted Claims does not withstand scrutiny, as no individual user is capable of "establishing a Bluetooth connection" with anything. In any event, there exists, at bare minimum, an open jury question with respect to this issue such that summary judgment was improper.

### D. "PROVIDING A SOFTWARE MODULE" PERFORMED IN THE UNITED STATES

On this point, Mr. Vijh stated only that "it is obvious and necessarily true that the Accused Instrumentalities are each provided with a software module at the time they are manufactured *and shipped to consumers by the Defendant*." Appx0553 at ¶ 166) (emphasis added). Cellspin does *not* agree that the Accused Fitbit Wearables are shipped to consumers in the United States by someone outside the United States. The statement offered by Mr Vijh refers to the instance when a consumer in the United States makes a purchase and such device is delivered direct to the consumer. This same reasoning applies equally to all Defendants on this point.

### E. THE ACCUSED WEARABLES PERFORM DECRYPTION

In its Red Brief, Defendant Fitbit does not dispute the facts that: (i) encryption occurs on the Fitbit Wearable; (ii) encryption occurs on the Mobile Device; (iii) decryption occurs on the Mobile Device; and (iv) there is an exchange of cryptographic link keys during Bluetooth pairing. The argument offered by Fitbit is

that there is no *direct* evidence of "decryption on the Fitbit device." Of course, direct evidence as to all elements is not required, and the jury is free to consider circumstantial evidence of infringement. *Liquid Dynamics Corp. v. Vaughan Co.,* 449 F.3d 1209, 1219 (Fed. Cir. 2006). Again, because of the interactions of the Accused Instrumentalities, the evidence of record is sufficient to establish the facts of infringement. Stated differently, the fact that encryption takes place on the Mobile Device and the fact that the Fitbit Wearables operate in the manner in which they do, it is reasonable to conclude that the encrypted data is decrypted at the Wearable. The District Court erred in removing this issue from the jury.

## III. DEFENDANT GARMIN

Garmin, like the other Defendants, relies on caselaw intended to illustrate how Cellspin has purportedly improperly placed the entire burden on the Court to scour the entire record in an effort to glean the basis for infringement. Here, for example, Garmin cites *Novartis Corp. v. Ben Venue Labs., Inc*., 271 F.3d 1043, 1054 (Fed. Cir. 2001) for this purpose [Fitbit Red Br. at 2], but the expert in *Novartis* created an unexplained computer model purporting to prove how an infringing product could be created from the accused process. *Novartis,* 271 F.3d at 1054. Under those facts, this Court begrudgingly held that it was unable to evaluate the model, and thus affirmed summary judgment. No such issues exist here, and as discussed at length

in Cellspin's Blue Brief, the District Court plainly erred in granting summary judgment as to Garmin.

### A. "USER IDENTIFIER" AND "USER INFORMATION"

As to these limitations, Garmin argues that Cellspin's failure to seek leave to amend its contentions prior to serving its Expert Reports somehow justifies the District Court's actions in precluding Cellspin's infringement theories to proceed. *See* Dkt. 64 at 14-15 (hereafter as "Garmin Red Br."). Yet Garmin's argument is nonsensical, and if it were honest about the facts it would have reported the following: (i) Garmin's Source Code was produced on August 2, 2021; and (ii) the Expert Report on infringement as to Garmin was tendered on September 3, 2021. The notion that Cellspin should have reviewed all of Defendants' collective Source Code, prepared six Expert Reports, *and* moved for leave to amend its contentions in a single month lacks any credibility whatsoever. Under no circumstance was Cellspin anything short of diligent, and Garmin knows it.

With respect to Garmin's argument that Cellspin's failure to devote scarce pages of its Blue Brief to this issue specifically for Garmin, Plaintiff responds by pointing out the obvious fact that the District Court likewise devoted zero specific energies in discussing Garmin on this "user identifier" issue. *See* Appx0099-0100. Because the District Court's erroneous Order relied exclusively upon its faulty

findings relating to Fitbit, Cellspin here rests on its arguments *supra* specific to Fitbit concerning the "user identifier" and "user information" limitations.

## B. DIRECT INFRINGEMENT ("PAIRING")

With respect to "pairing," Garmin again follows Fitbit's lead in arguing that there is no evidence establishing the fact that Garmin's Accused Instrumentalities directly infringe this step. *See* Garmin Red Br. at 23-30. In its Opposition, Garmin makes much of Plaintiff's reliance on *SiRF*, but Garmin misapplies the law and the facts of this case.

According to Garmin, the rule in *SiRF* does not apply here, in view of this Court's decision in *Koninklijke Philips N.V. v. Zoll Med. Corp.,* 656 F. App'x 504, 521 (Fed. Cir. 2016). Garmin Red Br. at 23-30. But Garmin, and the other Defendants, seek to read-in limitations into the claims which do not exist; namely, the requirement that a user must activate the recited "establishing a paired connection." This is the exact argument considered and rejected by this Court in *SiRF,* and it should likewise be rejected here. *See SiRF Tech., Inc. v. ITC,* 601 F.3d 1319 (Fed. Cir. 2010) ("There exists no method step in any of the disputed claims that requires 'enabling' or 'activating' the devices that perform these claim limitations. Nor is there a step which requires 'downloading' the data into the GPS receiver. Appellants, in essence, ask us to read such limitations into the claims. We

decline to do so"). The rule in *SiRF* is perfectly applicable to the facts of this case, and the District Court erred.

Otherwise, Garmin offers much of the same argument as Fitbit. As such, Plaintiff restates and adopts its reply, as set forth *supra*.

### C. TEMPORAL ORDER

The opposition argument offered by Garmin largely mirrors that of Fitbit, as discussed in detail *supra*. As such, Plaintiff adopts and restates those arguments here. Broadly, Garmin makes the exact same mistake as Fitbit by reducing Mr. Vijh's opinions on this issue to a single summary paragraph. *See* Garmin Red Br. at 16-20. Again, the expert opinions of Mr. Vijh concerning the temporal order are plainly *not* limited to the single summary statement in ¶ 134 of his Written Report.

With respect to Garmin's complaints over the "persistent acquisition of data" carried out by its Accused Instrumentalities, and as discussed *supra* in relation to Fitbit, Mr. Vijh has explained (and Plaintiff has cited) how such a configuration evidences the straightforward fact that the Garmin Instrumentalities do indeed "acquire new data *after* the secure paired Bluetooth connection is established." *See, e.g.,* Appx1081-1082 at ¶ 114. Simply put, if the Garmin Instrumentalities acquire new data on a near-constant basis, there can be no other conclusion drawn except that such data is necessarily acquired both before and "after" pairing. Again, this is explained by Mr. Vijh in his Written Report. Appx1081-1082 at ¶ 114 (explaining

this concept and citing observation and Garmin Source Code).

With respect to Garmin's assertion that there is purportedly no evidence concerning the temporal performance of the claimed "event notifications limitation" [Garmin Red Br. at 19], Garmin needs look no further than Appx1095-1096 at ¶ 134, where Mr. Vijh discusses all temporal aspects and incorporates specific sections of his Written Report in support. In sum, Garmin's arguments fail for many of the same reasons as Fitbit, and the clearly erroneous District Court Order should be reversed.

### D. GARMIN DETECTS, SIGNALS, AND DETERMINES NEW DATA FOR TRANSFER

In his Written Report, Mr. Vijh cited the Source Code for the Accused Instrumentalities as was produced for inspection by Garmin. In the process, he cites to Code identified with the S-40 device because the Source Code written for one device is commonly used and compiled for other devices, especially when it is doing the same or similar function. Garmin does not dispute the fact that it has reused this cited Code for other devices. In any event, the cited Source Code is not the only evidence; rather, Mr. Vijh relies upon the Bluetooth sniffing logs and the numerous other documents cited in the Report. Further, Mr. Vijh states as follows: "This notification functionality is also observed via the Bluetooth sniffing logs present in Exhibit E at: '752 Exhibits 1-3 at Element 1.I.c. *See* Exhibit E at: '752 Exhibits 1-3 at Element 1.I.c; *see also* discussion above concerning Element 1.I.g of Claim 1 of

the '847 Patent. In my opinion, this element is met by the Accused Instrumentalities." *See* Appx1082-1083 at ¶ 115.

## IV. DEFENDANT FOSSIL

In its Response, Defendant Fossil seeks to punish Plaintiff for its word-constrained decision to combine substantially similar arguments across multiple Defendants in its omnibus opening Blue Brief. More specifically, Fossil argues that Plaintiff has "waived" all argument on appeal concerning any of "user identifier," "user information," and "signaling new data for transfer." *See* Dkt. 71 at 13-15 (hereafter as "Fossil Red Br."). Fossil's argument lacks merit, as Plaintiff's Blue Brief specifically incorporated by reference the base argument on the "user identifier" and "user information" elements as raised in the first instance by Defendant Fitbit; namely, that Plaintiff's "OAuth" arguments were improperly rejected by the District Court. *See* Blue Br. at 73. The fact that Plaintiff specifically adopted arguments from a different section of its Brief does not in any sense amount to a waiver as to Fossil.

Likewise, there is no waiver of the "signaling new data for transfer" limitation, given the fact that an entire section of the Blue Brief relating to Fossil is titled "signaling new data," and Plaintiff therein argues that the District Court "erred by weighing evidence against Cellspin at summary judgment, including the weighing of expert testimony and credibility as between Cellspin's expert (Vijh) and Fossil's

expert (Rysavy)." Blue Br. at 74. This argument is equally applicable to each of the "signaling new data for transfer" and "polling" limitations, as the District Court consistently erred in this regard. Specifically with respect to the "signaling" limitation, Mr. Vijh cites and relies upon Fossil Source Code as evidence of the infringing signaling functionality, along with his personal testing of the Accused Instrumentalities as set forth in his Exhibit E for Fossil. *See* Appx0860-0861 at ¶ 118 (citing Appx0845-0846 at ¶ 97; Appx5145-5151; and Appx7517-7527 (indicating event notifications, excerpted below:)).




*See, e.g.:* Bluetooth Sniffing Traffic Logs using the Fossil Hybrid Smartwatch HR Collider Wearable and Fossil Hybrid Smartwatches Mobile Application (showing a Bluetooth notification (Handle Value Notification) is sent by the Fossil Hybrid Smartwatch HR Collider Wearable and received by the Fossil Hybrid Smartwatches Mobile Application during a *real-time viewing* session of step counting (Attribute Handle value: 0x0048) and/or heart rate (Attribute Handle value: 0x004e) values).

A request to enable Bluetooth notifications is further shown to be received by the Fossil Hybrid Smartwatch Wearable from the Bluetooth enabled cellular phone by viewing a log of Bluetooth communication traffic, for example:

| | | | | |
|---|---|---|---|---|
| 54 15.818527 | controller | host | HCI_EVT | 14 Rcvd Number of Completed Packets |
| 55 15.987390 | localhost () | remote () | ATT | 23 Sent Write Request, Handle: 0x004b (Unknown) |
| 56 16.043226 | controller | host | HCI_EVT | 14 Rcvd Number of Completed Packets |
| 57 16.088722 | remote () | localhost () | ATT | 10 Rcvd Write Response, Handle: 0x004b (Unknown) |
| 58 16.089154 | remote () | localhost () | ATT | 32 Rcvd Handle Value Indication, Handle: 0x004b (Unknown) |

| | | | | |
|---|---|---|---|---|
| 40 15.653595 | controller | host | HCI_EVT | 14 Rcvd Number of Completed Packets |
| 41 15.685695 | localhost () | remote () | ATT | 23 Sent Write Request, Handle: 0x0045 (Unknown) |
| 42 15.698101 | controller | host | HCI_EVT | 14 Rcvd Number of Completed Packets |
| 43 15.712819 | remote () | localhost () | ATT | 10 Rcvd Write Response, Handle: 0x0045 (Unknown) |
| 44 15.728771 | remote () | localhost () | ATT | 21 Rcvd Handle Value Indication, Handle: 0x0045 (Unknown) |

*See* Appx7526-7527.

As argued by Cellspin, the District Court plainly erred in crediting the opinions of Mr. Rysavy over those of Mr. Vijh (which were supported by Source Code and specific reported testing results). *See* Appx0090 (District Court agreeing with Rysavy and rejecting Vijh). Cellspin has not waived this argument.

## A. "Cryptographically Authenticate"

The mantra carried by Fossil that Plaintiff and its expert cite to swaths of documents and never explain anything continues here, but Plaintiff has plainly identified specific evidence in Fossil's Source Code establishing the fact that the Accused Bluetooth Low Energy devices perform BLE Authentication:

> pertinent term ("paired")). Authentication is used in both Bluetooth LE Legacy Connection Pairing and Bluetooth LE Secure Connections Pairing, and both use cryptographic keys for authentication. The authentication step follows key generation in the pairing process, with one objective being to protect against "Man-In-The-Middle" (MITM) attacks. For example, FOSSIL-CS_SC-0000010-0000011 is capture device code detailing authentication during the pairing process. *See* Exhibit E at: '847 Exhibits 1-5 at Element 1.I.c.i. In my opinion, and based on my experience and training, and further including

*See* Appx0841 at ¶ 92. The District Court erred in failing to credit Mr. Vijh's qualified and factually supported opinions, and the Order must be reversed.

## V. DEFENDANT NIKON

Nikon's argument boils down to its faulty belief that the Asserted Claims specifically recite a specific Bluetooth channel, frequency, or version. They do not, and to the extent Nikon's Accused Instrumentalities establish a paired connection and acquire new data, they directly and literally infringe. This is precisely what they do, and no matter how many times Nikon claims a given fact is purportedly "unrebutted," Cellspin has identified more than sufficient evidence establishing the facts upon which infringement can and should be found. The District Court plainly erred, and its Order should be reversed.

### A. NIKON'S SO-CALLED "TWO-CONNECTION" PROCESS INFRINGES

The Asserted Claims each recite one of the following Bluetooth connections: (i) "the established paired Bluetooth connection" [the '794 Patent]; (ii) "the established secure paired Bluetooth connection" [the '752 Patent]; or (iii) "the

established paired Bluetooth wireless connection" [the '847 Patent]. Of course, each word of the Asserted Claims is important, and Nikon's error here (and that of the District Court) lies in the fact that *none* of the recited connections are specific to any single Bluetooth channel, frequency, or version. Rather, and as explained in Plaintiff's Blue Brief, under the District Court's construction the Accused Instrumentalities do indeed infringe, inasmuch as they each establish and maintain connections which persist "in the condition of having an exchanged link key (either before connection establishment was requested or during connection phase)."

Further, the evidence establishes the fact that the only way to *unpair* a Nikon Bluetooth connection is to deliberately force the unpairing to occur:



**Disconnecting and Reconnecting the Bluetooth Connection**

Use either of the following methods to switch the setting.

- **Network menu → Airplane mode** in the camera (You can set it to **On** to turn off all communication functions in places where wireless communication is prohibited.)
- **Network menu → Bluetooth → Connection** in the camera

**Unpairing**

Tap the [camera] tab → [•••] → **Forget camera** → Camera you want to unpair → **Yes** in the SnapBridge app. (During a Wi-Fi connection, tap [•••], and then tap **Yes**.)

For iOS, then tap **Go** and delete the registered device (camera name) in the iOS settings app.

*See* Appx8348. Further, Nikon's technical expert has not refuted this fact. Moreover, Cellspin offers direct Nikon Source Code evidence establishing the fact that the same **Tech Detail** are used throughout a given communications session between the Accused Nikon Instrumentalities, which confirms the fact that link keys have been exchanged. *See* Appx8213. In view of the foregoing, Nikon's argument falls flat, and it was clear error for the District Court to grant summary judgment. Only with expert testimony and rigorous cross examination will the jury be able to discern whether to credit Cellspin's technical expert and his opinions concerning infringement or Nikon's Expert.

### B. NIKON'S RELEVANT SERVERS ARE LOCATED IN THE UNITED STATES

Nikon does not dispute the fact that Cellspin's Infringement Contentions include "video" data. In its Contentions, Cellspin defined "Image Data" as "data associated with digital images and/or videos." *See* Appx8218. Further, it is undisputed that the "other data" (including specifically video data) is stored and processed in and by servers located in the United States. To the extent certain models and/or certain data types are served from outside the United States, such questions are resolved by the jury.

### C. "CRYPTOGRAPHICALLY AUTHENTICATE THE IDENTITY"

Cellspin's technical Expert cited to actual Nikon Source Code in support of his conclusion that the Accused Nikon Instrumentalities satisfy the "cryptographic

authentication" limitation. In its Red Brief, Nikon for the first time argues that "neither Cellspin's brief nor its evidence show that allegedly different authentication happens before acquiring data." Nikon Red Br. at 52. Even assuming certain portions of a video are captured prior to authentication, the fact remains that the Accused Instrumentalities are configured such that they capture video after authentication. Thus, to the extent damages are in question, the jury is in the best position to make damages determinations.

## VI. Defendant Under Armour

A primary argument offered by Under Armour rests on its assertion that the Accused Instrumentalities "go to sleep" at various intervals. As such, according to Under Armour, there can be no infringement. *See* Dkt. 66 at 25-26 (hereafter as "Under Armour Red Br."). The problem for Under Armour is that the "sleep" mode in Bluetooth is simply a "low power" connection state which nevertheless maintains a connection between the devices. Stated differently, the "sleep" state is *not* a "disconnected" state. *See* Appx8507-8508; *see also* Appx15739 (excerpted below):

BLUETOOTH SPECIFICATION Version 2.1 + EDR [vol 2] page 161 of 906

*Baseband Specification*

Bluetooth®




*Figure 8.5: Connection state.*

### 8.6 ACTIVE MODE

In the active mode, both master and slave actively participate on the channel. Up to seven slaves may be in the active mode at any given time. The master schedules the transmission based on traffic demands to and from the different slaves. In addition, it supports regular transmissions to keep slaves synchronized to the channel. Slaves in the active mode listen in the master-to-slave slots for packets. These devices are known as *active slaves*. If an active slave is not addressed, it may sleep until the next new master transmission. Slaves can derive the number of slots the master has reserved for transmission from the TYPE field in the packet header; during this time, the non-addressed slaves do not have to listen on the master-to-slave slots. When a device is participating in multiple piconets it should listen in the master-to-slave slot for the current

In Bluetooth, power consumption is mode-specific, whether it be "active," or "hold," "park," or "sleep." The only time power consumption reduces to *zero* is when there is a disconnect. Indeed, the figures relied upon by Under Armour actually establish the fact that there is *non-zero* power consumption, even during "sleep" mode. *See* Under Armour Red Br. at 26. Plainly, the connection is still alive and not disconnected. Once again, the District Court erred in rendering technical

determinations, which should properly be vetted by the jury following expert testimony and rigorous cross examination.

Further, it is undisputed that the Accused Under Armour Instrumentalities persistently acquire data. *See* Appx0747-0748 at ¶ 114. Even assigning credit to Under Armour's version of connectivity among its Accused Instrumentalities, there is no dispute that a paired Bluetooth connection is nevertheless established, even if limited in duration. As such, infringement is proven, at least for the time period of the admitted connection. Accordingly, summary judgment was improper.

## A. THE OPTIONAL BLUETOOTH FEATURES

In its Response, Under Armour relies heavily on the optional nature of certain features within the Bluetooth standards. *See, e.g.,* Under Armour Red Br. at 34. While this fundamental fact is not in dispute, the evidence of record nevertheless establishes that Under Armour does, in fact, implement features such that the Accused Instrumentalities directly and literally infringe. The evidence is cited with specificity by Mr. Vijh, and includes the following with respect to pairing and link key exchange: (i) Under Armour Technical Documents indicating pairing, key generation, and AES encryption (Appx8549-8550); (ii) Under Armour Source Code indicating pairing, BLE security, authentication, and encryption (Appx0745-0746 at ¶ 112; Appx0777; each citing Under Armour Source Code at Appx8510); and (iii) direct testing of the Under Armour Accused Instrumentalities, as recorded in detail

by Mr. Vijh in his Exhibits E (*see, e.g.,* Appx8540-8549 and Appx8590-8591). Again, Cellspin has not relied upon merely the Bluetooth standard to establish infringement; rather, it has cited and relied upon a wealth of evidence including Source Code, Technical Documents, Technical Witness Testimony, and physical testing. The District Court plainly erred, and the Order should be reversed.

## VII. DEFENDANT NIKE

The arguments raised by Nike depend upon the veracity and credibility of witnesses, including Nike's technical expert. Of course, Cellspin has presented compelling evidence of its own, including detailed expert testimony, which runs directly counter to Nike's self-serving version. As elsewhere, Cellspin and Mr. Vijh rely on specifically cited Nike Source Code, Nike Technical Documents, counter-testimony from Nike's own Technical Witnesses, and direct testing of the Accused Instrumentalities in infringing use. Among the evidence are screen captures taken by Mr. Vijh illustrating the fact that user information is stored and applied at the mobile device. *See* Appx9117. Likewise, Mr. Vijh illustrates the fact that user information and user identifier is first configured on the mobile device; the Nike Watch Mobile Application does not possess an interface for initial login without the Mobile Application. *See* Appx9019-9021. Still further, Mr. Vijh illustrates the fact that user information is present and applied in and by the Nike Mobile Application. *See* Appx9131. Still further, Mr. Vijh physically tested the Accused

Instrumentalities and confirmed the communications between the Nike Mobile Application and the Nike Website. *See* Appx9131-9132. It was thus clear error for the District Court to reject Cellspin's substantial evidence and the testimony of Mr. Vijh, upon which a reasonable juror could certainly find infringement.

With respect to Nike's argument that Cellspin's failure to obtain Source Code directly from Apple is fatal to its case, Cellspin again points out that infringement can be, and has been, shown through the Nike Source Code (including the NRC Watch Code and the NRC Mobile Application Code) without the need to obtain third party discovery. Indeed, Nike admits the fact that its Mobile Application sends data via the mobile device to the cloud server. *See* Dkt. No. 72 at 15 (hereafter the "Nike Red Br.") (Nike states: "the Nike app sends the data packet through an iPhone on its way to the Nike cloud server"). Again, it is Cellspin's contention that the Nike Mobile Application on the infringing watch is plainly designed to work in all three connectivity scenarios: (i) GPS; (ii) Wi-Fi; and (iii) Bluetooth. In the Bluetooth scenario, the evidence supports the inference and finding that the infringing user identifier is applied at the mobile device.

## VIII. CONCLUSION AND PRAYER FOR RELIEF

The District Court's erroneous Order granting summary judgment as to each Defendant should be reversed, and these matters should be remanded for further proceedings and individual trials on the merits.

Dated: May 1, 2023

*<u>/s/ M Scott Fuller</u>*
Randall Garteiser
rgarteiser@ghiplaw.com
(415) 568-0553
Christopher A. Honea
chonea@ghiplaw.com
(918) 510-5375
M. Scott Fuller
sfuller@ghiplaw.com
(214) 729-6548
**GARTEISER HONEA PLLC**
119 West Ferguson Street
Tyler, Texas 75702
Main Telephone: (415) 785-3762
Facsimile: (415) 785-3805

*Attorneys for Plaintiff-Appellant*
CELLSPIN SOFT, INC.

## CERTIFICATE OF COMPLIANCE

This Brief complies with the type-volume limitation of Federal Circuit Rule 32(b) as modified by Order of the Court at Docket No. 37. This Brief contains 6,857 words, excluding those portions of the brief exempted by Federal Circuit Rule 32(b)(2). This Brief has been prepared in a proportionally spaced typeface using Microsoft Office Word 14-point Times New Roman font.

/s/ *M. Scott Fuller*
M. Scott Fuller

## CERTIFICATE OF CONFIDENTIAL MATERIAL

The foregoing Brief contains 2 unique text words (in addition to PDF text from Source Code excerpts at pp. 9 and 10) marked Confidential and protected by the parties in the District Court.

/s/ *M. Scott Fuller*
M. Scott Fuller

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the above and foregoing document has been served on January 10, 2023 to all counsel of record who are deemed to have consented to electronic service via the Court's CM/ECF system. To the extent confidential information is contained herein, the above and foregoing document will be served to all counsel of record via electronic mail.

/s/ *M. Scott Fuller*
M. Scott Fuller